pecified amount or amounts for meals /hile traveling away from home in lieu f substantiating the actual cost of 1eals. The taxpayer would not be reeved of substantiating the actual cost f other travel expenses as well as the ime, place, and business purpose of ne travel. See paragraphs (b)(2) and c) of this section.

(k) *Exceptions for qualified onpersonal use vehicles*—(1) *In general.* The substantiation requirements f section 274(d) and this section do 1ot apply to any qualified nonpersonal 1se vehicle (as defined in paragraph k)(2) of this section).

(2) *Qualified nonpersonal use ehicle*—(i) *In general.* For purposes of ection 274(d) and this section, the erm "qualified nonpersonal use vehi-le" means any vehicle which, by rea-.on of its nature (i.e., design), is not likely to be used more than a de ninimis amount for personal purposes.

(ii) *List of vehicles.* Vehicles which ire qualified nonpersonal use vehicles nclude the following—

(A) Clearly marked police and fire vehicles (as defined and to the extent provided in paragraph (k)(3) of this section),

(B) Ambulances used as such or nearses used as such,

(C) Any vehicle designed to carry cargo with a loaded gross vehicle weight over 14,000 pounds,

(D) Bucket trucks ("cherry pickers"),

(E) Cement mixers,

(F) Combines,

(G) Cranes and derricks,

(H) Delivery trucks with seating only for the driver, or only for the driver plus a folding jump seat,

(I) Dump trucks (including garbage trucks),

(J) Flatbed trucks,

(K) Forklifts,

(L) Passenger buses used as such with a capacity of at least 20 passengers,

(M) Qualified moving vans (as defined in paragraph (k)(4) of this section),

(N) Qualified specialized utility repair trucks (as defined in paragraph (k)(5) of this section),

(O) Refrigerated trucks,

(P) School buses (as defined in section 4221(d)(7)(C)),

(Q) Tractors and other special purpose farm vehicles,

(R) Unmarked vehicles used by law enforcement officers (as defined in paragraph (k)(6) of this section) if the use is officially authorized, and

(S) Such other vehicles as the Commissioner may designate.

(3) *Clearly marked police or fire vehicles.* A police or fire vehicle is a vehicle, owned or leased by a governmental unit, or any agency or instrumentality thereof, that is required to be used for commuting by a police officer or fire fighter who, when not on a regular shift, is on call at all times, provided that any personal use (other than commuting) of the vehicle outside the limit of the police officer's arrest powers or the fire fighter's obligation to respond to an emergency is prohibited by such governmental unit. A police or fire vehicle is clearly marked if, through painted insignia or words, it is readily apparent that the vehicle is a police or fire vehicle. A marking on a license plate is not a clear marking for purpose of this paragraph (k).

(4) *Qualified moving van.* The term "qualified moving van" means any truck or van used by a professional moving company in the trade or business of moving household or business goods if—

(i) No personal use of the van is allowed other than for travel to and from a move site (or for de minimis personal use, such as a stop for lunch on the way between two move sites),

(ii) Personal use for travel to and from a move site is an irregular practice (i.e., not more than five times a month on average), and

(iii) Personal use is limited to situations in which it is more convenient to the employer, because of the location of the employee's residence in relation to the location of the move site, for the van not to be returned to the employer's business location.

(5) *Qualified specialized utility repair truck.* The term "qualified specialized utility repair truck" means any truck (not including a van or pickup truck) specifically designed and used to carry heavy tools, testing equipment, or parts if—

(i) The shelves, racks, or other permanent interior construction which has been installed to carry and store such heavy items is such that it is unlikely

that the truck will be used more than a de minimis amount for personal purposes, and

(ii) The employer requires the employee to drive the truck home in order to be able to respond in emergency situations for purposes of restoring or maintaining electricity, gas, telephone, water, sewer, or steam utility services.

(6) *Unmarked law enforcement vehicles*—(i) *In general.* The substantiation requirements of section 274(d) and this section do not apply to officially authorized uses of an unmarked vehicle by a "law enforcement officer". To qualify for this exception, any personal use must be authorized by the Federal, State, county, or local governmental agency or department that owns or leases the vehicle and employs the officer, and must be incident to law-enforcement functions, such as being able to report directly from home to a stakeout or surveillance site, or to an emergency situation. Use of an unmarked vehicle for vacation or recreation trips cannot qualify as an authorized use.

(ii) *Law enforcement officer.* The term "law enforcement officer" means an individual who is employed on a full-time basis by a governmental unit that is responsible for the prevention or investigation of crime involving injury to persons or property (including apprehension or detention of persons for such crimes), who is authorized by law to carry firearms, execute search warrants, and to make arrests (other than merely a citizen's arrest), and who regularly carries firearms (except when it is not possible to do so because of the requirements of undercover work). The term "law enforcement officer" may include an arson investigator if the investigator otherwise meets the requirements of this paragraph (i)(6)(ii), but does not include Internal Revenue Service special agents.

(7) *Trucks and vans.* The substantiation requirements of section 274(d) and this section apply generally to any pickup truck or van, unless the truck or van has been specially modified with the result that it is not likely to be used more than a de minimis amount for personal purposes. For example, a van that has only a front bench for seating, in which permanent shelving that fills most of the cargo area has been in-

Ex 1  pp 001-228

*(left margin fragments)*

also made
nd 16 em-
law which
t bar and

the entire
ldequately
ough the
r to what
assume as
2, and did
atory neg-
on 13, the
y instruct-
gence and
there was
"ordinary
The Court
ing it the
approach-
nechanical
of an ap-
½, § 180.
that rail-
)laces, and
a highway
d right-of-
with that
mensurate

he learned
:ould have
o just how
d instruc-
ced with a
ually, in-
before the
idge is, at
for time to
form, for
:ollows im-
have con-
any times
cover in
as the prin-
judge pre-
ge. Many
are repeti-
l with the
5 cause.

t stated to
id 13 would
neral prin-

---

ciple involved would be submitted. No claim of error is made as to any of the instructions which were given. In our opinion reversible error has not been shown.

Judgment affirmed.



Art JOHNSTON, Appellant,

v.

Hugh EARLE, Collector of Internal Revenue, Walter S. Shanks, Irwin Borthick and Irving H. Curran, Appellees.

No. 14951.

United States Court of Appeals Ninth Circuit.

Feb. 28, 1957.

Action against two officers of the Internal Revenue Bureau for alleged tortious seizure and conversion to their own use of a tractor belonging to plaintiff. The United States District Court for the District of Oregon, Claude McColloch, Chief Judge, entered judgment adverse to plaintiff and he appealed. The Court of Appeals, Denman, Chief Judge, held that jurisdiction of claim against defendants holding offices in Bureau of Internal Revenue, individually, based on tortious conversion of plaintiff's property, based on Oregon law, is not conferred on federal courts under statute conferring jurisdiction on district courts over any seizure under any law of the United States, nor under statute giving District Courts original jurisdiction of a civil action arising under any internal revenue laws, nor under statute providing District Courts shall have original jurisdiction of all civil actions where amount in controversy exceeds $3,000 and arises under the Constitution or laws of the United States.

Judgment reversed with directions.
245 F.2d—50½

**Courts ☞284, 297**

Jurisdiction of claim against defendants holding offices in Bureau of Internal Revenue, individually, based on tortious conversion of plaintiff's property, based on Oregon law, is not conferred on federal courts under statute conferring jurisdiction on District Courts over any seizure under any law of the United States, nor under statute giving District Courts original jurisdiction of a civil action arising under any internal revenue laws, nor under statute providing District Courts shall have original jurisdiction of all civil actions where amount in controversy exceeds $3,000 and arises under the Constitution or laws of the United States. 28 U.S.C.A. §§ 1331, 1340, 1356, 1442.

---

Warde H. Erwin, Barzee, Leedy & Erwin, Portland, Ore., for appellant.

Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, A. F. Prescott and George F. Lynch, Attys., Dept. of Justice, Washington, D. C., Clarence E. Luckey, U. S. Atty., Edward J. Georgeff, Asst. U. S. Atty., Portland, Ore., for appellees.

Before DENMAN, Chief Judge, and POPE and CHAMBERS, Circuit Judges.

DENMAN, Chief Judge.

Johnston, a citizen of the State of Oregon, appeals from a judgment in a suit against appellees, also citizens of Oregon, each holding offices in the Internal Revenue Bureau. The judgment held that appellant could not recover on his complaint that defendants had tortiously seized and converted to their own use a caterpillar tractor belonging to Johnston, because the evidence failed to show they were not entitled to do so in their official capacities as federal revenue officers acting in a federal tax levy.

The controlling matter of this appeal is the question of jurisdiction. It is not a diversity case. The question is whether the acts of the appellees violated the Federal Constitution or federal law, or are they only a violation of a state law against tortious conversion. There was

a pretrial at which the government's officers' contention of lack of jurisdiction was stated as follows:

"Contentions of Defendants. 1. Neither diversity of citizenship nor a substantial federal question exists in this cause and therefore the court does not have jurisdiction of the cause. This is not a cause arising under 28 U.S.C. § 1331, 28 U.S.C. § 1340, 28 U.S.C. § 1356 or the laws or constitution of the United States [as contended by plaintiff]. The issue of jurisdiction should be segregated and determined before any of the other issues are tried."

The court held it had jurisdiction.

However, when these federal officers had secured a favorable judgment that their acts were not illegal, they abandoned their contention that the court lacked jurisdiction of the subject matter of the case and in their brief on appeal state the "sole issue"[1] *here* is whether the district court properly determined the merits. Such an abandonment of the contention of lack of jurisdiction cannot create it where absent, however, pleasing to these office holders it would be if we sustained their successful contentions on the merits below. We agree that the several grounds of jurisdiction claimed by Johnston are not valid.

A. *Jurisdiction of the claim based on a tortious conversion under the Oregon law is not conferred on the federal courts by 28 U.S.C. § 1356.*

This section provides:

"§ 1356. *Seizures not within admiralty and martime jurisdiction.* The district courts shall have original jurisdiction, exclusive of the courts of the States, of any seizure under any law of the United States on land or upon waters not within admiralty and maritime jurisdiction."

Here the complaint alleges that the seizure was *not* under any law of the United States. The law was first stated in Section 9 of the Judiciary Act of 1789, 1 Stat. 77, as follows: "the district courts * * * shall also have exclusive original cognizance of all seizures on land * * * and of all suits for penalties and forfeitures incurred, under the laws of the United States."

That the federal courts had no jurisdiction under it for damages for conversion was early determined in the case of Slocum v. Mayberry, 1817, 2 Wheat. 1, 15 U.S. 1, 4 L.Ed. 169. There, as here, a seizure had been made of certain cargo on a vessel by the United States surveyor of customs under the direction of the director of customs. The cargo owners brought an action in replevin in the state court of Rhode Island for the restoration of the cargo.

The Supreme Court sustained the Rhode Island court in holding that, in the absence of authority under the laws of the United States to seize the cargo, its owners could replevy it in a state tribunal. The Supreme Court continued to state what is obvious from the face of the statute:

"If the officer has a right, under the laws of the United States, to seize for a supposed forfeiture, the question, whether that forfeiture has been actually incurred, belongs exclusively to the federal courts, and cannot be drawn to another *forum;* and it depends upon the final decree of such courts, whether such seizure is to be deemed rightful or tortious. If the seizing officer should refuse to institute proceedings to ascertain the forfeiture, the court may, upon the application of the aggrieved party, compel the officer to proceed to adjudication, or to abandon the seizure. And if the seizure be finally ad-

1. "Summary of Argument. *The sole issue herein is* whether a Collector and Deputy Collectors of Internal Revenue may be held liable for damages for the alleged unlawful conversion of certain property (a caterpillar tractor) of appellant,

where the acts of the officials in levying upon the property were performed entirely within the scope of the authority vested in them by law." [Emphasis supplied.]

es that the sei-
r of the United
stated in Sec-
Act of 1789, 1
district courts
elusive original
n land * * *
ilties and for-
he laws of the

had no juris-
ges for conver-
7, 2 Wheat. 1,
There, as here,
f certain cargo
States surveyor
rection of the
e cargo owners
vin in the state
the restoration

sustained the
ing that, in the
er the laws of
e the cargo, its
n a state tribu-
t continued to
om the face of

right, under
ed States, to
orfeiture, the
forfeiture has
, belongs ex-
l courts, and
other *forum*;
e final decree
e such seizure
al or tortious.
ould refuse to
ascertain the
nay, upon the
rieved party,
roceed to ad-
on the seizure.
e finally ad-

icials in levying
performed en-
f the authority
[Emphasis sup-

judged wrongful, and without rea-
sonable cause, he may proceed, at his
election, by a suit at common law, or
in the admiralty, for damages for
the illegal act. *Yet, even in that
case, any remedy which the law may
afford to the party supposing himself
to be aggrieved, other than such as
might be obtained in a court of ad-
miralty, could be prosecuted only in
the state court. The common-law
tribunals of the United States are
closed against such applications,
were the party disposed to make
them."* [Emphasis supplied.] 2
Wheat. 9, 15 U.S. at 9.

*B. Jurisdiction for the claim of tor-
tious conversion is not created by 28
U.S.C. § 1340.*

This statute provides:

"§ 1340. *Internal revenue; cus-
toms duties.* The district courts
shall have original jurisdiction of
any civil action arising under any
Act of Congress providing for in-
ternal revenue, or revenue from im-
ports or tonnage except matters
within the jurisdiction of the Cus-
toms Court."

The complaint's claim for recovery of
damages for the tortious conversion of
of the appellant's property by defendants
is not one "arising under any Act of
Congress providing for internal reve-
nue." The basic theory of the complaint
is not the return of federal taxes alleged
to have been wrongfully assessed as in
Roybark v. United States, 9 Cir., 1954,
218 F.2d 164; Loetscher Co. v. Birming-
ham, D.C.Iowa 1950, 95 F.Supp. 892,
affirmed, 8 Cir., 1951, 188 F.2d 78, or for
the return of property wrongfully seized
as in Stuart v. Chinese Chamber of Com-
merce, 9 Cir., 1948, 168 F.2d 709. The
recovery sought is solely for a state tort
by one citizen of the state against other
citizens of the same state.

*C. Nor is the jurisdiction in the
United States District Court created by
28 U.S.C. § 1331.*

We do not think that the district court
was entitled to determine the merits of

the issues of fact presented by the com-
plaint under Title 28 U.S.C. § 1331. This
section reads:

"§ 1331. *Federal question;
amount in controversy.* The district
courts shall have original jurisdic-
tion of all civil actions wherein the
matter in controversy exceeds the
sum or value of $3,000, exclusive of
interest and costs, and arises under
the Constitution, laws or treaties of
the United States."

It is clear that the mere fact that a
suit is against a federal officer does not
support original jurisdiction thereof in
the United States district courts on the
ground that it is a case arising under the
laws of the United States within the
meaning of this section. This neces-
sarily follows from Section 1442, Title 28
U.S.C., which provides for the *removal by
the defendant* of such a suit from a state
court to a federal district court where the
act complained of is claimed to have been
done under the authority of the United
States. Where Congress has intended to
create original federal jurisdiction over
suits against certain types of federal offi-
cials, such as United States Marshals, it
has expressly provided for such jurisdic-
tion by statute. See, e.g., 28 U.S.C. §
544; Bedenbaugh v. National Surety
Corporation, 5 Cir., 1955, 227 F.2d 102.
It is not contended that any such special
statute is applicable here.

Nor can jurisdiction be sustained on
the ground that the plaintiff's complaint
alleges that defendants may plead in
their answer that their acts were within
the scope of their authority as federal
officers. Skelly Oil Co. v. Phillips Petro-
leum Co., 1950, 339 U.S. 667, 672, 70 S.
Ct. 876, 94 L.Ed. 1194.

Jurisdiction in the present case, there-
fore, can be sustained only if, by his al-
legation that the acts of the appellees
"deprived plaintiff of the property with-
out just compensation and without the
process of law contrary to the Constitu-
tion of the United States", appellant has
asserted a federal cause of action. Of
course, courts have jurisdiction to deter-
mine whether or not the subject matter

of the complaint presents a cause which they can entertain. The Fair v. Kohler Die & Specialty Co., 1913, 228 U.S. 22, 25, 33 S.Ct. 410, 57 L.Ed. 716.

This is not a case like Bell v. Hood, 1946, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939, where the district court decided it lacked jurisdiction even to consider whether it had jurisdiction of the subject matter of the complaint. Here the district court decided it had such jurisdiction,[2] and we are called upon to determine whether the tortious taking of property by federal officials acting beyond the scope of their authority which undoubtedly is a tort cognizable in a state court also creates a cause of action cognizable in the United States District Court because it is alleged this action violates the Fifth Amendment.

In Bell v. Hood, the refusal of the district court to consider this question, and its affirmance by the court of appeals[3] was reversed, and the cause returned to the district court to determine whether the complaint stated a federal cause of action.

2. Unlike Lowe v. Manhattan Beach City School District of Los Angeles County, 222 F.2d 258, 9 Cir., 1955, where the district court held it had no jurisdiction.

3. Bell v. Hood, 9 Cir., 1945, 150 F.2d 96.

4. Bell v. Hood, D.C.S.D.Cal.1947, 71 F. Supp. 813.

5. That the Fifth Amendment applies only to the acts of the federal government is settled beyond doubt. See, e. g., Spies v. People of the State of Illinois, 1887, 123 U.S. 131, 166, 8 S.Ct. 21, 31 L.Ed. 80; Burdeau v. McDowell, 1921, 256 U.S. 465, 476, 41 S.Ct. 574, 65 L. Ed. 1048. In Feldman v. United States, 1944, 322 U.S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408, the Court said: "* * * [F]or more than one hundred years, ever since Barron v. [Mayor and City Council of City of] Baltimore [1833], 7 Pet. 243 [32 U.S. 243], 8 L.Ed. 672, one of the principles of our Constitution has been that these [the Fourth and Fifth] Amendments protect only against invasion of civil liberties by the Government whose conduct they alone limit. Brown v. Walker, 161 U.S. 591, 606, 16 S.Ct. 644, 650, 40 L.Ed. 819; Jack

On its return to the district court, that court, in a very able opinion by Judge Mathes, held that no federal cause of action existed for the acts of federal officials violating the Fourth and Fifth Amendments.[4] His reasoning is that the due process clause of the Fifth Amendment applies only to the federal government,[5] and not to individuals.[6]

In fine, the federal government has created no cause of action enforceable in its courts for such torts under the state law, and hence the district court here lacked jurisdiction of the subject matter.

Judgment is reversed, and the district court ordered to enter an order dismissing the action for failure to state a claim arising under the laws of the United States.

CHAMBERS, Circuit Judge (concurring).

I believe that here we have a case where the Congress by legislation could give us jurisdiction. I do not believe that it has. Plaintiff seeks no relief against the United States government. He wants it off of the private hide of gov-

v. [State of] Kansas, 199 U.S. 372, 380, 26 S.Ct. 73, 75, 50 L.Ed. 234; Twining v. [State of] New Jersey, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97." 322 U.S. at page 490, 64 S.Ct. 1083.

6. Mr. Justice Black stated in Bell v. Hood that "whether federal courts can grant money recovery for damages said to have been suffered as a result of federal officers violating the Fourth and Fifth Amendments" is a question which "has never been specifically decided by this Court." 327 U.S. at page 684, 66 S.Ct. 777. In Weeks v. United States, 1914, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, however, the Supreme Court clearly indicated that there was no civil action for damages based upon the Fourth Amendment against officers who had violated it seizing plaintiff's property. Speaking of the possible nonfederal liability of the offending officers, the Court said: "What remedies the defendant may have against them we need not inquire, as the 4th Amendment is not directed to individual misconduct of such officials. Its limitations reach the Federal government and its agencies." 232 U.S. at page 398, 34 S.Ct. 346.

:e from the Cal-
*solidated Data*
*ital Data Sys-*
) (9th Cir.1983).

California has
: liability to the
-act," lest "tort
the expectations
*Direct Buying*
*il Company of*
769, 686 P.2d
otr. 354, 362–3
re open the pos-
: recognized in
than those of
contracts "char-
public interest,
onsibility." *Id.*
:06 Cal.Rptr. at
detect elements
.ry relation that
:hip close to one
ice. California
.uation a tort ac-
termination or

Premier asks
ies paid to its
Gallo products
fee under the
Act and that
: Franchise Act
ranchisor. It is
ide this conten-
ichise Act. Sec-
liability to the
: for damages
ified Laws Ann.
not shown that
by this alleged

her significance
lo was a fran-
-duty might be
A broad holding
orts this theory.
:., 609 F.2d 873,
*enied,* 446 U.S.
d.2d 272 (1980).
retreated from
that it did not

mean that in South Dakota a franchise relationship alone will create a fiduciary relation. *See Bain v. Champlin Petroleum Co.,* 692 F.2d 43, 48 (8th Cir.1982). Premier makes no other showing that fiduciary duties existed, and the bare franchisor/franchisee relation which it claims is not enough to establish such obligations between a producer and a non-exclusive distributor.

AFFIRMED.



**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**William Waldo EMERSON,**
**Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Scott WOLLMAN, Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Bruce EHRLICH, Defendant-Appellant.**

**Nos. 86–5267, 86–5274 and 86–5275.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 2, 1987.

Decided May 10, 1988.

Defendants were convicted in the United States District Court for the Central District of California, Dickran M. Tevrizian, Jr., J., of distributing and conspiring to distribute 3,4–methylenedioxymethamphetamine, also known as MDMA or Ecstasy, pursuant to their guilty pleas, and they appealed. The Court of Appeals, Boochever, Circuit Judge, held that Administra-

tor of the Drug Enforcement Agency lacked authority to schedule drug temporarily in Schedule I, pursuant to the Dangerous Drug Diversion Control Act, absent delegation of authority from Attorney General.

Reversed.

Wiggins, Circuit Judge, filed dissenting opinion.

**1. Administrative Law and Procedure**
 **⟐651**

Constitutional review of agency action is presumed to be available, absent clear and convincing evidence that Congress intended to preclude constitutional review.

**2. Criminal Law ⟐1134(3)**

Court of Appeals could review on appeal from criminal conviction constitutionality of DEA Administrator's scheduling drug temporarily as controlled substance pursuant to the Dangerous Drug Diversion Control Act, notwithstanding provision in Act that temporary scheduling order was not subject to judicial review. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 201(h)(1, 6), as amended, 21 U.S.C.A. § 811(h) (1, 6).

**3. Constitutional Law ⟐62(5)**
 **Drugs and Narcotics ⟐43**

Dangerous Drug Diversion Control Act, which permitted Attorney General to schedule temporarily in Schedule I previously unscheduled substance upon finding action necessary to avoid imminent hazard to public safety, was permissible delegation of congressional power, despite lack of notice and comment and restriction of judicial review. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 201(h), (h)(1)(A), (h)(6), as amended, 21 U.S.C.A. § 811(h), (h)(1)(A), (h)(6).

**4. Constitutional Law ⟐258(3)**
 **Drugs and Narcotics ⟐43**

Dangerous Drug Diversion Control Act, which permitted the Attorney General to schedule temporarily in Schedule I previously unscheduled substance upon finding action necessary to avoid imminent hazard to public safety, did not violate constitu-

tional due process guarantee; harsh punishment of those who distribute substances posing imminent hazard to public safety was not irrational means of reducing that hazard, and fact that no scheduling distinction was made between those drugs found by Attorney General to pose varying degrees of imminent hazard did not affect Act's rationality. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 201(h), as amended, 21 U.S.C.A. § 811(h).

**5. Drugs and Narcotics ⚖46**

Attorney General's delegation to DEA Administrator of his power to schedule substance permanently under the Controlled Substances Act did not effectively delegate Attorney General's power to schedule drugs temporarily under the Dangerous Drug Diversion Control Act, which amended the Controlled Substances Act, and, therefore, Administrator did not have authority to temporarily schedule drug as controlled substance, and defendants could not be convicted of distributing and conspiring to distribute drug. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 201(h), (h)(1, 6), as amended, 21 U.S.C.A. § 811(h), (h)(1, 6).

---

Yolanda Orozco, Los Angeles, Cal., for defendant-appellant Emerson.

Michael D. Nasatir, Nasatir & Hirsch, Santa Monica, Cal., for defendant-appellant Ehrlich.

J. Brendan O'Neill, Santa Monica, Cal., for defendant-appellant Wollman.

Michael W. Emmick, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Appeal from the United States District Court for the Central District of California.

Before HUG, BOOCHEVER and WIGGINS, Circuit Judges.

BOOCHEVER, Circuit Judge:

William Waldo Emerson, Scott Wollman, and Bruce Ehrlich (defendants) appeal their convictions under 21 U.S.C. §§ 841(a)(1) and 846 (1982) for distributing and conspiring to distribute 3,4–methylenedioxymeth-

amphetamine, also known as MDMA or Ecstasy (MDMA). Defendants challenge the temporary scheduling of MDMA as a controlled substance by the Administrator of the Drug Enforcement Agency (Administrator) under 21 U.S.C. § 811(h) (Supp.III 1985). We hold that the Attorney General did not properly subdelegate his authority temporarily to schedule drugs to the Administrator and reverse the convictions.

## BACKGROUND

Defendants were indicted for their activities involving the distribution of MDMA from or before September 1985 to February 1986. Defendants moved to dismiss the indictment on the ground that the Administrator improperly scheduled MDMA as a temporarily controlled substance. The district court denied the motion. Defendant Emerson then pled guilty to conspiracy to distribute a controlled substance. Defendants Wollman and Ehrlich pled guilty to distribution and conspiracy to distribute a controlled substance. All pleas reserved the right to appeal the court's order upholding the temporary scheduling of MDMA. The defendants timely appeal to this court under 28 U.S.C. § 1291 (1982).

## ANALYSIS

The Controlled Substances Act, Pub.L. No. 91–513, tit. II, 84 Stat. 1242 (1970) (codified as amended at 21 U.S.C. §§ 801–904 (1982 & Supp.III 1985)), prohibits the distribution of a "controlled substance." 21 U.S.C. § 841(a)(1) (1982). Penalties vary according to the scheduling of the substance. *Id.* § 841(b) (1982). The scheduling of a particular drug (from Schedule I to V in decreasing order of severity of penalty) depends on the drug's potential for abuse, its currently accepted medical use in the United States, and its safety for use or potential for dependency. *Id.* § 812(b) (1982). Congress initially established schedules for a number of substances, *id.* § 812(c) (1982), and authorized the Attorney General to schedule, transfer between schedules, or remove a substance from a schedule, *id.* § 811(a) (1982).

Case 3:03-cv-00065-MCR-MD   Document 52-2   Filed 11/18/03   Page 8 of 65

To add a substance to a schedule under the "permanent" scheduling authority, the Attorney General must find the substance has "a potential for abuse" and make the requisite findings of section 812. *Id.* § 811(a)(1) (1982). In making these findings, the Attorney General must consider the following factors with respect to each drug:

(1) Its actual or relative potential for abuse.

(2) Scientific evidence of its pharmacological effect, if known.

(3) The state of current scientific knowledge regarding the drug or other substance.

(4) Its history and current pattern of abuse.

(5) The scope, duration, and significance of abuse.

(6) What, if any, risk there is to the public health.

(7) Its psychic or physiological dependence liability.

(8) Whether the substance is an immediate precursor of a substance already controlled under this subchapter.

*Id.* § 811(c) (1982). The Attorney General must also request an evaluation by the Secretary of Health and Human Services (Secretary). *Id.* § 811(b) (1982). If after weighing the scientific and medical considerations involved in the above eight factors the Secretary recommends against controlling the drug, the Attorney General must honor that decision. *Id.* Finally, any scheduling by the Attorney General must be made in accordance with the formal rule-making requirements of the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–559 (1982 & Supp.IV 1986). 21 U.S.C. § 811(a). In 1973, pursuant to authority granted by 21 U.S.C. § 871(a) (1970), the Attorney General delegated the performance of his functions under the Controlled Substances Act to the Administrator. 28 C.F.R. § 0.100(b) (1986).

Congress recognized that permanent scheduling could take from six to twelve months, during which time "enforcement actions against traffickers are severely limited and a serious health problem may arise." S.Rep. No. 225, 98th Cong., 2d Sess. 264, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3446; *see also* H.R.Rep. No. 835, 98th Cong., 2d Sess., pt. 1, at 11–12 (1984). As a result, Congress amended the Controlled Substances Act in 1984 to authorize the Attorney General to schedule substances on an emergency basis without "await[ing] the exhaustive medical and scientific determinations ordinarily required when a drug is being considered for control." S.Rep. No. 225, 98th Cong., 2d Sess. 265, *reprinted in* 1984 U.S.Code Cong. & Admin.News at 3447. The amendment, the Dangerous Drug Diversion Control Act of 1984 (1984 Act), Pub.L. No. 98–473, tit. II, sec. 508, 98 Stat. 2070, 2071–72 (codified at 21 U.S.C. § 811(h) (Supp. III 1985)), permits the Attorney General to schedule temporarily in Schedule I a previously unscheduled substance upon finding this action "necessary to avoid an imminent hazard to the public safety." 21 U.S.C. § 811(h)(1). In making this finding the Attorney General must consider only "those factors set forth in [21 U.S.C. § 811(c)(4), (5), and (6)], including actual abuse, diversion from legitimate channels, and clandestine importation, manufacture, or distribution." *Id.* § 811(h)(3). While the Attorney General must transmit proposed orders to the Secretary, he need only "take into consideration any comments submitted by the Secretary." *Id.* § 811(h)(4). The temporary scheduling expires at the end of one year, with one six-month extension permitted if the Attorney General has undertaken permanent scheduling efforts pursuant to section 811(a)(1). *Id.* § 811(h)(2).

On May 31, 1985, acting pursuant to the 1973 delegation and the Attorney General's temporary scheduling authority under 21 U.S.C. § 811(h), the Administrator issued a notice including an order temporarily scheduling MDMA as a Schedule I controlled substance effective July 1, 1985. Schedules of Controlled Substances; Temporary Placement of 3,4–Methylenedioxymethamphetamine (MDMA) Into Schedule

I, 50 Fed.Reg. 23,118, 23,119 (1985).[1]

## I. REVIEWABILITY

Defendants challenge the constitutionality of section 811(h), the Administrator's general authority to schedule substances temporarily, and the propriety of the particular MDMA scheduling order. Ordinarily these issues would be properly before the court in a criminal proceeding. *See generally* 5 U.S.C. § 703 (1982) ("Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement."). Section 811(h)(6), however, provides that "[a]n order issued under [section 811(h)(1)] is not subject to judicial review." We must consider the extent to which this section precludes our review of the above issues.

[1, 2] The government argues that section 811(h)(6) disallows all review by this court—including constitutional review—of the issuance of particular temporary scheduling orders. We disagree. This provision does not refer specifically to review of section 811(h)'s constitutionality or the authority of the Administrator to schedule substances temporarily. Absent "clear and convincing" evidence that Congress intended to preclude constitutional review of agency action, we presume such review to be available. *Califano v. Sanders,* 430 U.S. 99, 109, 97 S.Ct. 980, 986, 51 L.Ed.2d 192 (1977); *Johnson v. Robison,* 415 U.S. 361, 373–74, 94 S.Ct. 1160, 1169, 39 L.Ed.2d 389 (1974); *Rodrigues v. Donovan,* 769 F.2d 1344, 1347 (9th Cir.1985). There is no "clear and convincing" evidence that Congress intended section 811(h)(6)'s general preclusion of "judicial review" to extend to constitutional review of the Attorney General's temporary scheduling orders. Nor does the legislative history of § 811(h) pro-

vide any indication that Congress intended to undertake such "extraordinary" action. *Sanders,* 430 U.S. at 109, 97 S.Ct. at 986. Construing a statute to preclude constitutional review would "raise serious questions concerning [its] constitutionality," and therefore, whenever possible, statutes should be interpreted as permitting such review. *Johnson,* 415 U.S. at 366–67, 94 S.Ct. at 1165. This appeal does not require us to address whether Congress has the power to preclude constitutional review. We merely hold that consistent with section 811(h)(6), we can review on appeal from a criminal conviction the constitutionality of the Administrator's temporary scheduling of MDMA. *Cf. Rodrigues,* 769 F.2d at 1347–48 (statute making Secretary of Labor's decision to deny payments unreviewable did not bar review to ensure that decision comported with fifth amendment's guarantee of due process).

We express no opinion whether section 811(h)(6) precludes judicial review of temporary scheduling orders in criminal enforcement proceedings to determine their compliance with the relevant *statutory* requirements. In *United States v. Caudle,* 828 F.2d 1111, 1112 (5th Cir.1987), the Fifth Circuit held that the order scheduling MDMA was ineffective because it failed to meet section 811(h)'s requirement that such an order "may not be issued before the expiration of thirty days from … the date of the publication by the Attorney General of a notice in the Federal Register of the intention to issue such order and the grounds on which such order is to be issued." 21 U.S.C. § 811(h). The *Caudle* court nowhere discusses whether judicial review is precluded by section 811(h)(6). Because we conclude *infra* that the Administrator lacked the authority to schedule MDMA temporarily, we do not decide the scope of statutory review available in criminal enforcement proceedings.

---

1. On June 17, 1986, the Administrator published a notice extending the emergency classification for six months or until the permanent scheduling procedures were complete. On November 13, 1986, the Administrator issued a final rule permanently placing MDMA on Schedule I, declining to accept an Administrative Law Judge's opinion after hearings that MDMA should be

placed on Schedule III. The First Circuit has since found that the Administrator erred in his interpretation of the criteria for which findings are required under section 812(b)(1), vacating the Schedule I placement and remanding the rule to the Administrator. *Grinspoon v. Drug Enforcement Admin.,* 828 F.2d 881, 891 (1st Cir. 1987).

## II. CONSTITUTIONALITY OF SECTION 811(h)

### A. Congressional Delegation to the Attorney General

Defendants argue that section 811(h) impermissibly delegates Congress' legislative power to the executive and that its provisions are so arbitrary that it does not comport with due process of law. The constitutionality of the statute is a question of law, which we review de novo. *See United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

[3] Congress may provide criminal sanctions for violation of regulations provided that the authority delegated to the executive to promulgate the regulations is "accompanied by sufficient guidelines and standards for the exercise of the authority." *United States v. Davis*, 564 F.2d 840, 844 (9th Cir.1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 733, 54 L.Ed.2d 760 (1978). This court in *Davis* held section 811(a)'s permanent scheduling authorization to be a constitutional delegation of authority. 564 F.2d at 843–44. Section 811(a) requires a finding of "a potential for abuse," the requisite findings of section 812, and consideration of the eight factors in section 811(c). Section 811(h) requires a finding of necessity of temporary scheduling "to avoid an imminent hazard to the public safety" and consideration of "those factors set forth in [section 811(c)(4), (5), and (6)], including actual abuse, diversion from legitimate channels, and clandestine importation, manufacture, or distribution." Section 811(h)'s scheduling criteria are as specific as reasonably practicable to meet the threat to the public safety posed by designer drugs, and to provide the Attorney General with sufficient guidance in scheduling dangerous substances temporarily.

Section 811(h)'s temporary scheduling procedure provides significantly less opportunity for public notice and comment than that available for permanent scheduling under section 811(a). While section 811(a) requires APA notice and hearing before a substance may be permanently scheduled, section 811(h)(1)(A) only requires the Attorney General to place a notice in the Federal Register thirty days before the temporary scheduling order is issued and becomes effective. Also, section 811(h), unlike section 811(a), specifically provides that a temporary scheduling order "is not subject to judicial review." 21 U.S.C. § 811(h)(6).

Defendants argue that the lack of notice and comment and restriction of judicial review remove safeguards that protect against an abuse of discretion by the Attorney General. It is true that the APA provides procedural protections to ensure that executive agencies conform to the standards set out in the legislation. *See Davis*, 564 F.2d at 844. Nonetheless, the absence of notice and public comment does not render section 811(h) a constitutionally infirm delegation of legislative power. The temporary scheduling of a controlled substance is an emergency measure, lasting at most eighteen months. Requiring lengthy public comment could jeopardize the public safety sought to be protected by temporary scheduling.

Nor do we believe that section 811(h)(6)'s preclusion of "judicial review" invalidates the statute under a separation of powers theory. We have held that the section is subject to constitutional review. Temporary scheduling orders are thus reviewable to ensure compliance with the fifth amendment's guarantee of due process. *See supra* section I. Even assuming that section 811(h)(6) bars all judicial review of scheduling orders to determine their compliance with the statutory requirements of section 811(h), we do not find this unconstitutional. A constitutionally imposed requirement of judicial review to ensure compliance with statutory standards would invalidate many statutes precluding judicial review. *See* 5 U.S.C. § 701(a)(1) (judicial review under APA is unavailable if the relevant statute precludes it). Such a requirement would contravene the decisions denying judicial statutory review of the executive's exercise of legislatively delegated powers. *See, e.g., Block v. Community Nutrition Inst.*, 467 U.S. 340, 348, 104 S.Ct. 2450, 2455, 81 L.Ed.2d 270 (1984) (denying consumer's suit for review of Secretary of Agricul-

ture's market orders setting price limits for dairy products under authority of the Agricultural Marketing Agreement Act of 1937); *see also Heckler v. Chaney,* 470 U.S. 821, 838, 105 S.Ct. 1649, 1659, 84 L.Ed. 2d 714 (1985) (distinguishing statutory review from constitutional review and leaving for Congress—not the courts—the decision whether an agency's refusal to institute proceedings should be judicially reviewable); *Rosen v. Walters,* 719 F.2d 1422, 1423 (9th Cir.1983) (upholding statute's preclusion of review of denial of benefit payments by Administrator of Veterans Administration). We conclude that section 811(h) is a permissible delegation of congressional power.

**B. Due Process**

[4] Defendants also challenge section 811(h) as an inappropriate means to protect the public safety. Defendants argue that two aspects of the temporary scheduling procedure are arbitrary and irrational and therefore violate due process of law. First, the temporary procedure requires all temporarily scheduled drugs be placed in Schedule I. Second, the procedure's "necessary to avoid an imminent hazard to the public safety" standard withdraws consideration of scientific evidence, the drug's dependence liability, and whether the precursor of the substance is already controlled. Defendants assert no fundamental right to distribute controlled substances. Thus, to successfully assert a substantive due process claim they must "overcome a presumption of constitutionality" and show that Congress " 'has acted in an arbitrary and irrational way.' " *National R.R. Passenger Corp. v. Atchison, T. & S.F. Ry. Co.,* 470 U.S. 451, 472, 105 S.Ct. 1441, 1455, 84 L.Ed.2d 432 (1985) (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 729, 104 S.Ct. 2709, 2717, 81 L.Ed.2d 601 (1984)).[2]

Section 811(h) clearly survives rationality review. Harsh punishment of those who distribute substances posing "an imminent hazard to the public safety" is not an irra-

tional means of reducing that hazard. The fact that no scheduling distinction is made between those drugs found by the Attorney General to pose varying degrees of imminent hazard does not affect section 811(h)'s rationality. In *Williamson v. Lee Optical,* 348 U.S. 483, 487–88, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955) the Court held that "the law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." Likewise, Congress' dispensing with scientific evaluation of a substance does not make section 811(h) irrational. Given the need for immediate action to protect public safety, the Attorney General's determination of an imminent threat to that safety is a reasonable basis for scheduling substances on a temporary basis.

Temporary scheduling lasts, for the most, eighteen months. 21 U.S.C. § 811(h)(2). An individual must refrain from distributing a substance during its temporary placement on Schedule I. When the consideration of permanent scheduling begins, generally before the end of the temporary classification, an individual has the opportunity to participate in hearings. After the permanent scheduling decision, the individual may petition for judicial review. In the case of MDMA, a doctor's petition to the First Circuit for review of MDMA's permanent Schedule I classification succeeded: the court vacated the Schedule I placement and remanded the rule to the Administrator. *Grinspoon v. Drug Enforcement Admin.,* 828 F.2d 881, 891 (1st Cir.1987). Section 811(h) serves the need for a summary procedure to protect the public safety, without seriously impairing the rights of individuals.

**III. SUBDELEGATION OF TEMPORARY SCHEDULING AUTHORITY TO ADMINISTRATOR**

[5] Defendants also argue that the Attorney General has failed to subdelegate

---

**2.** The fact that section 811(h) is a criminal statute does not mandate a more searching inquiry than rational basis review. *See, e.g., United States v. Alexander,* 673 F.2d 287, 288 (9th Cir.)

(substance classification under 21 U.S.C. § 812 "need not be perfect or ideal," only rational and reasonable), *cert. denied,* 459 U.S. 876, 103 S.Ct. 168, 74 L.Ed.2d 139 (1982).

rd. The
is made
e Attor-
rees of
section
*n v. Lee*
.Ct. 461,
eld that
ect logi-
constitu-
n evil at
night be
ive mea-
rect it."
th scien-
loes not
iven the
ct public
termina-
safety is
ng sub-

for the
U.S.C.
refrain
uring its
. When
heduling
l of the
dual has
earings.
decision,
dicial re-
doctor's
eview of
lassifica-
ated the
ided the
*spoon v.*
.F.2d 881,
)) serves
e to pro-
seriously
s.

**TEMPO-
HORITY**

t the At-
delegate

S.C. § 812
ttional and
i, 103 S.Ct.

---

his temporary scheduling function to the Administrator. In 1973, the Attorney General delegated to the Administrator those "[f]unctions vested in the Attorney General by the Comprehensive Drug Abuse Prevention and Control Act of 1970." 28 C.F.R. § 0.100(b) (1986). The Controlled Substances Act was part of this act. *See* 84 Stat. at 1236, 1242 (1970). The Attorney General's power to schedule substances permanently under 21 U.S.C. § 811(a), enacted pursuant to the Controlled Substances Act, thus clearly has been delegated to the Administrator. *See United States v. Burnes,* 816 F.2d 1354, 1359–60 (9th Cir.1987) (delegation to Administrator includes permanent rescheduling of controlled substances); *United States v. Lippner,* 676 F.2d 456, 461 (11th Cir.1982) (permanent scheduling authority may be subdelegated); *United States v. Gordon,* 580 F.2d 827, 840 (5th Cir.) (same), *cert. denied,* 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978).

Defendants contend, however, that the Attorney General has not similarly delegated his *temporary* scheduling authority to the Administrator. They point out that section 811(h) was enacted not in the 1970 Controlled Substances Act, but rather in the 1984 Act. Defendants argue that only by specifically delegating his authority under the 1984 Act could the Attorney General assign to the Administrator temporary scheduling authority under section 811(h). The interpretation of the Attorney General's 1973 authorization order is a question of law which we review de novo. *Cf. Trustees of Amalgamated Ins. Fund v. Geltman Indus.,* 784 F.2d 926, 929 (9th Cir.) (de novo review for statutory interpretation), *cert. denied,* — U.S. —, 107 S.Ct. 90, 93 L.Ed.2d 42 (1986).

We hold that the Attorney General's 1973 delegation of permanent scheduling to the Administrator does not apply to the power to schedule drugs temporarily under the 1984 Act. In so holding, we are in agreement with the Tenth Circuit's recent decision in *United States v. Spain,* 825 F.2d 1426 (10th Cir.1987). *See also United States v. Hovey,* 674 F.Supp. 161, 169–70 (D.Del.1987) (following *Spain* ). We are

reluctant to create a direct conflict with the Tenth Circuit, criminalizing behavior in our jurisdiction which is not proscribed in another. Further, like the Tenth Circuit, we conclude that the differences between sections 811(a) and 811(h) are so marked that we may not assume that the Attorney General's delegation of his authority under section 811(a) was intended to encompass the emergency powers granted to him eleven years later by section 811(h).

First, to schedule a drug temporarily under section 811(h), the Attorney General must consider only three of the eight factors required for permanent scheduling under section 811(a): the substance's "history and current pattern of abuse," the "scope, duration, and significance of abuse," and the "risk ... to the public health." 21 U.S.C. § 811(c)(4)–(6). Although the Administrator considers these factors when evaluating whether to schedule a drug permanently, the inquiry in that case is quite different. Before the Administrator may place a drug on Schedule I, section 811(a)(1)(B) also requires findings that the drug has "a high potential for abuse," "no currently accepted medical use in treatment in the United States," and that "[t]here is a lack of accepted safety for use of the drug ... under medical supervision." 21 U.S.C. § 812(b)(1). Section 811(h), in contrast, requires no findings at all.

A second difference between the two procedures is that section 811(a) requires a hearing and public comment as specified in the APA, 5 U.S.C. § 555. Section 811(h) does not. It does not follow that because the Attorney General delegated to the Administrator the authority for permanent scheduling with the support of required hearings and findings, the Administrator is automatically authorized to make a temporary scheduling decision entirely on his own under the summary procedure of section 811(h).

The third major difference between permanent and temporary scheduling further emphasizes the unilateral nature of the decision to schedule a drug under section 811(h). Before permanent scheduling, the Administrator must request a scientific and

Case 3:03-cv-00065-MCR-MD   Document 52-2   Filed 11/18/03   Page 13 of 65

medical evaluation and recommendations from the Secretary. The Secretary must submit the evaluation and recommendation in writing, and the recommendation is *binding* on the Administrator. 21 U.S.C. § 811(b). In sharp contrast, section 811(h) requires only that the notice of temporary scheduling be transmitted to the Secretary, who need not respond at all. Any comments the Secretary might choose to make need only be "taken into consideration." Section 811(h)(4). Further, as discussed above, section 811(h)(6) exempts temporary scheduling orders from judicial review. Section 811(h) thus leaves almost unfettered discretion in the Attorney General. The delegation of that discretion should be explicit.[3]

The government argues that when in 1973 the Attorney General delegated his authority to schedule substances permanently under the Controlled Substances Act of 1970, he impliedly delegated his authority under any amendment to the Act. Any other interpretation, according to the government, would require a new delegation any time an amendment, however minor or technical, is added to the Act. Our holding does not dictate that result. As discussed above, it is because section 811(h) is an almost entirely different procedure, and the Administrator's role in that new procedure would be so fundamentally altered, that a specific delegation of temporary scheduling authority is necessary. Section 811(h) is more than a mere amendment; changes to the Act that do not propose such an altered role for the Administrator would not necessarily require explicit delegation. For example, in 1984, Congress also amended section 811(g) to provide for the exemption of certain mixtures containing controlled substances. 21 U.S.C. § 811(g)(3) (Supp. III 1985). The Administrator's authority to exempt such a mixture would appear to fall within the

scope of the authority delegated to him in 1973.

Nor is it persuasive to cite, as the government does, the subsequent actions of Congress or the Attorney General as evidence of the intent to delegate temporary scheduling to the Administrator. A failure to challenge or correct the Administrator's actions, or even tacit approval of those actions, is not a substitute for express delegation by the Attorney General. If delegation is to be accomplished by omission, any opportunity for prior review, however lenient, of the propriety of delegation is lost.

We emphasize, however, that our conclusion that temporary scheduling was not properly delegated to the Administrator does not imply that any such subdelegation would be inappropriate. The Tenth Circuit has questioned whether Congress intended to permit the Attorney General to subdelegate his temporary scheduling authority. *Spain,* 825 F.2d at 1428–29. We do not reach that issue here. Nor do we suggest that the Administrator is necessarily an inappropriate official to make the determination that temporary scheduling is necessary. We simply hold that the delegation of permanent scheduling does not encompass delegation of the very different function added to the statute eleven years after its first enactment.

## IV. VALIDITY OF THE MDMA SCHEDULING ORDER

Because we hold that the Attorney General did not delegate his temporary scheduling authority to the Administrator, we do not reach the issue of whether the order placing MDMA on Schedule I was otherwise proper or whether the Administrator's order met section 811(h)(1)'s procedural requirements. *But see Caudle,* 828 F.2d at 1112 (order ineffective because no thirty-day notice); *Spain,* 825 F.2d at 1429 (ques-

3. On July 1, 1987, the Attorney General amended 28 C.F.R. § 0.100(b) to delegate to the Administrator "functions which may be vested in the Attorney General in subsequent amendments to the Comprehensive Drug Abuse Prevention and Control Act of 1970, and not otherwise specifically assigned or reserved by him."

28 C.F.R. § 0.100(b) (1987). The government has not brought this amendment to our attention, nor has it argued its applicability. Whether this amendment delegates the temporary scheduling function to the Administrator is not before us on this appeal.

Case 3:03-cv-00065-MCR-MD   Document 52-2   Filed 11/18/03   Page 14 of 65

tioning the propriety of the "premature" order).

## CONCLUSION

The Administrator's temporary scheduling of MDMA was an improper exercise of authority not delegated to him by the Attorney General. The judgments of conviction of the defendants are REVERSED.

WIGGINS, Circuit Judge, dissenting:

Because I disagree with the majority's conclusion that the Attorney General failed properly to subdelegate to the Administrator of the Drug Enforcement Agency (DEA) his authority to schedule dangerous, new, "designer" drugs temporarily, I dissent.

I do not share the majority's narrow reading of the Attorney General's authorization order for delegation of his duties to the DEA. 28 C.F.R. § 0.100(b) (1986). Although the temporary scheduling procedure of section 811(h) was not part of the original 1970 Controlled Substances Act, it expressly amended the 1970 Act. 21 U.S. C. § 811(h) (1982 & Supp.1984). It would be a strained and unreasonable interpretation of the Attorney General's authorization order to read it as invalidating all actions taken by the DEA's Administrator under amendments to the 1970 Act. The 1973 subdelegation clearly contemplated the DEA's assumption of the Attorney General's permanent substance scheduling function. The 1984 Act amended the scheduling function to include temporary scheduling.[1]

The majority, however, adopts wholesale the analysis of *United States v. Spain*, 825 F.2d 1426 (10th Cir.1987), and rules to the

contrary. I believe *Spain* was premised on two false assumptions: (1) that whether the Attorney General had subdelegated his temporary scheduling authority depended on the degree of similarity between that process and the permanent scheduling process, and (2) that these two processes were wholly dissimilar. As for the second assertion, the *Spain* decision considered temporary scheduling to be fundamentally different from permanent scheduling. *Id.* at 1428. The court stated that the DEA is a "technical group" incompetent to determine, under section 811(h)(1), whether temporary scheduling is necessary to avoid imminent danger to the public safety. *Id.* *Spain* found this general public safety decision to be within the Attorney General's special expertise, and therefore it concluded that the Attorney General would not have intended the 1973 subdelegation to extend to temporary scheduling authority. *Id.*

However, in determining the threat to the public safety under section 811(h)(1), the substance's "history and current pattern of abuse," the "scope, duration, and significance of abuse," and "risk ... to the public health" must be considered. 21 U.S.C. § 811(c), (h)(3). These general public safety considerations are among those that must be considered when determining a substance's "potential for abuse" for permanent scheduling under section 811(a)(1). *See id.* § 811(a)(1), (c). The Attorney General has entrusted the Administrator with determining a substance's threat to the public safety when exercising permanent scheduling authority, and I do not believe he would consider the DEA incompetent to make essentially the same inquiry when temporarily scheduling a substance.[2]

---

1. *See* Pub.L. No. 98–473, tit. II, § 508, 98 Stat. 2070, 2071–72 (1984) ("21 U.S.C. 811 ... is amended by adding a new subsection (b) as follows...."). Temporary scheduling is one of the Attorney General's functions under the Controlled Substances Act, and is therefore delegable under 21 U.S.C. § 871(a). Additionally, 28 U.S.C. § 510 generally permits the Attorney General to delegate to "any other officer, employee, or agency of the Department of Justice ... any function of the Attorney General."

2. The *Spain* decision also stated that the Attorney General would not intend to permit the Administrator to exercise the broad discretion involved in scheduling a substance temporarily. 825 F.2d at 1429. The discretion given under section 811(h), however, is comparable to that given in permanently scheduling substances under section 811(a). For example, although the Secretary of Health and Human Services may not veto a temporary scheduling order, her recommendation must still be considered. 21 U.S. C. § 811(h)(1), (4). The *Spain* decision ob-

I believe, therefore, that the temporary scheduling process is not so different from the permanent scheduling process. And even if it were, I do not think that would require a holding that subdelegation had not been perfected in this case. The court in *Spain* relied on the rule that ambiguous criminal statutes be read narrowly and with lenity in order to interpret the Attorney General's 1973 delegation to the Administrator as not extending to temporary substance scheduling 825 F.2d at 1429 (citing *United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), and *Bell v. United States*, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955)). Assuming, *arguendo*, that the rule of lenity applies to situations in which the criminal prohibition itself is clear but the authority to proscribe the activity is doubtful,[3] I do not find the 1973 delegation to be ambiguous. The Attorney General in 1973 unquestionably delegated to the Administrator his functions under the Controlled Substances Act, and temporary scheduling is clearly one of the Attorney General's functions under the Controlled Substances Act as amended. I decline to construe the 1973 delegation so strictly as to defeat the Attorney General's obvious intention to permit the Administrator temporarily to schedule substances. *Cf. Huddleston v. United States*, 415 U.S. 814, 831, 94 S.Ct. 1262, 1271, 39 L.Ed.2d 782 (1974) ("Although penal laws are to be construed strictly, they 'ought not be construed so strictly as to defeat the obvious intention of the legislature.'") (quoting *American Fur Co. v. United States*, 27 U.S. (2 Pet.) 358, 367, 7 L.Ed. 450 (1829)). This is not the case of a rogue agency usurping the Attorney General's authority. If the Attorney General did not intend the Administrator to schedule substances temporarily under the 1973 delegation, I am confident he would have acted to reduce the Administrator's authority.

I believe the plain intent of Congress was to establish an expedited system of review in order to criminalize the possession, manufacturing, and distribution of newly-developed "designer" drugs *before* they became public health hazards. The responsibility for this temporary scheduling process was vested sensibly in the DEA, through the Attorney General. The majority's decision requires that when any amendment to a crime-fighting statute is adopted, no matter how technical or minor, a new trail of delegation and subdelegation be laid down, even when past delegation practice is clear and unambiguous. The majority's decision vacates a criminal conviction because of an alleged lack of proper delegation of authority. I believe the majority demands too much of the government's crime-fighting efforts in the face of an unambiguous delegation of responsibility by Congress.

I respectfully dissent.



Robert H. FENDLER,
Petitioner–Appellant,

v.

UNITED STATES BUREAU OF PRISONS; Charles A. Turnbo, Warden, F.C. I. Pleasanton, Respondents–Appellees.

No. 86–2467.

United States Court of Appeals,
Ninth Circuit.

Submitted Nov. 9, 1987.[*]

Decided May 11, 1988.

Paroled federal prisoner brought claims under Privacy Act and for expunge-

---

served that temporary scheduling, unlike permanent scheduling, is not subject to the Administrative Procedure Act's procedural protections. 825 F.2d at 1429. I do not find this factor alone to be dispositive of the Attorney General's intent underlying the 1973 order.

3. The purpose of the rule is to ensure that "no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited."

*Dunn v. United States*, 442 U.S. 100, 112, 99 S.Ct. 2190, 2197, 60 L.Ed.2d 743 (1979). Here, the defendants were on notice that their conduct was prohibited: the Controlled Substances Act plainly prohibits distributing and conspiring to distribute controlled substances, and the Administrator had plainly scheduled MDMA as a controlled substance.

* The panel finds this case appropriate for submission without oral argument pursuant to Ninth Circuit Rule 34–4 and Fed.R.App.P. 34(a).

**548**        **157 FEDERAL SUPPLEMENT**

served to prevent other operators from like conduct. See City of Oroville v. Indiana Gold-Dredging Company.[2] Injunctive relief was also granted in Costello v. Bowen.[3] This principle has not been applied exclusively in Alaska and California but has been of general application wherever equitable principles are applied by courts. In 1888 a court in Vermont applied it in Goodrich v. Dorset Marble Company.[4] See also, Guynn v. Wabash Water and Light Company,[5] where it was said, "The general rule of property is applicable to a riparian proprietor, and he is restricted in the management of his property by such rule. 'So use your own as not to injure others.' "

Plaintiff is entitled to a Judgment restraining defendants from depositing overburden or mine wastes into the Healy River, or placing such overburden and mine wastes so that they will be washed into the Healy River.

Judgment will await the decision of the issues remaining to be tried.



Joseph J. PINKUS, trading as More-Wate Co., Plaintiff,

v.

Louis A. REILLY, Postmaster of the City of Newark, New Jersey, Defendant.

Civ. A. No. 856–56.

United States District Court
D. New Jersey.

Dec. 26, 1957.

Proceeding by Post Office Department against defendant for use of mail to defraud. The Hearing Examiner entered a finding adverse to defendant and on appeal, the Department entered a similar decision. On motion by defendant for summary judgment and for issuance of a permanent injunction against further procedure by the Department, the District Court, Hartshorne, J., held that where duty of Assistant General Counsel for Post Office Department to file complaints for use of mail to defraud was published as "procedures" but Federal Register contained no publication whatever of any regulations of Post Office Department covering "organization", proceeding by Post Office Department against person for use of mails to defraud was invalid when he was required to resort to organization of the Department not published in Federal Register.

Motion for summary judgment and issuance of injunction granted.

**1. Administrative Law and Procedure**
 &#8284;4
Administrative Procedure Act not only prohibits commingling of functions of adjudication and prosecution, but it also requires publication by administrative department of its organization on one hand, and its procedure on other hand. Administrative Procedure Act, § 3a, 5 U.S.C.A. § 1002(a).

**2. Administrative Law and Procedure**
 &#8284;390

**Post Office** &#8284;26
Where published regulations of Post Office Department covering department's organization gave Department's general counsel sole prosecuting power of that Department in cases involving use of mails to defraud and gave him duty to file complaints in such proceedings, delegation of adjudicating authority to General Counsel violated section of Administrative Procedure Act requiring separation of functions between adjudication and prosecuting authorities, and such violation continued notwithstanding vesting in Assistant General

2. C.C.1908, 165 F. 550.

3. 1947, 80 Cal.App.2d 621, 182 P.2d 615.

4. 60 Vt. 280, 13 A. 636.

5. 1914, 181 Ind. 486, 104 N.E. 849.

Case 3:03-cv-00965-MCR-MD    Document 52-2    Filed 11/18/03    Page 17 of 65

Counsel of duty to file complaints in such proceedings, when general counsel continued to have general supervisory power over such proceedings and over his assistant. Administrative Procedure Act, §§ 1 et seq., 3(a), 5(c), 5 U.S.C.A. §§ 1001 et seq., 1002(a), 1004(c).

**3. Post Office ⊚⇒26**

Where duty of Assistant General Counsel for Post Office Department to file complaints in proceedings involving use of mail to defraud was published in Federal Register as "procedures", but Federal Register contained no publication whatever of any regulations of Post Office Department covering "organization", proceeding by Post Office Department against a person for use of mail to defraud was invalid when person was required to resort to organization of Department not published in Federal Register. Administrative Procedure Act, §§ 1 et seq., 3(a), 5(c), 5 U.S.C.A. §§ 1001 et seq., 1002(a), 1004(c).

Fast & Fast, Newark, N. J., Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., by Edward Mullinix, Philadelphia, Pa., of counsel, for plaintiff.

Chester A. Weidenburner, U. S. Atty., Newark, N. J., by Charles H. Hoens, Jr., Asst. U. S. Atty., Newark, N. J., for defendant.

HARTSHORNE, District Judge.

The issue in these proceedings involves the scope and effect of the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., which has been the subject of such lengthy interest and debate on both Executive and Congressional levels, as outlined in the case of Wong Yang Sung v. McGrath, 1949, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616. The importance of this problem to the public is emphasized by the fact that it is cited in the Report of the Committee on Administrative Tribunals and Enquiries Presented by the Lord High Chancellor to Parliament by Command of Her Majesty, July, 1957, as "a matter of concern on both sides of the Atlantic."

Specifically, under the provisions of the fraud order statute, 39 U.S.C.A. §§ 259, 732, plaintiff Pinkus was brought before the Post Office Department for an administrative hearing as to whether or not he had violated that statute, by advertising a preparation which he alleged would result in the increase of the weight of the user. The Hearing Examiner entered a finding adverse to Pinkus and on appeal the Department entered a similar decision, save that Pinkus claims that this appeal decision went primarily on a ground not adverted to at the original hearing, in which both he and his counsel participated.

Pinkus now moves for summary judgment and asks the issuance of a permanant injunction against further procedure by the Department on the above fraud order of the Department. Pinkus attacks this appellate decision of the Department on the grounds that (1) it was wrong on the merits, in that his advertisement was neither misleading nor intentionally fraudulent, both of which it must be to be invalid under the statute, Reilly v. Pinkus, 1949, 338 U.S. 269, 70 S.Ct. 110, 94 L.Ed. 63, (2) the Department violated the statute, 5 U.S.C.A. § 1004(b), by its refusal to consider bona fide the compromise of the situation which he offered consisting of a changed advertisement, (3) the hearing was invalid in any event because (a) there was no separation of functions between the adjudicating and prosecuting authorities, as required by the statute, ibid., § 1004(c), and (b) there was no publication of the "central and field organization" of the Department, "including the delegations by the agency of final authority," covering the above action against Pinkus, as required by the statute, ibid., § 1002(a).

[1] The last above point raised by Pinkus seems to be directly and clearly covered by the terms of the Administrative Procedure Act itself, which provides that "no person shall in any manner be required to resort to *organization* or *procedure* not so published," ibid., § 1002(a) (emphasis added). As shown

in *Wong Yang Sung*, 339 U.S. at page 42, 70 S.Ct. at pages 450, previous to the enactment of the Administrative Procedure Act, when "the same men are obliged to serve both as prosecutors and as judges. [t]This not only undermines judicial fairness; it weakens public confidence in that fairness." Thus not only did this Act require an end to the commingling of the functions of adjudication and prosecution, but it required the publication by an administrative department of its "organization" on the one hand, and its "procedure" on the other, in order to create "public confidence in that [the Department's] fairness." The opinion of our highest court in *Wong Yang Sung* adds:

"'* * * it would be a disservice to our form of government and to the administrative process itself if the court should fail, so far as the terms of the Act warrant, to give effect to its remedial purposes where the evils it was aimed at appear * * * It is the plain duty of the courts, regardless of their views of the wisdom or policy of the Act, to construe this remedial legislation to eliminate, so far as its text permits, the practices it condemns." 339 U.S. at pages 41, 45, 70 S.Ct. at page 450.

[2] The question thus is whether at the time Pinkus was proceeded against

by the Department, as above, the Department had complied with this publication requirement. The prosecution of Pinkus by the Department, as above, was initiated February 7, 1955, so the specific question is whether at that time there existed in the Federal Register the published "central and field organization" of the Post Office Department, its "delegation of final authority," and its "procedures" to which Pinkus was "required to resort" as above. We turn to such facts.

Prior to May 17, 1954, the Department regulations, published in the Federal Register, covering the Department's "organization," showed that the Department Solicitor, stipulated to have been succeeded now by its General Counsel, had the sole prosecuting power of that Department in the kind of proceedings involved here.[1]

In addition, by separate regulations so published and entitled "Procedures of the Post Office Department," the Solicitor, now General Counsel, was expressly given the duty to file complaints in such proceedings.[2] On May 17, 1954, to this General Counsel, now vested with prosecuting authority generally, including both the supervision of prosecutions, and, as a matter of procedure, the filing of complaints, there was delegated the adjudicating authority.[3] This indubitably constituted a vio-

---

1. 16 Fed.Reg. 6623, July 7, 1951; 39 Code of Fed.Regs. § 1.9(f) (1) (1949 Ed., pocket supplement). This states inter alia that the solicitor [now the general counsel] shall be charged "with the preparation and presentation before the Hearing Examiners of all cases in which final adjudication is required by the Administrative Procedure Act to be made upon the record after opportunity for agency hearing". (Brackets added.)

2. 16 Fed.Reg. 6683, July 10, 1951; 39 Code of Fed.Regs. § 150.403 (1949 Ed., pocket supplement). "Whenever the Solicitor [now General Counsel] of the Post Office Department shall have reason to believe that any person or concern is using the mails in any manner requiring administrative action by the Postmaster General, where the authorized ac-

tion is required by the Administrative Procedure Act to be taken only after opportunity for agency hearing, he shall prepare and file with the Docket Clerk a complaint which shall name the person or concern involved; state the legal authority and jurisdiction under which the proceeding is initiated; state the facts in a manner sufficient to enable the person or concern named therein to make answer thereto; and recommend the issuance by the Postmaster General of an appropriate order. The person or concern so named in the complaint shall be known as the respondent." (Brackets added.)

3. Postmaster General's Order No. 55628; published in 19 Fed.Reg. 3065 (May 27, 1954), which provided: "Decisions of the Solicitor [now General Counsel]

De-
bli-
1 of
was
spe-
.ime
ster
ani-
, its
and
was
turn

oart-
Fed-
ent's
oart-
been
nsel,
that
lings

itions
dures
' the
was
com-
May
, now
gen-
vision
f pro-
there
uthori-
a vio-

ative
after
shall
Clerk
erson
1 au-
1 the
:ts in
erson
e an-
issu-
of an
con-
all be
ackets

i5628;
ay 27,
ns of
unsel]

lation of the above separation of functions provisions of the Administrative Procedure Act, as it was then, and is now, in effect.[4] Pinkus' counsel insists that this was due to no inadvertence, as evidenced by the Department's attempts to have Congress exempt it altogether from the provisions of the Administrative Procedure Act. Note the confession of error in that regard by the Solicitor General of the United States in the case of Cates v. Haderlein, 1951, 342 U.S. 804, 72 S.Ct. 47, 96 L.Ed. 609. But this matter of intent seems relatively immaterial.

[3] On June 3, 1954, while this violation of the Act by the Department continued, the above "Procedures" provisions of the Department were slightly amended to vest in the Assistant General Counsel the duty to file complaints similar to that here involved against Pinkus.[5] But the violation continued, since the General Counsel continued to have the general supervisory power over such prosecutions and over his assistant, as stated in note 1, supra, together with the sole adjudicating authority in such cases, as stated in note 3, supra.

When on December 1, 1954, the Post Office Department revised its regulations and published them, the duty of the Assistant General Counsel to file such complaints, published as "Procedures," was repeated, and this verbatim.[6] In addition, these revised regulations, as published, specifically stated that "Rules dealing with *organization* and *delegation of authority,* substantive rules, and rules

of *procedure* will be *separately* stated pursuant to the requirements of Section 3(a) of the Administrative Procedure Act (5 U.S.C.A. § 1002)".[7] (Emphasis added.) The Department's intention was thus clear that this regulation of its "Procedures," as so repeated, covered its "Procedures" only, and did not cover its "Organization." However, the Federal Register of December 1, 1954, which published such revised regulations covering Department "Procedures," did not contain any publication whatever of any regulations covering "Organization", which by the Department's own rule were to be "separately stated." The old organizational regulation cited in note 1, supra, was completely deleted. This condition continued through the time the present proceedings were taken by the Department against Pinkus.

It is thus clear that Pinkus was "required to resort to organization * * * not so published"—in the Federal Register. This obviously violates the above provision of the statute that "no person shall in any manner be required to resort to organization or procedure not so published." Thus the Department's present proceedings against Pinkus are invalid.

The Department attempts to avoid this invalidity of its action against Pinkus, by claiming that these regulations as to "Procedures" actually were regulations covering both "Procedures" and "Organization." But the Department's own words, as above, where they say that "rules dealing with organization

made under the authority of this order shall be the final agency decision except that the Solicitor may refer any proceeding to either the Postmaster General or the Deputy Postmaster General for final decision." (Brackets added.)

4. 5 U.S.C.A. § 1004(c), providing in part: "No officer, employee, or agent engaged in the performance of investigative or prosecuting functions for any agency in any case shall, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 1007 of

this title except as witness or counsel in public proceedings."

5. 19 Fed.Reg. 3255, amending 39 Code of Fed.Regs. § 150.403 (1949 Ed., pocket supplement), as stated in note 2, by substituting: "Assistant Solicitor, [now Assistant General Counsel] Fraud Division" for the word "Solicitor [now General Counsel]." (Brackets added.)

6. 19 Fed.Reg. 7849; 39 Code of Fed.Regs. § 201.4 (Revision of 1955) (changing the section number from 150.403 to 201.4).

7. 19 Fed.Reg. 7859; 39 Code of Fed.Regs. § 201.100(b) (Revision of 1955).

\* \* \* and rules of procedure will be separately stated \* \* \*" belie any such argument. So do the previous words of the Department, in repeatedly publishing these very same words as to filing complaints, etc., and calling them "Procedures," at the same time that it published separately regulations as to its "Organization."[1]

Of course, the Department's claim is immaterial that in this case in fact the General Counsel did not tell the Assistant General Counsel what to do in prosecuting Pinkus. For the purpose of the Act is not only to see that such commingling of the judicial and prosecuting authority does not occur in fact in a single case, but to see that it can never occur, and that the public should know, by publication, that it can never occur, in order to insure their confidence in the fairness of their government.

It is a further interesting question whether the Administrative Procedure Act as adopted prevents all such harmful commingling of the functions of adjudication and prosecution or only certain harmful commingling, leaving certain commingling of prosecuting and adjudicating authority still lawful. This question is raised now by the parties since, as seen above, in this case it is not the prosecuting authority which is alleged to be the superior of the adjudicating authority, which *Wong Yang Sung* holds to be prohibited, but rather it is the adjudicating authority which is alleged to be the superior of the prosecuting authority. At first the Department agreed with Pinkus that this was a distinction without a difference, and it is clear that in either aspect such commingling may have harmful results,

and so is contrary to the spirit of the Act itself. Now the Department claims that in fact, according to its plan of "organization," (unpublished as above) its "General Counsel" is not the superior of this particular "Assistant General Counsel," when the latter prosecutes fraud cases, despite these titles, and despite the fact that its General Counsel is the superior of any or all other Assistant General Counsel in charge of all the Department's other legal proceedings—a rather unusual situation. However, assuming this to be correct in fact, it is unnecessary to pursue this point through the lengthy legislative history of the statute, in view of the clear invalidity of the present procedure against Pinkus, because of his being required to "resort" to the Department's unpublished plan of "organization" pertinent to its prosecution of him. For the same reason, it is unnecessary to consider the other issues above alluded to. Indeed, in view of Pinkus' formal offer to compromise by changing his advertisement, any decision as to the present advertisement would shortly be but academic. And, of course, as soon as the Department complies with the Administrative Procedure Act, it is free to take any further action against Pinkus which it then deems requisite to protect the public.

The facts herein stated and the conclusions of law herein expressed shall be considered the findings of fact and the conclusions of law required by Fed.Rules Civ.Proc. rule 52, 28 U.S.C.

The motion of Pinkus for summary judgment and the issuance of injunction will be granted. Settle order accordingly.

---

1. 16 Fed.Reg. 6623, July 7, 1951; 39 Code of Fed.Regs. § 1.9(f) (1) (1949 Ed., pocket supplement). This states inter alia that the solicitor [now the general counsel] shall be charged "with the preparation and presentation before the

Hearing Examiners of all cases in which final adjudication is required by the Administrative Procedure Act to be made upon the record after opportunity for agency hearing". (Brackets added.)

of any function transferred to the Administrator by the provisions of this reorganization plan.

Sec. 4. *Effective date.*—The provisions of this reorganization plan shall take effect 60 days after they would take effect under section 6(a) of the Reorganization Act of 1949 in the absence of this section.

63 Stat. 205.
5 U. S. C., Sup. III,
§ 133z-4.

# REORGANIZATION PLAN NO. 25 OF 1950[1]

Transmitted May
9, 1950.
Effective July 9,
1950.
63 Stat. 203.
5 U. S. C., Sup. III,
§ 133z note.

Prepared by the President and transmitted to the Senate and the House of Representatives in Congress assembled, May 9, 1950, pursuant to the provisions of the Reorganization Act of 1949, approved June 20, 1949.

## NATIONAL SECURITY RESOURCES BOARD

SECTION 1. *Functions of Chairman and of Board.*—The functions of the National Security Resources Board are hereby transferred to the Chairman of the National Security Resources Board, and the Board shall hereafter advise and consult with the Chairman with respect to such matters within his jurisdiction as he may request.

SEC. 2. *Vice Chairman.*—There is hereby established the office of Vice Chairman of the National Security Resources Board. Such Vice Chairman shall (1) be an additional member of the National Security Resources Board, (2) be appointed from civilian life by the President, by and with the advice and consent of the Senate, (3) receive compensation at the rate of $16,000 per annum, and (4) perform such of the duties of the Chairman as the Chairman shall designate.

SEC. 3. *Performance of functions of Chairman.*—The Chairman may from time to time make such provisions as he shall deem appropriate authorizing the performance by any other officer, or by any agency or employee, of the National Security Resources Board of any function of the Chairman.

# REORGANIZATION PLAN NO. 26 OF 1950[2]

Transmitted May
31, 1950.
Effective July 31,
1950.
63 Stat. 203.
5 U. S. C., Sup. III,
§ 133z note.

Prepared by the President and transmitted to the Senate and the House of Representatives in Congress assembled, May 31, 1950, pursuant to the provisions of the Reorganization Act of 1949, approved June 20, 1949.

## DEPARTMENT OF THE TREASURY

SECTION 1. *Transfer of functions to the Secretary.*—(a) Except as otherwise provided in subsection (b) of this section, and subject to the provisions of subsection (c) of this section, there are hereby transferred to the Secretary of the Treasury all functions of all other officers of the Department of the Treasury and all functions of all agencies and employees of such Department.

5 U. S. C. § 1001
note; Sup. III, § 1001
et seq.

(b) This section shall not apply to the functions vested by the Administrative Procedure Act (60 Stat. 237) in hearing examiners employed by the Department of the Treasury or to functions vested by any provision of law in the Comptroller of the Currency.

(c) Notwithstanding the transfer to the Secretary of the Treasury of the functions of the United States Coast Guard and of the func-

[1] Reorganization Plan No. 24 of 1950 disapproved by the Senate July 6, 1950 (S. Res. 290).
[2] Reorganization Plan No. 27 of 1950 disapproved by the House of Representatives July 10, 1950 (H. Res. 647).

tions of the Commandant of the Coast Guard, effected by the provisions of subsection (a) of this section, such Coast Guard, together with the said functions, shall operate as a part of the Navy, subject to the orders of the Secretary of the Navy, in time of war or when the President shall so direct, as provided, in section 1 of the Act of January 28, 1915, ch. 20, 38 Stat. 800, as amended (14 U. S. C. 1).

    14 U. S. C., Sup. III.
    § 1 and note.

SEC. 2. *Performance of functions of Secretary.*—The Secretary of the Treasury may from time to time make such provisions as he shall deem appropriate authorizing the performance by any other officer, or by any agency or employee, of the Department of the Treasury of any function of the Secretary, including any function transferred to the Secretary by the provisions of this reorganization plan.

SEC. 3. *Administrative Assistant Secretary.*—There shall be in the Department of the Treasury an Administrative Assistant Secretary of the Treasury, who shall be appointed, with the approval of the President, by the Secretary of the Treasury under the classified civil service, who shall perform such duties as the Secretary of the Treasury shall prescribe, and who shall receive compensation at the rate of $14,000 per annum.

SEC. 4. *Incidental transfers.*—The Secretary of the Treasury may from time to time effect such transfers within the Department of the Treasury of any of the records, property, personnel, and unexpended balances (available or to be made available) of appropriations, allocations, and other funds of such Department as he may deem necessary in order to carry out the provisions of this reorganization plan.

432 THIRTY–SEVENTH CONGRESS. Sess. II. Ch. 110–112, 116, 119. 1862.

and fifty thousand dollars is hereby appropriated, out of any money in the Treasury not otherwise appropriated, for postal service on such mail routes established by the present Congress as the Postmaster General may deem necessary and expedient.

APPROVED, June 18, 1862.

---

June 19, 1862.

CHAP. CXL.—*An Act to secure Freedom to all Persons within the Territories of the United States.*

Freedom in the Territories secured.

*Post,* p. 811.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That from and after the passage of this act there shall be neither slavery nor involuntary servitude in any of the Territories of the United States now existing, or which may at any time hereafter be formed or acquired by the United States, otherwise than in punishment of crimes whereof the party shall have been duly convicted.

APPROVED, June 19, 1862.

---

June 19, 1862.

CHAP. CXII.—*An Act to change the Location of the Port of Entry for the Puget Sound Collection District.*

Port of entry for Puget Sound collection district.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That from and after the first day of October, eighteen hundred and sixty-two, the port of Port Townsend, in the district of Puget Sound, in Washington Territory, is hereby abolished as a port of entry; and that Port Angelos be and is hereby established as the port of entry and delivery for the said district from and after the said date.

APPROVED, June 19, 1862.

---

June 20, 1862.

CHAP. CXVI.—*An Act to change the Port of Entry for the District of Brunswick, Georgia.*

Port of entry for the district of Brunswick, Georgia.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That from and after the first day of July, eighteen hundred and sixty-two, the port of entry for the district of Brunswick, Georgia, shall be Brunswick, and that Darien shall be abolished as the port of entry.

Deputy collector at Darien.

SEC. 2. *And be it further enacted,* That there shall be a deputy collector appointed, according to law, to reside at Darien, and to exercise such powers as the Secretary of the Treasury, under the revenue laws, may prescribe.

APPROVED, June 20, 1862.

---

July 1, 1862.
1862, ch. 163, § 25. *Post,* pp. 561, 627.
1863, ch. 74.
*Post,* p. 713.
Office of Commissioner of Internal Revenue, created.

CHAP. CXIX.—*An Act to provide Internal Revenue to support the Government and to pay Interest on the Public Debt.*

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That, for the purpose of superintending the collection of internal duties, stamp duties, licenses, or taxes imposed by this act, or which may be hereafter imposed, and of assessing the same, an office is hereby created in the Treasury Department to be called the office of the Commissioner of Internal Revenue: and the President of the United States is hereby authorized to nominate, and,

Commissioner, appointment, salary, duty, &c.,
to prepare rules, forms, blanks, &c.,

with the advice and consent of the Senate, to appoint, a Commissioner of Internal Revenue, with an annual salary of four thousand dollars, who shall be charged, and hereby is charged, under the direction of the Secretary of the Treasury, with preparing all the instructions, regulations, directions, forms, blanks, stamps, and licenses, and distributing the same,

Case 3:03-cv-00065-MCR-MD    Document 52-2    Filed 11/18/03    Page 24 of 65

or any part thereof, and all other matters pertaining to the assessment and collection of the duties, stamp duties, licenses, and taxes, which may be necessary to carry this act into effect, and with the general superintendence of his office, as aforesaid, and shall have authority, and hereby is authorized and required, to provide proper and sufficient stamps or dies for expressing and denoting the several stamp duties, or the amount thereof in the case of percentage duties, imposed by this act, and to alter and renew or replace such stamps from time to time, as occasion shall require; and the Secretary of the Treasury may assign to the office of the Commissioner of Internal Revenue such number of clerks as he may deem necessary, or the exigencies of the public service may require, and the privilege of franking all letters and documents pertaining to the duties of his office, and of receiving free of postage all such letters and documents, is hereby extended to said commissioner.

*Commissioner of Internal Revenue,*

*to provide stamps and dies,*

*Post, p. 725.*

*to have clerks.*

*Franking privilege.*

## GENERAL PROVISIONS.

*General provisions.*

SEC. 2. *And be it further enacted,* That, for the purpose of assessing, levying, and collecting the duties or taxes hereinafter prescribed by this act, the President of the United States be, and he is hereby, authorized to divide, respectively, the States and Territories of the United States and the District of Columbia into convenient collection districts, and to nominate, and, by and with the advice and consent of the Senate, to appoint an assessor and a collector for each such district, who shall be residents within the same : *Provided,* That any of said States and Territories, and the District of Columbia, may, if the President shall deem it proper, be erected into and included in one district : *Provided,* That the number of districts in any State shall not exceed the number of representatives to which such State shall be entitled in the present Congress, except in such States as are entitled to an increased representation in the Thirty-Eighth Congress, in which States the number of districts shall not exceed the number of Representatives to which any such State may be so entitled : *And provided further,* That in the State of California the President may establish a number of districts not exceeding the number of Senators and Representatives to which said State is entitled in the present Congress.

*Convenient collection districts to be made.*

*Assessor and collector for each. Post, p. 561. Any State, &c., may make one district. Limit to number of districts in any State.*

*California.*

SEC. 3. *And be it further enacted,* That each of the assessors shall divide his district into a convenient number of assessment districts, subject to such regulations and limitations as may be imposed by the Commissioner of Internal Revenue, within each of which he shall appoint one assistant assessor, who shall be resident therein ; and each assessor and assistant assessor so appointed, and accepting the appointment, shall, before he enters on the duties of his appointment, take and subscribe, before some competent magistrate, or some collector, to be appointed by virtue of this act, (who is hereby empowered to administer the same,) the following oath or affirmation, to wit: "I, A B, do swear, or affirm, (as the case may be,) that I will bear true faith and allegiance to the United States of America, and will support the Constitution thereof, and that I will, to the best of my knowledge, skill, and judgment, diligently and faithfully execute the office and duties of assessor for, (naming the assessment district,) without favor or partiality, and that I will do equal right and justice in every case in which I shall act as assessor." And a certificate of such oath or affirmation shall be delivered to the collector of the district for which such assessor or assistant assessor shall be appointed. And every assessor or assistant assessor acting in the said office without having taken the said oath or affirmation shall forfeit and pay one hundred dollars, one moiety thereof to the use of the United States, and the other moiety thereof to him who shall first sue for the same, with costs of suit.

*Assessor to divide his district into convenient assessment districts.*

*Assistant assessor in each.*

*Oath of assessor and assistants.*

*Certificate of oath.*

*Penalty for acting without taking oath.*

SEC. 4. *And be it further enacted,* That before any such collector

*Provided,* That the said drawbridges shall be so constructed as not to interfere with the free or to materially or substantially obstruct the free navigation of said streams, beyond what is necessary in order to carry into effect the rights and privileges hereby granted; and in case of any litigation arising from any obstruction, or alleged obstruction, to the free navigation of said river, the cause may be tried before the district court of the United States of the State of Alabama in which any portion of said obstruction or bridges touches: *And provided also,* That said drawbridges shall be opened promptly, upon reasonable signal, for the passage of boats, and in no case shall unnecessary delay occur in opening the said draw during or after the passage of trains.

Sec. 2. That any bridge constructed under this act, and according to its limitations, shall be a lawful structure, and shall be known and recognised as a post-route, upon which, also, no higher charge shall be made for the transmission over the same of the mails, the troops, and the munitions of war of the United States than the rate per mile paid for their transportation over the railroads or public highways leading to said bridges.

Sec. 3. That all railway companies desiring to use said bridges shall have and be entitled to equal rights and privileges in the passage of the same, and in the use of the machinery and fixtures thereof, and of all the approaches thereto, under and upon such terms and conditions as shall be prescribed by the Secretary of War, upon hearing the allegations and proofs of the parties in case they shall not agree.

Sec. 4. That the right to alter or amend this act so as to prevent or remove all material obstructions to the navigation of said river by the construction of bridges is hereby expressly reserved; and that any bridge or bridges constructed under this act shall be built under and subject to such regulations for the security of the navigation of said river as the Secretary of War shall prescribe; and the said bridges shall be, at all times, so kept and managed as to offer reasonable and proper means for the passage of vessels through and under them; and the said bridges shall be changed, at the cost and expense of the owners thereof, from time to time, as Congress may direct, so as to preserve the free and convenient navigation of said river; and the authority to erect and continue said bridges shall be subject to revocation by law whenever the public good shall, in the judgment of Congress, so require.

Approved, December 24, 1872.

*Drawbridges, how to be constructed;*

*litigation,*

*to be opened promptly;*

*to be lawful structures and post-routes; charges.*

*All railroad companies to have equal rights to use the bridges.*

*This act may be altered, &c.*

*Bridges how to be built, managed, changed, &c.*

---

CHAP. XIII. — *An Act for the Reduction of Officers and Expenses of the internal Revenue.*    Dec. 24, 1872.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That on the first day of July, eighteen hundred and seventy-three, or at such time prior thereto, in the districts respectively, as the commissioner of internal revenue may find practicable, the offices of assessor and assistant assessor of internal revenue shall cease to exist; thereupon all duties imposed by law on assessors and assistant assessors, except as hereinafter otherwise provided, be, and the same are hereby, transferred to and imposed upon collectors of internal revenue, to be performed by them or their deputies; and that all returns and reports required by law to be made to the said assessors and assistant assessors shall be made to the said collectors, or to their deputies; and that each of said assessors shall, prior to the date aforesaid, and at the time set therefor by the commissioner of internal revenue, transfer to such revenue officer as may be designated by the commissioner of internal revenue for that purpose all books, papers, and other property belonging to the government in his possession, or in that of any of his assistant assessors, and shall file with his final account an inventory thereof in detail, with the receipt of said revenue officer there-

*Offices of assessor and assistant assessor of internal revenue to cease on or before July 1, 1873;*

*collectors, &c., to perform their duties; transfer of books and papers.*

Case 3:03-cv-00065-MCR-MD   Document 52-2   Filed 11/18/03   Page 26 of 65

402            FORTY-SECOND CONGRESS. Sess. III. Ch. 18. 1873.

for; and from the time set for said transfer, his office and that of his assistants shall cease.

**Commissioner of internal revenue to make certain assessments, &c., for deficiencies in returns of distilled spirits;**
**1868, ch. 186, § 20.**
**Vol. xv. p. 133,**

SEC. 2. That the commissioner of internal revenue is hereby authorized and required thereafter to make the inquiries, determinations, and assessments of the following taxes, to wit:

For deficiencies imposed by the provisions of section twenty of an act entitled "An act imposing taxes on distilled spirits and tobacco, and for other purposes," approved July twentieth, eighteen hundred and sixty-eight, as amended by subsequent acts.

**deposits, &c., in banking business;**
**1864, ch. 173, § 110.**
**Vol. xiii. p. 277.**

Semi-annually, upon the deposits, capital, and circulation of each person, bank, association, company, or corporation engaged in the business of banking, imposed by the provisions of section one hundred and ten of an act entitled "An act to provide internal revenue to support the government and to pay interest on the public debt, and for other purposes," approved June thirtieth, eighteen hundred and sixty-four, as amended and supplemented by subsequent acts.

**Upon certain distilled spirits sold without a stamp;**
**1867, ch. 169, §§ 5, 14.**
**Vol. xiv. pp. 472, 481.**
**on tobacco, &c.;**
**1868, ch. 186, § 60.**
**1872, ch. 315, § 31.**
**Ante, p. 249.**
**on legacies and successions, assessments to be certified to, and collected by, collectors.**

Upon articles provided for in section five, and in the first proviso of section fourteen, of an act entitled "An act to amend existing laws relating to internal revenue, and for other purposes," approved March second, eighteen hundred and sixty-seven.

Upon tobacco, snuff, and cigars, provided for in section sixty of an act entitled "An act imposing taxes on distilled spirits and tobacco, and for other purposes," approved July twentieth, eighteen hundred and sixty-eight, as amended by section thirty-one of an act entitled "An act to reduce duties on imports and to reduce internal taxes, and for other purposes," approved June sixth, eighteen hundred and seventy-two.

Upon legacies and successions, and of all other internal-revenue taxes liable to be assessed, or accruing under the provisions of former acts; and the said commissioner shall certify such assessments, when made, to the proper collectors, respectively, who shall proceed to collect and account for taxes so certified in the same manner as assessments on lists are now collected and accounted for.

**All special taxes after, &c., to be paid by stamps.**
**Stamps to be procured, and provisions of former laws to apply.**
**1868, ch. 186, §§ 96, 101.**
**Vol. xv. pp. 147, 155.**

SEC. 3. That all special taxes imposed by law, accruing after April thirty, eighteen hundred and seventy-three, including the tax on stills, or worms, shall be paid by stamps denoting the tax, and the commissioner of internal revenue is hereby authorized and required to procure appropriate stamps for the payment of such taxes; and the provisions of sections twenty-six and one hundred and one of an act entitled "An act imposing taxes on distilled spirits and tobacco, and for other purposes," approved July twentieth, eighteen hundred and sixty-eight, and all other provisions of law relating to the preparation and issue of stamps for distilled spirits, fermented liquors, tobacco, and cigars, so far as applicable, are hereby extended, so as to include such stamps, and the commissioner of internal revenue shall have authority to make all needful rules and regulations relative thereto. Every person engaged in any business, avocation, or employment, who is thereby made liable to a special tax, except tobacco peddlers, shall place and keep conspicuously in his establishment or place of business all stamps denoting the payment of said special tax; and any person who shall through negligence, fail to so place and keep said stamp, shall, upon conviction, be sentenced to pay a penalty equal to the special tax for which his business rendered him liable, and the costs of prosecution; but in no case shall said penalty be less than ten dollars. And

**Penalty for not keeping conspicuously in place of business stamps denoting payment of special tax;**
**In cases of willful neglect or refusal.**
**Proviso.**

where the failure to comply with the foregoing provision of law shall be through willful neglect or refusal, then the penalty shall be double the amount above prescribed: *Provided*, That nothing contained in this section shall change, or in any way affect, the liability of any person for exercising or carrying on any trade, business, or profession, or doing any act for the exercising, carrying on, or doing of which a special tax is imposed by law, without the payment thereof.

FORTY–SECOND CONGRESS. Sess. III. Ch. 18. 1873.   403

SEC. 4. That each collector of internal revenue shall, under regulations of the commissioner of internal revenue, place and keep conspicuously in his office, for public inspection, an alphabetical list of the names of all persons who shall have paid special taxes within his district, and shall state thereon the time, place, and business for which such special taxes have been paid.

*Collector to keep conspicuously in his office list of names of persons who have paid special taxes, &c.*

SEC. 5. That section one hundred and ten of an act entitled "An act to provide internal revenue to support the government, to pay interest on the public debt, and for other purposes," approved June thirtieth, eighteen hundred and sixty-four, as subsequently amended, be so amended that the returns therein required to be made shall be made and rendered semi-annually on the first day of December and the first day of June, in duplicate; one copy of which shall be transmitted to the collector of the proper district, and one copy to the commissioner of internal revenue.

*Returns of persons engaged in banking, &c., to be made semi-annually, in duplicate. Vol. xiii. p. 278.*

SEC. 6. That the act entitled "An act imposing taxes on distilled spirits and tobacco, and for other purposes," approved July twentieth, eighteen hundred and sixty-eight, as amended by subsequent acts, be further amended as follows, to wit:

*Amendments of 1868, Vol. xv. p. 125.*

That section five be amended so that the duplicate statement therein required to be retained by the assistant assessor of the district shall, from and after the time when the office of said assistant assessor shall cease, be transmitted by the collector to the commissioner of internal revenue.

*Section 5. Statements as to stills and distilling apparatus.*

That section nineteen be amended so that one of the duplicate returns therein required to be sent to the assistant assessor of the district shall, from and after the time when the office of said assistant assessor shall cease, be transmitted by the collector to the commissioner of internal revenue.

*Section 19. Returns of materials used and spirits produced.*

That section twenty-eight be so amended that all of the additional commission of one-half of one per centum therein allowed shall be paid to the collector receiving the tax on all spirits produced after the office of the assessor shall cease under the provisions of this act: *Provided*, That the total net compensation of collectors as now fixed by law shall not be thereby increased.

*Section 28. Commission to collector on amount of tax on distilled spirits. Proviso.*

That section fifty-nine be so amended that in case any peddler refuses to exhibit a proper certificate from the collector of his or her district, and fails to show cause why the property seized shall not be forfeited, proceedings for its forfeiture shall be taken and had under the general provisions of the internal-revenue laws relating to forfeitures.

*Section 59. Forfeiture of peddlers' goods.*

That the provisions of section one hundred and three be extended and made applicable to the provisions of this act.

*Regulations of commissioner.*

SEC. 7. That section forty-three of an act entitled "An act to reduce duties on imports and to reduce internal taxes, and for other purposes," approved June sixth, eighteen hundred and seventy-two, be, and the same is hereby, repealed.

*Repeal of 1872, ch. 315, §43, Ante, p. 257, reducing internal revenue districts, &c.*

SEC. 8. That the commissioner of internal revenue shall, under the direction of the Secretary of the Treasury, require that each collector of internal revenue shall, before entering upon the duties prescribed by this act, give additional bond, conditioned that said collector shall faithfully perform the duties of his office according to the provisions of existing laws or of laws hereafter enacted.

*Collectors to give additional bond.*

SEC. 9. That the commissioner of internal revenue be, and hereby is, authorized to designate one of the heads of division as chief clerk of the bureau without additional compensation.

*Commissioner to designate a head of division as chief clerk of bureau.*

APPROVED, December 24, 1872.

Case 3:03-cv-00065-MCR-MD   Document 52-2   Filed 11/18/03   Page 28 of 65

SEC. 314. There shall be in the office of the Register of the Treasury an Assistant Register, who shall be appointed by the President, by and with the advice and consent of the Senate, and shall be entitled to a salary of two thousand dollars a year.

*Assistant Register.*
20 Feb., 1863, c.
44, s.1, v.12, p.656.
14 Mar., 1864, c.
30, s. 7, v. 13, p. 28.

SEC. 315. The Assistant Register shall perform such duties as may be devolved on him by the Register, and, in the absence of the Register, shall act in his stead; and any official record, certificate, or other document, excepting warrants, bonds, and drafts, signed by the Assistant Register, shall have the same effect as if signed by the Register.

*Duties of Assistant Register.*
20 Feb., 1863, c.
44, s. 2, v.12, p. 656.

## CHAPTER SEVEN.

### THE COMMISSIONER OF CUSTOMS.

Sec.                                          Sec.
316. Commissioner of Customs.                 318. Duty to prescribe official forms.
317. Duties of Commissioner of Customs.

SEC. 316. There shall be in the Department of the Treasury a Commissioner of Customs, who shall be appointed by the President, by and with the advice and consent of the Senate, and shall be entitled to a salary of four thousand dollars a year.

*Commissioner of Customs.*

3 Mar., 1849, c.
108, s. 12, v.9, p.396.
3 Mar., 1873, c. 226, s. 3, v. 17, p. 508.   3 Mar., 1875, c. 130, s. 2, v. 18, p. 397.

SEC. 317. The Commissioner of Customs shall examine all accounts settled by the First Auditor relating to the receipts from customs, including accounts of collectors and other officers of the customs, and certify the balances arising thereon to the Register.  [And shall perform all the acts and exercise all the powers, relating to the receipts from customs and the accounts of collectors and the other officers of the customs or connected therewith, devolved by section two hundred and sixty-nine upon the First Comptroller in regard to other receipts and other accounts.]

*Duties of Commissioner of Customs.*

3 Mar., 1849, c.
108, s. 12, v.9, p.396.
27 Feb., 1877, c.
69, r. 19, p. 241.

SEC. 318. The Commissioner of Customs shall report to the Secretary of the Treasury official forms to be used in the different offices for collecting the public receipts from customs, and all the manner and form of keeping and stating the accounts of the persons employed therein.

*Duty to prescribe official forms.*

2 Mar., 1817, c.
45, s. 8, v. 3, p. 367.
3 Mar., 1849, c. 108, s. 12, v. 9, p. 396.

## CHAPTER EIGHT.

### THE COMMISSIONER OF INTERNAL REVENUE.

Sec.                                          Sec.
319. Commissioner of Internal Revenue.        322. Deputy Commissioner of Internal
320. Chief Clerk.                                  Revenue.
321. Duties of Commissioner of Internal       323. Duties of Deputy Commissioner of
     Revenue.                                      Internal Revenue.

SEC. 319. There shall be in the Department of the Treasury a Commissioner of Internal Revenue, who shall be appointed by the President, by and with the advice and consent of the Senate, and shall be entitled to a salary of six thousand dollars a year.

*Commissioner of Internal Revenue.*

1 July, 1862, c.
119, s. 1, v. 12, p. 432.
30 June, 1864, c. 173, s. 1, v. 13, p. 223.   3 Mar., 1875, c. 130 s. 2, v. 18, p. 398.

SEC. 320. The Commissioner of Internal Revenue is authorized to designate one of the heads of division as chief clerk of the Bureau without additional compensation.

*Chief Clerk.*
24 Dec., 1872, c.
13, s. 9, v. 17, p.403.

SEC. 321. The Commissioner of Internal Revenue, under the direction of the Secretary of the Treasury, shall have general superintendence of the assessment and collection of all duties and taxes now or hereafter

*Duties of Commissioner of Internal Revenue.*

Case 3:03-cv-00065-MCR-MD    Document 52-2    Filed 11/18/03    Page 29 of 65

30 June, 1864, c. 173, s.1, v.13, p.223. imposed by any law providing internal revenue; and shall prepare and distribute all the instructions, regulations, directions, forms, blanks, stamps, and other matters pertaining to the assessment and collection of internal revenue; and shall provide hydrometers, and proper and sufficient adhesive stamps and stamps or dies for expressing and denoting the several stamp duties, or, in the case of percentage duties, the amount thereof; and alter and renew or replace such stamps from time to time, as occasion may require. He may also contract for or procure the printing of requisite forms, decisions and regulations, but the printing of such forms, decisions and regulations shall be done at the Public Printing-Office, unless the Public Printer shall be unable to perform the work: *Provided*, That the Commissioner of Internal Revenue may, under such regulations as may be established by the Secretary of the Treasury, after due public notice, receive bids and make contracts for supplying stationery, blank-books and blanks to the collectors in the several collection-districts; and the said Commissioner shall estimate in detail by collection-districts the expense of assessing and the expense of the collection of internal revenue. [See § 307.]

Deputy Commissioner of Internal Revenue. — 3 Mar., 1863, c. 74, s. 19, v. 12, p. 725.
30 June, 1864, c. 173, s. 3, v. 13, p. 224. 13 July, 1866, c. 184, s. 64, v. 14, p. 170. 29. Jan., 1874, c. 18, v. 18, p. 6.

SEC. 322. There shall be in the office of the Commissioner of Internal Revenue a Deputy Commissioner of Internal Revenue, who shall be appointed by the President, by and with the advice and consent of the Senate, and shall be entitled to a salary of three thousand five hundred dollars a year.

Duties of Deputy Commissioner of Internal Revenue. — 3 Mar., 1863, c. 74, s. 19, v. 12, p. 725.

SEC. 323. The Deputy Commissioner of Internal Revenue shall be charged with such duties in the office of the Commissioner of Internal Revenue as may be prescribed by the Secretary of the Treasury, or by law, and shall act as Commissioner of Internal Revenue in case of the absence of that officer.

30 June, 1864, c. 173, s. 3, v. 13, p. 224. 13 July, 1866, c. 184, s. 64, v. 14, p. 170.

---

# CHAPTER NINE.

## THE COMPTROLLER OF THE CURRENCY.

| Sec. | | Sec. | |
|---|---|---|---|
| 324. | Bureau of the Comptroller of the Currency. | 329. | Interest in national banks. |
| 325. | Comptroller of the Currency. | 330. | Seal of Comptroller of the Currency. |
| 326. | Bond and oath of office of Comptroller of the Currency. | 331. | Rooms, vaults, furniture, &c., for Currency Bureau. |
| 327. | Deputy Comptroller of the Currency. | 332. | Banks in District of Columbia. |
| 338. | Clerks. | 333. | Report of Comptroller. |

Bureau of the Comptroller of the Currency. — 3 June, 1864, c. 106, s. 1, v. 13, p. 99.

SEC. 324. There shall be in the Department of the Treasury a Bureau charged with the execution of all laws passed by Congress relating to the issue and regulation of a national currency secured by United States bonds; the chief officer of which Bureau shall be called the Comptroller of the Currency, and shall perform his duties under the general direction of the Secretary of the Treasury.

Comptroller of the Currency. — 3 June, 1864, c. 106, s. 1, v. 13, p. 99. 3 Mar., 1875, c. 130, s.2, v.18, p. 398.

SEC. 325. The Comptroller of the Currency shall be appointed by the President, on the recommendation of the Secretary of the Treasury, by and with the advice and consent of the Senate, and shall hold his office for the term of five years unless sooner removed by the President, upon reasons to be communicated by him to the Senate; and he shall be entitled to a salary of five thousand dollars a year.

Bond and oath of office of Comptroller of the Currency. — 3 June, 1864, c. 106, s. 1, v. 13, p. 99.

SEC. 326. The Comptroller of the Currency shall, within fifteen days from the time of notice of his appointment, take and subscribe the oath of office; and he shall give to the United States a bond in the penalty of one hundred thousand dollars, with not less than two responsible sureties, to be approved by the Secretary of the Treasury, conditioned for the faithful discharge of the duties of his office.

# Subtitle E—Personnel

## TABLE OF CONTENTS

CHAPTER 39—THE OFFICE OF THE COMMISSIONER OF INTERNAL REVENUE

### SUBCHAPTER A—THE COMMISSIONER

Sec. 3900. Appointment and salary.
Sec. 3901. Powers and duties.

### SUBCHAPTER B—THE ASSISTANT TO THE COMMISSIONER

Sec. 3905. Appointment.
Sec. 3906. Duties.

### SUBCHAPTER C—SPECIAL DEPUTY COMMISSIONER

Sec. 3910. Appointment.
Sec. 3911. Duties.

### SUBCHAPTER D—DEPUTY COMMISSIONERS

Sec. 3915. Employment.
Sec. 3916. Duties.

### SUBCHAPTER E—CHEMISTS AND MICROSCOPISTS

Sec. 3920. Appointment of analytical chemist and microscopist.
Sec. 3021. Employment of additional chemists and microscopists.

# CHAPTER 39—THE OFFICE OF THE COMMISSIONER OF INTERNAL REVENUE

## SUBCHAPTER A—THE COMMISSIONER

SEC. 3900. APPOINTMENT AND SALARY.

There shall be in the Department of the Treasury a Commissioner of Internal Revenue, who shall be appointed by the President, by and with the advice and consent of the Senate, and shall be entitled to a salary of $10,000 a year.

SEC. 3901. POWERS AND DUTIES.

(a) ASSESSMENT AND COLLECTION.—The Commissioner, under the direction of the Secretary—

(1) GENERAL SUPERINTENDENCE.—Shall have general superintendence of the assessment and collection of all taxes imposed by any law providing internal revenue; and

(2) REGULATIONS, FORMS, STAMPS, AND DIES.—Shall prepare and distribute all the instructions, regulations, directions, forms, blanks, stamps, and other matters pertaining to the assessment and collection of internal revenue; and shall provide hydrometers, and proper and sufficient adhesive stamps and stamps or dies for expressing and denoting the several stamp taxes, or, in the case of percentage taxes, the amount thereof; and alter and renew or replace such stamps from time to time, as occasion may require.

477

# CHAPTER 80—GENERAL RULES

SUBCHAPTER A. Application of internal revenue laws.
SUBCHAPTER B. Effective date and related provisions.

## Subchapter A—Application of Internal Revenue Laws

Sec. 7801. Authority of Department of the Treasury.
Sec. 7802. Commissioner of Internal Revenue.
Sec. 7803. Other personnel.
Sec. 7804. Effect of reorganization plans.
Sec. 7805. Rules and regulations.
Sec. 7806. Construction of title.
Sec. 7807. Rules in effect upon enactment of this title.
Sec. 7808. Depositaries for collections.
Sec. 7809. Deposit of collections.

**SEC. 7801. AUTHORITY OF DEPARTMENT OF THE TREASURY.**

(a) POWERS AND DUTIES OF SECRETARY.—Except as otherwise expressly provided by law, the administration and enforcement of this title shall be performed by or under the supervision of the Secretary of the Treasury.

(b) GENERAL COUNSEL FOR THE DEPARTMENT.—There shall be in the Department of the Treasury the office of General Counsel for the Department of the Treasury. The General Counsel shall be appointed by the President, by and with the advice and consent of the Senate. The General Counsel shall be the chief law officer of the Department and shall perform such duties as may be prescribed by the Secretary. The Secretary may appoint and fix the duties of an Assistant General Counsel who shall serve as Chief Counsel of the Internal Revenue Service and may appoint and fix the duties of not to exceed five other Assistant General Counsels. All Assistant General Counsels shall be appointed without regard to the provisions of the civil service laws. The Secretary may also appoint and fix the duties of such other attorneys as he may deem necessary.

(c) FUNCTIONS OF DEPARTMENT OF JUSTICE UNAFFECTED.— Nothing in this section shall be considered to affect the duties, powers, or functions imposed upon or vested in the Department of Justice, or any officer thereof, by law existing on May 10, 1934.

**SEC. 7802. COMMISSIONER OF INTERNAL REVENUE.**

There shall be in the Department of the Treasury a Commissioner of Internal Revenue, who shall be appointed by the President, by and with the advice and consent of the Senate. The Commissioner of Internal Revenue shall have such duties and powers as may be prescribed by the Secretary.

**SEC. 7803. OTHER PERSONNEL.**

(a) APPOINTMENT AND SUPERVISION.—The Secretary or his delegate is authorized to employ such number of persons as the Secretary or his delegate deems proper for the administration and enforcement of the internal revenue laws, and the Secretary or his delegate shall

§ 7803(a)

031

## NOTICES

*Issue.* Whose profit margin and aggregate annual revenues should hospital A consider in determining if it can increase its prices?

*Ruling.* Institutional providers of health services include any hospital owned or operated by any person. Economic Stabilization Regulations, 6 CFR Part 300, Appendix I, 36 F.R. 23584 (December 30, 1971). In applying the regulations of the Economic Stabilization Program, each separate and distinct institutional health care provider in a community is considered on an individual basis. Therefore each individual hospital that wishes to charge a price in excess of its base price must individually meet the requirements of Economic Stabilization Regulations, 6 CFR 300.18, 36 F.R. 23584 (December 30, 1971), as amended, 37 F.R. 775 (January 19, 1972) and 37 F.R. 7621 (April 18, 1972). Each hospital must use its own allowable cost increases to justify a price increase and use its own profit margin, not the profit margin of a larger entity (such as corporation X in this example) that operates the hospital. Also, the aggregate annual revenue requirements of § 300.18(c) of the regulations apply to each individual hospital.

Therefore hospital A must consider its own profit margin (3 percent) and its own aggregate annual revenues ($1.5 million) in determining if its proposed price increase is allowable.

This ruling has been approved by the General Counsel of the Price Commission.

Dated: June 5, 1972.

LEE H. HENKEL, Jr.,
*Acting Chief Counsel,
Internal Revenue Service.*

Approved: June 5, 1972.

SAMUEL R. PIERCE, Jr.,
*General Counsel,
Department of the Treasury.*

[FR Doc.72-8786 Filed 6-9-72;8:48 am]

[Price Commission Ruling 1972-183]

## PROFIT MARGIN DETERMINATIONS

### Price Commission Ruling

*Facts.* Company A, a manufacturing firm which uses a cost method of accounting in preparing its financial statements, generally writes down its inventory valuation each year by approximately $100,000. This write down reflects losses due to spoilage, obsolescence and other acceptable reasons. This year, however, A proposes to write down its inventory $400,000 due to extraordinary reasons.

*Issue.* Is an inventory write down considered a general and recurring cost of business operations which may be used in determining A's profit margin?

*Ruling.* Economic Stabilization Regulation § 300.5, 6 CFR 300.5 (February 24, 1972), defines the term "Profit Margin" as "the ratio that operating income (net sales less cost of sales and less normal and generally recurring costs of business operations, determined before nonop-

erating items, extraordinary items, and income taxes) bears to net sales as reported on the person's financial statement prepared in accordance with generally accepted accounting principles consistently applied." In accordance with this regulation general accounting theory is used instead of income tax accounting, and each expense in order to be allowable in calculating the profit margin, must be general, recurring, operational in nature and not extraordinary. Further, its use in financial statements in determining profit and loss, must be consistent with general accounting principles applied consistently.

On the above facts, an inventory write down would comply with all the requirements, except that this year the excessive amount would make it extraordinary. As such it cannot be used, this year, in determining A's profit margin in accordance with the regulations.

This ruling has been approved by the General Counsel of the Price Commission.

Dated: June 5, 1972.

LEE H. HENKEL, Jr.,
*Acting Chief Counsel,
Internal Revenue Service.*

Approved: June 5, 1972.

SAMUEL R. PIERCE, Jr.,
*General Counsel,
Department of the Treasury.*

[FR Doc.72-8787 Filed 6-9-72;8:48 am]

[Price Commission Ruling 1972-184; Cost of Living Council Ruling 1972-54]

## RETROACTIVE PAYMENTS

### Price Commission Ruling and Cost of Living Council Ruling

*Facts.* The Postal Service has a procedure for adjusting the payments it makes to contractors who carry mail in order to compensate them for unexpected cost increases. X, a contractor, applied and filed for such an increase in May 1971, for its various routes. The requests were neither granted nor denied due to the transition problems occurring within the Post Office.

*Issue.* If the Post Office approves such requests after August 15, 1971, will such payments to X violate the Economic Stabilization Act?

*Ruling.* X has performed services for the Post Office during the period prior to August 15, 1971. It is clear that the subsequent freeze did not give an obligor the right to renege on its past obligations due for services rendered prior to August 15, 1971. X can collect increased payments from the Post Office for services performed during this period even though such approval occurred after August 15, 1971.

As for compensation for services rendered by X during the August 15 to November 13, 1971, period, X can also collect the increased payments for this period. Under Phase I, the ceiling price for a service is the highest price at which a seller furnished the service in a substantial number of transactions during

the base period. Economic Stabilization Regulation No. 1, section 3a(1), 36 F.R. 16515 (August 21, 1971). A "transaction" under Phase I takes place when the seller performs the service. Economic Stabilization Circular No. 101.302(1). Since X has performed services during the pre-August 15, 1971, period at a higher price, the ceiling price during the freeze will be the higher price subsequently granted by the Post Office.

This ruling has been approved by the General Counsels of the Price Commission and Cost of Living Council.

Dated: June 6, 1972.

LEE H. HENKEL, Jr.,
*Acting Chief Counsel,
Internal Revenue Service.*

Approved: June 6, 1972.

SAMUEL R. PIERCE, Jr.,
*General Counsel,
Department of the Treasury.*

[FR Doc.72-8788 Filed 6-9-72;8:48 am]

## Office of the Secretary

[Treasury Department Order 221]

## BUREAU OF ALCOHOL, TOBACCO, AND FIREARMS

### Establishment, Organization, and Functions

By virtue of the authority vested in me as Secretary of the Treasury, including the authority in Reorganization Plan No. 26 of 1950, it is ordered that:

1. The purpose of this order is to transfer, as specified herein, the functions, powers, and duties of the Internal Revenue Service arising under laws relating to alcohol, tobacco, firearms, and explosives (including the Alcohol, Tobacco, and Firearms Division of the Internal Revenue Service), to the Bureau of Alcohol, Tobacco, and Firearms (hereinafter referred to as the Bureau) which is hereby established. The Bureau shall be headed by the Director, Bureau of Alcohol, Tobacco, and Firearms (hereinafter referred to as the Director). The Director shall perform his duties under the general direction of the Secretary of the Treasury (hereinafter referred to as the Secretary) and under the supervision of the Assistant Secretary (Enforcement, Tariff and Trade Affairs, and Operations) (hereinafter referred to as the Assistant Secretary).

2. The Director shall perform the functions, exercise the powers, and carry out the duties of the Secretary in the administration and enforcement of the following provisions of law:

(a) Chapters 51, 52, and 53 of the Internal Revenue Code of 1954 and sections 7652 and 7653 of such Code insofar as they relate to the commodities subject to tax under such chapters;

(b) Chapters 61 to 80, inclusive, of the Internal Revenue Code of 1954, insofar as they relate to activities administered and enforced with respect to chapters 51, 52, and 53;

(c) The Federal Alcohol Administration Act (27 U.S.C. Chapter 8);

(d) 18 U.S.C. Chapter 44 (relating to firearms) ;

(e) Title VII, Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. Appendix, sections 1201–1203) ;

(f) 18 U.S.C. 1262–1265; 1952; 3615 (relating to liquor traffic) ;

(g) Act of August 9, 1939 (49 U.S.C. Chapter 11); insofar as it involves matters relating to violations of the National Firearms Act;

(h) 18 U.S.C. Chapter 40 (relating to explosives) ; and

(i) Section 414 of the Mutual Security Act of 1954, as amended (22 U.S.C. 1934) relating to the control of the importation of arms, ammunition, and implements of war.

3. All functions, powers, and duties of the Secretary which relate to the administration and enforcement of the laws specified in paragraph 2 hereof are delegated to the Director. Regulations for the purposes of carrying out the functions, powers, and duties delegated to the Director may be issued by him with the approval of the Secretary.

4. (a) All regulations prescribed, all rules and instructions issued, and all forms adopted for the administration and enforcement of the laws specified in paragraph 2 hereof, which are in effect or in use on the effective date of this order, shall continue in effect as regulations, rules, instructions, and forms of the Bureau until superseded or revised;

(b) All existing activities relating to the collection, processing, depositing, or accounting for taxes (including penalties and interest), fees, or other moneys under the laws specified in paragraph 2 hereof, shall continue to be performed by the Commissioner of Internal Revenue to the extent not now performed by the Alcohol, Tobacco, and Firearms Division or the Assistant Regional Commissioners (Alcohol, Tobacco, and Firearms), until the Director shall otherwise provide with the approval of the Secretary;

(c) All existing activities relating to the laws specified in paragraph 2 hereof which are now performed by the Bureau of Customs, shall continue to be performed by such Bureau until the Director shall otherwise provide with the approval of the Secretary.

5. (a) The terms "Director, Alcohol, Tobacco, and Firearms Division" and "Commissioner of Internal Revenue" wherever used in regulations, rules, instructions, and forms, issued or adopted for the administration and enforcement of the laws specified in paragraph 2 hereof, which are in effect or in use on the effective date of this order, shall be held to mean the Director.

(b) The terms "Assistant Regional Commissioner" wherever used in such regulations, rules, instructions, and forms, shall be held to mean Regional Director.

(c) The terms "internal revenue officer" and "officer, employee, or agent of the internal revenue" wherever used in such regulations, rules, instructions,

and forms, in any law specified in paragraph 2 above, and in 18 U.S.C. 1114, shall include all officers and employees of the United States engaged in the administration and enforcement of the laws administered by the Bureau, who are appointed or employed by, or pursuant to the authority of, or who are subject to the directions, instructions, or orders of, the Secretary.

(d) The above terms, when used in regulations, rules, instructions, and forms of Government agencies other than the Internal Revenue Service, which relate to the administration and enforcement of the laws specified in paragraph 2 hereof, shall be held to have the same meaning as if used in regulations, rules, instructions, and forms of the Bureau.

6. (a) There shall be transferred to the Bureau all positions, personnel, records, property, and unexpended balances of appropriations, allocations, and other funds of the Alcohol, Tobacco and Firearms Division of the Internal Revenue Service, including those of the Assistant Regional Commissioners (Alcohol, Tobacco and Firearms), Internal Revenue Service.

(b) In addition, there shall be transferred to the Bureau such other positions, personnel, records, property, and unexpended balances of appropriations, allocations, and other funds, as are determined by the Assistant Secretary for Administration, in consultation with the Assistant Secretary, the Director, and the Commissioner of Internal Revenue, to be necessary or appropriate to be transferred to carry out the purposes of this order.

(c) There shall be transferred to the Chief Counsel of the Bureau such functions, powers, and duties, and such positions, personnel, records, property, and unexpended balances of appropriations, allocations, and other funds, of the Chief Counsel of the Internal Revenue Service as the General Counsel of the Department shall direct.

7. All delegations inconsistent with this order are revoked.

8. This order shall become effective July 1, 1972.

Dated: June 6, 1972.

[SEAL]            CHARLS E. WALKER,
        Acting Secretary of the Treasury.

[FR Doc.72–8818 Filed 6–9–72;8:50 am]

# DEPARTMENT OF AGRICULTURE

## Agricultural Marketing Service

[Marketing Agreement 146]

### DOMESTICALLY PRODUCED PEANUTS

**Budget of Expenses of Administrative Committee and Rate of Assessment for 1972 Crop Year**

Pursuant to Marketing Agreement 146, regulating the quality of domestically

produced peanuts (30 F.R. 9402), and upon recommendation of the Peanut Administrative Committee established pursuant to such agreement and other information, it is hereby found and determined that the expenses of said Committee and the rate of assessment applicable to peanuts produced in 1972 and for the crop year beginning July 1, 1972, shall be as follows:

(a) *Administrative expenses.* The budget of expenses for the Committee for the crop year beginning July 1, 1972, shall be in the total amount of $285,000, such amount being reasonable and likely to be incurred for the maintenance and functioning of the Committee, and for such purposes as the Secretary may, pursuant to the provisions of the marketing agreement, determine to be appropriate.

(b) *Indemnification expenses.* Expenses of the Committee for indemnification payments, pursuant to the terms and conditions of indemnification applicable to 1972 crop peanuts, effective July 1, 1972, are estimated at, but may exceed $3.5 million, such amount being reasonable and likely to be incurred.

(c) *Rate of assessment.* Each handler shall pay to the Peanut Administrative Committee, in accordance with section 48 of the marketing agreement, an assessment at the rate of $2.55 per net ton of farmers stock peanuts received or acquired other than those described in section 31 (c) and (d) ($0.30 for administrative expenses and $2.25 for indemnification expenses).

(d) *Indemnification reserve.* Monetary additions to the indemnification reserve, established in the 1965 crop year pursuant to section 48 of the marketing agreement, shall continue. That portion of the total assessment funds accrued from the $2.25 rate and not expended in providing indemnification on 1972 crop peanuts shall be placed in such reserve and shall be available to pay indemnification expenses on subsequent crops.

The expenses and rate of assessment are, under the agreement, on a crop year basis and will automatically be applicable to all assessable peanuts from the beginning of such crop year. The handlers of peanuts who will be affected hereby have signed the marketing agreement authorizing approval of expenses that may be incurred and the imposition of assessments, they are represented on the Committee which has submitted the recommendation with respect to such expenses and assessment for approval; and handlers have had knowledge of the foregoing in their recent industrywide discussions and will be afforded maximum time to plan their operations accordingly.

Dated: June 7, 1972.

FLOYD F. HEDLUND,
Director,
Fruit and Vegetable Division.

[FR Doc.72–8790 Filed 6–9–72;8:50 am]

# Notices

## DEPARTMENT OF THE TREASURY

### Bureau of Customs

#### DEFORMED CONCRETE REINFORCING BARS OF NONALLOY STEEL FROM MEXICO

##### Antidumping Proceeding Notice

On June 8, 1972, information was received in proper form pursuant to §§ 153.26 and 153.27. Customs regulations (19 CFR 153.26, 153.27), indicating a possibility that deformed concrete reinforcing bars of nonalloy steel from Mexico are being, or are likely to be, sold at less than fair value within the meaning of the Antidumping Act, 1921, as amended (19 U.S.C. 160 et seq.).

There is evidence on record concerning injury to or likelihood of injury to or prevention of establishment of an industry in the United States.

Having conducted a summary investigation as required by § 153.29 of the Customs regulations (19 CFR 153.29) and having determined as a result thereof that there are grounds for so doing, the Bureau of Customs is instituting an inquiry to verify the information submitted and to obtain the facts necessary to enable the Secretary of the Treasury to reach a determination as to the fact or likelihood of sales at less than fair value.

A summary of information received from all sources is as follows:

The information received tends to indicate that the prices of the merchandise sold for exportation to the United States are less than the prices for home consumption.

This notice is published pursuant to § 153.30 of the Customs regulations (19 CFR 153.30).

[SEAL]          EDWIN F. RAINS,
*Acting Commissioner of Customs.*

Approved: July 5, 1972.

EUGENE T. ROSSIDES,
*Assistant Secretary
of the Treasury.*

[FR Doc.72-10599 Filed 7-7-72;9:14 am]

### Internal Revenue Service

#### NOTICE OF GRANTING OF RELIEF

Notice is hereby given that pursuant to 18 U.S.C. 925(c) the following named persons have been granted relief from disabilities imposed by Federal laws with respect to the acquisition, transfer, receipt, shipment, or possession of firearms incurred by reason of their convictions of crimes punishable by imprisonment for a term exceeding 1 year.

It has been established to my satisfaction that the circumstances regarding the convictions and each applicant's record and reputation are such that the applicant will not be likely to act in a manner dangerous to public safety, and that the granting of the relief would not be contrary to the public interest.

Davenport, Kenneth Alexander, 1132 19 Avenue, Apartment C, Seattle, WA, convicted on March 15, 1949, in the Superior Court, county of Los Angeles, Calif.

Day, John Paul, 467 South Broad Street, Mobile, AL, convicted on September 4, 1947, in the Criminal Court of Records at Panama City, Fla., June 11, 1953, in the Circuit Court of Montgomery, Ala., August 13, 1954, in the U.S. District Court, Northern Division, in Montgomery, Ala., and on April 23, 1963, in the Orleans Parish District Court, New Orleans, La.

Dean, Robert Edward, 6081 Walker Drive, Troy, MI, convicted on October 5, 1950, in the Circuit Court for the county of Oakland, Mich.

Dunne, Richard DeLafayette, 4631 Babcock Way SE., Salem, OR, convicted on February 19, 1963, in the Harney County Circuit Court, Oregon.

Essig, Irvin M., 1429 Halgren Road, Maple Plain, MN, convicted on October 8, 1963, in the Circuit Court of the State of Oregon for Douglas County.

Galipeau, Theodore Matthew, 213 Gage Street, Bennington, VT, convicted on January 11, 1946, in the Municipal Court, Bennington, Vt.

Green, Michael Axel, 152 Stone Way, Woodland, CA, convicted on August 29, 1960, in the Justice Court of Woodland Judicial District, county of Yolo, State of California.

Hall, Alfred Roosevelt, 15835 Florence Street, Detroit, MI, convicted on October 20, 1950, in the Recorder's Court for the city of Detroit, Mich.

Hall, Donald Louis, 1749 Northeast Oneal Way, Redmond, OR, convicted on February 13, 1967, in the Christian Circuit Court in and for the county of Christian, Commonwealth of Kentucky.

Harmon, Clifford Martin, 3914 South 117 Street, Seattle, WA, convicted on March 28, 1952, in the Superior Court of Washington in and for King County.

Harris, Clifford Lee, Route 2, Stuart, Va., convicted on February 8, 1965, in the U.S. District Court, Western District of Virginia, Danville, Va.

Heneghen, James Patrick, 1220 Ledwich Street, Yakima, WA, convicted on September 12, 1961, in the Superior Court of the State of Washington in and for Yakima County.

Johnson, Herman, 2949 McClellan, Detroit, MI, convicted on January 3, 1947, in the Recorder's Court, Detroit, Mich.; and on March 25, 1937, in the Douglas County District Court, Omaha, Nebr.

Johnson, Jesse Eugene, 19581 Crandell Court, Belleville, MI, convicted on April 23, 1963, in the U.S. District Court for the Eastern District of Kentucky.

Jones, Ben Felix, Route 5, Box 157, Vicksburg, MS, convicted on May 18, 1959, in the U.S. District Court, Southern District of Mississippi.

Lowe, Kevin Clark, Sr., Box 287, Route 10, Baltimore, MD, convicted on December 3, 1951, and on May 10, 1952, in Baltimore City Municipal Court; and on January 20, 1960, in the Baltimore County Court, Towson, Md.

Welker, John James, 114 West Garfield Street, Seattle, WA, convicted on October 1, 1969, in the Superior Court of the State of Washington for Snohomish County.

Walton, Harmon, 4114 South Howard, Kerman, CA, convicted on February 11, 1952, in the Superior Court of the State of California, County of Kings, Hanford, Calif.

Young, James Matt, Jenson, Ky., convicted on April 4, 1955, in the U.S. District Court, Eastern District of Kentucky.

Signed at Washington, D.C., this 14th day of June 1972.

[SEAL]          REX D. DAVIS,
*Director, Alcohol,
Tobacco and Firearms Division.*

[FR Doc.72-10485 Filed 7-7-72;8:50 am]

### Office of the Secretary

[Treasury Dept. Order 221-1]

#### BUREAU OF ALCOHOL, TOBACCO AND FIREARMS; ACTING DIRECTOR ET AL.

##### Delegation of Authority

Effective July 1, 1972, I hereby designate the following named individuals to act in the Bureau of Alcohol, Tobacco, and Firearms in the positions indicated:

Acting Director, Rex D. Davis.
Acting Deputy Director, John L. West.
Acting Assistant Director, John T. Caulfield (Criminal Enforcement).

Dated: June 30, 1972.

[SEAL]          EUGENE T. ROSSIDES,
*Assistant Secretary of the Treasury.*

[FR Doc.72-10471 Filed 7-7-72;8:46 am]

[Treasury Dept. Order 107, Rev. 15]

#### AUTHORITY TO AFFIX SEAL

By virtue of the authority vested in the Secretary of the Treasury, including the authority conferred by 5 U.S.C. 301, and by virtue of the authority delegated to me by Treasury Department Order No. 190 (Revised), it is hereby ordered that:

1. Except as provided in paragraph 2, the following officers are authorized to affix the Seal of the Treasury Department in the authentication of originals and copies of books, records, papers, writings, and documents of the Department, for all purposes, including the purposes authorized by 28 U.S.C. 1733 (b):

(a) In the Office of Central Services, Office of the Secretary:

(1) Director, Office of Central Services.

20736

# Notices

## DEPARTMENT OF STATE

### Agency for International Development

[Delegation of Authority 98]

### DEPUTY ADMINISTRATOR AND ASSISTANT ADMINISTRATORS

#### Delegation of Authority

Pursuant to the authority delegated to me by Delegation of Authority No. 104 of November 3, 1961, as amended, from the Secretary of State (25 F.R. 10608) and in accordance with the provisions of section 624(b) of the Foreign Assistance Act of 1961, as amended (22 U.S.C. 2384), it is directed as follows:

In the event of the absence, death, resignation, or disability of the Administrator, the following designated officers of the Agency for International Development shall, in the order of succession indicated, act as Administrator:

(1) Deputy Administrator.
(2) Assistant Administrator for Program and Management Services.
(3) Assistant Administrator, Bureau for Africa.
(4) Assistant Administrator, Bureau for Asia.
(5) Assistant Administrator, Bureau for Latin America.
(6) Assistant Administrator for Supporting Assistance.

This delegation of authority supersedes Delegation of Authority No. 9 (revised) of February 2, 1972 (37 F.R. 2892).

This delegation of authority is effective immediately.

Dated: September 22, 1972.

JOHN A. HANNAH,
*Administrator.*

[FR Doc.72-16802 Filed 10-2-72;8:50 am]

[Public Notice 366]

### NOTICE OF PRESIDENTIAL DETERMINATIONS UNDER THE FOREIGN ASSISTANCE ACT

Pursuant to section 654(c) of the Foreign Assistance Act of 1961, as amended (86 Stat. 29), notice is hereby given that:

(1) The President has made two determinations, both effective August 29, 1972, pursuant to section 614(a) of the Foreign Assistance Act of 1961, as amended (75 Stat. 444, 22 U.S.C. 2364(a)); and

(2) The President has concluded that publication of the said determinations would be harmful to the national security of the United States.

[SEAL]   THEODORE L. ELIOT, Jr.,
*Executive Secretary.*

SEPTEMBER 19, 1972.

[FR Doc.72-16813 Filed 10-2-72;8:50 am]

## DEPARTMENT OF THE TREASURY

### Bureau of Customs

[T.D. 72-265]

### FOREIGN CURRENCIES

#### Rates of Exchange for the Ceylon Rupee

The Federal Reserve Bank of New York, pursuant to section 522(c), Tariff Act of 1930, as amended (31 U.S.C. 372 (c)), has certified the following rates of exchange which vary by 5 percent or more from the quarterly rate published in Treasury Decision 72-194 for the Ceylon rupee. Therefore, as to entries covering merchandise exported on the dates listed, whenever it is necessary for Customs purposes to convert such currency into currency of the United States, conversion shall be at the following daily rates:

| Ceylon rupee: | |
|---|---|
| Sept. 11, 1972 | $0.1565 |
| Sept. 12, 1972 | .1500 |
| Sept. 13, 1972 | .1565 |
| Sept. 14, 1972 | .1560 |
| Sept. 15, 1972 | .1500 |

Rates of exchange certified for the Ceylon rupee which vary by 5 percent or more from the rate $0.1680 during the balance of the calendar quarter ending September 30, 1972, will be published in a Treasury Decision for dates subsequent to September 15, 1972, and before October 1, 1972.

[SEAL]   R. N. MARRA,
*Acting Assistant Commissioner,
Office of Operations.*

[FR Doc.72-16792 Filed 10-2-72;8:49 am]

### Office of the Secretary

[Treasury Department Order 221-2]

### BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

#### Designation of Officials

SEPTEMBER 22, 1972.

By virtue of the authority vested in the Secretary of the Treasury, including the authority in Reorganization Plan No. 26 of 1950, and by virtue of the authority delegated to me by Treasury Department Order No. 190 (revised), I hereby designate the following named individuals to serve in the Bureau of Alcohol, Tobacco and Firearms in the positions indicated:

Director—Rex D. Davis, Deputy Director—John L. West.

This order shall be effective immediately and thereby amend Treasury Department Order No. 221-1 of June 30, 1972.

[SEAL]   EUGENE T. ROSSIDES,
*Assistant Secretary
of the Treasury.*

[FR Doc.72-16825 Filed 10-2-72;8:51 am]

## DEPARTMENT OF JUSTICE

### Bureau of Narcotics and Dangerous Drugs

[No. 72-1]

### PHARMACEUTICAL WHOLESALERS, INC.

#### Denial of Application for Registration

On March 27, 1972, the Acting Director of the Bureau of Narcotics and Dangerous Drugs issued an order to show cause to Pharmaceutical Wholesalers, Inc., Plainview, N.Y., as to why its Application for Registration (B04501), executed on February 3, 1972, should not be denied for the reason that the Applicant's past record and experience in the distribution of controlled substances, and its failure to maintain controls against the diversion of controlled substances into other than legitimate channels evidenced a direct and continuing violation of the Controlled Substances Act of 1970 and the Administrative Regulations promulgated thereunder (21 U.S.C. 801, et seq., and Title 21, Code of Federal Regulations, Part 300, et seq.).

Thereafter, Pharmaceutical Wholesalers, Inc., requested a hearing in the matter and, on May 22, 1972, that hearing was held before Julius Rich, Administrative Law Judge. Following the hearing, proposed findings of fact and conclusions of law were submitted to Mr. Rich by the Office of Chief Counsel, Bureau of Narcotics and Dangerous Drugs; none were submitted by counsel for the Applicant. On September 22, 1972, Mr. Rich filed the following recommended decision with the Bureau of Narcotics and Dangerous Drugs:

Based upon the foregoing recommended findings of fact and conclusions of law, the presiding officer recommends to the Director of the Bureau of Narcotics and Dangerous Drugs that the application executed on February 3, 1972, by Pharmaceutical Wholesalers, Inc., for re-registration as a distributor of controlled substances listed in Schedules II, III, IV, and V of the Controlled Substances Act of 1970, be denied.

After reviewing the transcript of testimony of the hearing, the exhibits introduced, the findings of fact and conclusions of law proposed by counsel, the Director adopts the recommended decision of the Administrative Law Judge, Julius Rich. In accordance with the provisions of 21 CFR 316.66, and in view of the nature of the Applicant's past record and experience in the distribution of controlled substances, it is the Director's opinion that to permit Pharmaceutical Wholesalers, Inc., to continue doing business with controlled substances would not be consistent with the public health and safety.

Therefore, under the authority vested in the Attorney General by section 304 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 824), and redelegated to the Director, Bureau of Narcotics and Dangerous

035

1084

# notices

This section of the FEDERAL REGISTER contains documents other than rules or proposed rules that are applicable to the public. Notices of hearings and investigations, committee meetings, agency decisions and rulings, delegations of authority, filing of petitions and applications and agency statements of organization and functions are examples of documents appearing in this section.

## DEPARTMENT OF THE TREASURY

Office of the Secretary

[ORDER 221-3]

## BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

### Transfer of Functions

By virtue of the authority vested in me as Secretary of the Treasury, including the authority in Reorganization Plan No. 26 of 1950, it is ordered that:

1. There is hereby transferred, as specified herein, the functions, powers and duties of the Internal Revenue Service arising under laws relating to wagering, to the Bureau of Alcohol, Tobacco and Firearms (hereinafter referred to as the Bureau).

2. The Director of the Bureau shall perform the functions, exercise the powers, and carry out the duties of the Secretary in the administration and enforcement of the following provisions of law: Chapter 35 and Chapters 40 and 61 through 80, inclusive, of the Internal Revenue Code of 1954 insofar as they relate to activities administered and enforced with respect to Chapter 35.

3. All functions, powers and duties of the Secretary which relate to the administration and enforcement of the laws specified in paragraph 2 hereof are delegated to the Director. Regulations for the purposes of carrying out the functions, powers and duties delegated to the Director may be issued by him with the approval of the Secretary.

4. All regulations prescribed, all rules and instructions issued, and all forms adopted for the administration and enforcement of the laws specified in paragraph 2 hereof, which are in effect or in use on the effective date of this Order, including amendments thereto, shall continue in effect as regulations, rules, instructions and forms of the Bureau until superseded or revised.

5. All existing activities relating to the assessment, collection, processing, depositing, or accounting for taxes (including penalties and interest), under the laws specified in paragraph 2 hereof, shall continue to be performed by the Commissioner of Internal Revenue until the Director shall otherwise provide with the approval of the Secretary.

6. (a) The term "Commissioner of Internal Revenue" whenever used in regulations, rules, instructions, and forms issued or adopted for the administration and enforcement of the laws specified in paragraph 2 hereof, which are in effect or in use on the effective date of this Order, shall be held to mean the Director.

(b) The term "internal revenue officer" and "officer, employee or agent of

the internal revenue" wherever used in such regulations, rules, instructions and forms, in any law specified in paragraph 2 above, and in 18 U.S.C. 1114, shall include all officers and employees of the United States engaged in the administration and enforcement of the laws administered by the Bureau, who are appointed or employed by, or pursuant to the authority of, or who are subject to the directions, instructions or orders of, the Secretary.

7. All delegations inconsistent with this Order are revoked.

8. This Order shall be effective immediately.

Dated: December 24, 1974.

[SEAL]        WILLIAM E. SIMON,
            *Secretary of the Treasury.*

[FR Doc.75-280 Filed 1-3-75;8:45 am]

## LOCK-IN AMPLIFIERS AND PARTS THEREOF FROM THE UNITED KINGDOM

### Withholding of Appraisement Notice

Information was received on April 17, 1974, that lock-in amplifiers from the United Kingdom were being sold at less than fair value within the meaning of the Antidumping Act, 1921, as amended (19 U.S.C. 160 et seq.) (referred to in this notice as "the Act"). This information was the subject of an "Antidumping Proceeding Notice" which was published in the FEDERAL REGISTER of May 17, 1974, on page 17570. The term "lock-in amplifiers" refers to electrical measuring instruments for isolating and amplifying alternating current signals. The "Antidumping Proceeding Notice" indicated that there was evidence on record concerning injury to or likelihood of injury to or prevention of establishment of an industry in the United States. An "Amendment of Antidumping Proceeding Notice" was published in the FEDERAL REGISTER of August 13, 1974, changing the caption to read "Lock-in Amplifiers and parts Thereof from the United Kingdom."

Pursuant to section 201(b) of the Act (19 U.S.C. 160(b)), notice is hereby given that there are reasonable grounds to believe or suspect that the exporter's sales price (section 204 of the Act; 19 U.S.C. 163) of lock-in amplifiers and parts thereof from the United Kingdom is less, or is likely to be less, than the market value (section 205 of the Act; 19 U.S.C. 164).

*Statement of Reasons.* The information currently before the U.S. Customs Service indicates that the proper basis of comparison for fair value purposes is between exporter's sales price and adjusted home market price of such or similar merchandise.

Exporter's sales price was calculated on the basis of the resale price to unrelated purchasers in the United States, with deductions for air freight, insurance, U.S. duty, Customs brokerage and clearance charges, inland freight, selling expenses in the United States, and commissions. Assembly costs in the United States were also deducted from the resale price of the model which was imported in kit form.

Home market price was calculated on the basis of an ex-factory price to unrelated purchasers, with a deduction for selling expenses. For comparisons involving the model imported in kit form, assembly costs in the home market were deducted.

Using the above criteria, exporter's sales price was found to be lower than the adjusted home market price of such or similar merchandise.

Customs officers are being directed to withhold appraisement of lock-in amplifiers and parts thereof from the United Kingdom in accordance with § 153.48, Customs Regulations (19 CFR 153.48).

In accordance with §§ 153.32(b) and 153.37, Customs Regulations (19 CFR 153.32(b), 153.37), interested persons may present written views or arguments, or request in writing that the Secretary of the Treasury afford an opportunity to present oral views.

Any request that the Secretary of the Treasury afford an opportunity to present oral views should be addressed to the Commissioner of Customs, 2100 K Street NW., Washington, D.C. 20229, in time to be received by his office on or before January 16, 1975. Such requests must be accompanied by a statement outlining the issues wished to be discussed.

Any written views or arguments should likewise be addressed to the Commissioner of Customs in time to be received by his office on or before February 5, 1975.

This notice, which is published pursuant to § 153.34(b), Customs Regulations (19 CFR 153.34(b)), shall become effective January 6, 1975. It shall cease to be effective at the expiration of 6 months from the date of this publication, unless previously revoked.

Dated: December 31, 1974.

[SEAL]        DAVID R. MACDONALD,
            *Assistant Secretary*
            *of the Treasury.*

[FR Doc.75-312 Filed 1-3-75;8:45 am]

## TREASURY ADVISORY COMMITTEES

### Public Availability of Reports on the Closed Meeting

Pursuant to the provisions of the Federal Advisory Committee Act, 5 U.S.C.

036

# notices

This section of the FEDERAL REGISTER contains documents other than rules or proposed rules that are applicable to the public. Notices of hearings and investigations, committee meetings, agency decisions and rulings, delegations of authority, filing of petitions and applications and agency statements of organization and functions are examples of documents appearing in this section.

## DEPARTMENT OF THE TREASURY

### Internal Revenue Service

### ART ADVISORY PANEL

#### Closed Meeting

Notice is hereby given pursuant to section 10(a)(2) of the Federal Advisory Committee Act. Pub. L. 92-463, that a closed meeting of the Art Advisory Panel will be held on April 5 and 6, 1976, beginning at 9:30 a.m. in Room 3313, Internal Revenue Building, 1111 Constitution Avenue, NW., Washington, D.C. 20224.

The agenda will consist of the review and evaluation of the acceptability of market value appraisals of works of art involved in Federal income, estate, or gift tax returns. This involves the discussion of material in individual tax returns made confidential by the provisions of section 6103 and 7213 of Title 26 of the United States Code and the regulations issued thereunder, and section 1905 of Title 18 of the Code.

A determination as required by section 10(d) of the Federal Advisory Committee Act has been made that these meetings are concerned with matters listed in section 552(b) (3), (4), (5), (6) and (7) of Title 5 of the United States Code, and that the meetings will not be open to the public.

DONALD C. ALEXANDER,
Commissioner.

[FR Doc.76-6678 Filed 3-8-76;8:45 am]

[Treasury Department Order 221-3
(Revision 1)]

#### DIRECTOR, BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

#### Authority Delegation

By virtue of the authority vested in me as Secretary of the Treasury, including the authority in Reorganization Plan No. 26 of 1950, it is ordered that:

1. There is hereby transferred, as specified herein, the functions, powers and duties of the Commissioner of Internal Revenue arising under laws relating to wagering to the Director of the Bureau of Alcohol, Tobacco and Firearms (hereinafter referred to as the Director).

2. The Director shall perform the functions, exercise the powers, and carry out the duties of the Secretary under Subtitle F of the Internal Revenue Code of 1954, insofar as the provisions of Subtitle F relate to forefeitures and criminal violations of the provisions of Chapter 35—Taxes on Wagering and Chapter 40—General Provisions Relating to Occupational Taxes. Regulations for the purpose of carrying out the functions, powers and duties specified in this paragraph may be issued by the Director with the approval of the Secretary.

3. All regulations prescribed, all rules and instructions issued, and all forms adopted for carrying out the functions, powers and duties specified in paragraph 2 hereof, which are in effect or in use on the effective date of this Order shall continue in effect as regulations, rules, instructions and forms of the Bureau until superseded or revised.

4. All activities relating to the discovery of civil liability, determination, assessment, collection, processing, depositing, or accounting for taxes (including penalties and interest), under Chapter 35—Taxes on Wagering shall continue to be performed by the Commissioner of Internal Revenue. The Commissioner may call upon the Director for assistance when it is necessary to exercise any of the enforcement authority described in section 7608 of the Internal Revenue Code.

5 (a) The term "Commissioner of Internal Revenue" wherever used in regulations, rules, instructions and forms, issued or adopted for carrying out the functions, powers and duties specified in paragraph 2 hereof, which are in effect or in use of the effective date of this Order shall be held to mean the Director.

(b) The terms "internal revenue officer" and "officer, employee or agent of the internal revenue" wherever used in such regulations, rules, instructions and forms, in any law specified in paragraph 2 above, and in 18 U.S.C. § 1114, shall include all officers and employees of the United States engaged in the administration and enforcement of the laws administered by the Bureau, who are appointed or employed by, or pursuant to the authority of, or who are subject to the directions, instructions or orders of, the Secretary.

6. To the extent that any action taken by the Commissioner of Internal Revenue or his delegates or the Director of the Bureau or his delegates under Treasury Department Order 221-3, prior to the effective date of this Order, may require ratification, such action is hereby affirmed and ratified.

7. Each wagering tax case and investigation open or otherwise in process as of the date of this Order shall be pursued to conclusion by the agency processing the same on such date. The Commissioner shall be responsible for issuing rulings and regulations with respect to the administration of the wagering tax laws other than those described in paragraph 2.

8. This Order is effective immediately. Any prior orders or instructions in conflict with the provisions of this Order are hereby amended accordingly.

Dated: February 21, 1976.

WILLIAM E. SIMON,
Secretary of the Treasury.

[FR Doc.76-6624 Filed 3-8-76;8:45 am]

## DEPARTMENT OF DEFENSE

### Department of the Army

### HEADS OF PROCURING AGENCIES

#### Delegation of Authority

1. Pursuant to the authority contained in the Act of 31 December 1975 (Public Law 94-190) hereinafter called "the Act," a letter from the Office of Federal Procurement Policy, dated 9 January 1976, Subject: Guidelines for Implementation of the Small Business Emergency Relief Act, Public Law 94-190, and a memorandum from the Acting Assistant Secretary of Defense (Installations and Logistics), dated 29 January 1976, Subject: Small Business Emergency Relief Act, Public Law 94-190, I hereby delegate to Heads of Procuring Activities, with authority to redelegate to the extent practicable, the authority to terminate for the convenience of the Government or modify fixed-price contracts with small business concerns within the authority of Public Law 94-190 and in accordance with the following.

2. The above Relief cannot be granted if:

a. The award was not within the time frames permitted by the Act.

b. A firm has not suffered or will not suffer serious financial loss due to significant unanticipated cost increases directly affecting the cost of contract compliance.

c. The conditions which have caused or are causing such cost increases were not experienced generally by other similar small business concerns.

d. The conditions which caused the losses were caused by negligence, underbidding or other special management factors peculiar to that small business concern, or

e. The application was received too late to evaluate and grant relief by 30 September 1976.

3. Actions to terminate or modify contracts under the Act must be taken prior to 30 September 1976. Applications for relief must be received prior to that time and in sufficient time to permit a proper decision. Where the contractor's application for relief does not specify the portion of the contract to be terminated, the contractor should be requested to so

NOTICES

in the relevant market or so as to provide private, selective notification of that information. To assist officers in fulfilling their responsibilities, guidelines are set forth below.

### 763  DETERMINATION OF WHETHER INFORMATION IS MARKET-SENSITIVE

If an officer is not certain whether particular information which is to be released either selectively or to the public at large is market-sensitive, the officer should direct the question to the office in the Department which is best equipped to determine the significance of the information, such as the Office of International Commodities (EB/ORF/ICD), for commodity information, the Office of Food Policy (EB/ORF/OFD), for agricultural information, the Office of Monetary Affairs (EB/IFD/OMA), for foreign currency information, the Office of Investment Affairs (EB/IFD/OIA), for information relating to investment matters. It will not always be possible for officers in these offices to make a final determination of the matter, as this might require a more complete appraisal of the information in the context of the market in general and perhaps the commodity or security in particular than the officer can be expected to undertake. In such cases, the economic officer should consult the relevant government agency or agencies (such as the SEC, Department of Agriculture, Commodity Futures Trading Commission, Treasury). The offices to contact are as follows:

SEC—Directorate of Economic and Policy —Research.
Agriculture—Director of Agricultural Economics.
Treasury—Office of Securities Markets Policy.
Commodity Futures Trading Commission—Office of Intergovernmental Affairs.

Officers should, of course, use their judgement in deciding whether any additional agencies should be consulted in any particular situation.

### 764  RELEASE OF MARKET-SENSITIVE INFORMATION

Market-sensitive information should be released in such a manner as to: (1) Limit to the greatest extent possible any disturbance in the relevant market; and (2) attempt to assure that all interested parties and the public receive access to such information at the same time, so as to prevent a few privileged parties from obtaining a trading advantage. Therefore, market-sensitive information should, as a general matter, only be released after the close of any relevant trading market for the day. The information should then be released to news media in a manner such as to ensure the broadest possible dissemination, for example, by utilizing the Dow Jones and Reuters services. Where it is impossible to await the close of the market and it is considered that the information would have a significant impact on trading, the Department officer should coordinate with the SEC or other appropriate agency before the information is released, as certain agencies such as the SEC and Agri-

culture have established procedures to effect a suspension of trading in the relevant commodity or security.

While release of market-sensitive information to selected persons is to be avoided if at all possible, in certain instances (e.g., release of documents in response to a freedom of information request) such release may be unavoidable. In such instances, the Department officer should take concurrent steps (in cooperation with other agencies, if appropriate) to ensure the public dissemination of the information, thereby avoiding the possibility of the selected recipient gaining trading advantage.

Dated: January 10, 1977.

MONROE LEIGH,
*Legal Adviser.*

[FR Doc.77-1675 Filed 1-18-77; 8:45 am]

## DEPARTMENT OF TRANSPORTATION

### Office of the Secretary

### CITIZENS' ADVISORY COMMITTEE ON TRANSPORTATION QUALITY

#### Committee Renewal

Notice is hereby given that the Citizens' Advisory Committee on Transportation Quality is being renewed effective January 5, 1977. The Secretary of Transportation has determined that renewal of this Committee is in the public interest in connection with the performance of duties imposed on the Department of Transportation by law.

This notice is given pursuant to section 9(a)(2) of the Federal Advisory Committee Act.

Issued in Washington, D.C., on January 12, 1977.

JUDITH T. CONNOR,
*Assistant Secretary for Environment, Safety, and Consumer Affairs.*

[FR Doc.77-1649 Filed 1-18-77; 8:45 am]

## DEPARTMENT OF THE TREASURY

### Office of the Secretary

[Treasury Department Order No. 221-3 (Revision 2)]

### TRANSFER OF FUNCTIONS TO THE INTERNAL REVENUE SERVICE

By virtue of the authority vested in me as Secretary of the Treasury, including the authority in Reorganization Plan No. 26 of 1950, it is ordered that:

1. There is hereby transferred to the Commissioner, Internal Revenue Service those functions, powers and duties of the Director of the Bureau of Alcohol, Tobacco and Firearms arising under laws relating to taxes on wagering and the provisions of Treasury Department Order 221-3.

2. All regulations prescribed, all rules and instructions issued, and all forms adopted for administration of the wagering tax laws in effect or in use on the date of this Order shall continue in effect

or in use until superseded or revised by the Commissioner.

3. To the extent that any action taken by the Director of the Bureau of Alcohol, Tobacco and Firearms, or his delegates, under Treasury Department Order 221-3, before the effective date of this Order may require ratification, such action is hereby ratified.

4. Each wagering tax case or investigation open or otherwise in process as of the date of this Order shall be pursued to conclusion by the agency processing the same on that date.

5. This Order is effective immediately. All delegations in consistent with this Order are revoked.

Dated: January 14, 1977.

WILLIAM E. SIMON,
*Secretary of the Treasury.*

[FR Doc.77-1912 Filed 1-18-77; 8:45 am]

## TUNERS (OF THE TYPE USED IN CONSUMER ELECTRONIC PRODUCTS) FROM JAPAN

### Tentative Determination To Modify or Revoke Dumping Finding

A finding of dumping with respect to tuners (of the type used in consumer electronic products) from Japan was published as Treasury Decision 70-257 in the FEDERAL REGISTER of December 12, 1970 (35 FR 18914). Subsequently, the dumping finding was modified to exclude the subject tuners produced and/or sold by the following companies:

I. Matsushita Electrical Co. Ltd., and Matsushita Electric Trading Co., Ltd. in T.D. 75-80 (40 FR 14591);
II. Victor Company of Japan Ltd. in T.D. 75-80 (40 FR 14591);
III. Tokyo Shibaura Electric Co., Ltd. T.D. 76-143 (41 FR 21185);
IV. Sanyo Electric Co., Ltd., and Sanyo Electric Trading Co., Ltd. in T.D. 76-215 (41 FR 32421); and
V. Sony Corporation of Japan in T.D. 77-26 (42 FR

After due investigation, it has been determined tentatively that the subject tuners from Japan are no longer being, nor likely to be sold in the United States at less than fair value within the meaning of the Antidumping Act, 1921, as amended (19 U.S.C. 160 *et seq.*).

### STATEMENT OF REASONS ON WHICH THIS TENTATIVE DETERMINATION IS BASED

The investigation indicated that: 1. Sales of subject tuners by Alps Electric Co., Ltd., accounting for approximately 83.3 percent of all subject tuner sales from Japan to the United States during the years 1970 through 1975, have not, with the exception of certain sales for which dumping duties in a *de minimis* amount were found to accrue, been made at less than fair value for a 2-year period since the finding of dumping. Written assurances have been given by Alps that future sales of subject tuners to the United States will not be made at less than fair value.

d. Requests for correction of records shall be submitted to the Personnel Officer, Office of Human Resources, Saint Lawrence Seaway Development Corporation, P.O. Box 520, Massena, New York 13662–0520.

6. *Personal Identification Requirements.* Refer to § 10.35 for normal requirements. In those cases involving mail requests for sensitive records, e.g., medical records, the requester's signature shall be notarized.

**Narrative Statement for the Department of Transportation, Saint Lawrence Seaway Development Corporation**

**EXPLANATION OF CHANGE:**

The Department of Transportation, on behalf of the Saint Lawrence Seaway Development Corporation, proposes to amend three existing systems of records: Claimants Under Federal Tort Claims Act, DOT/SLS 151; Data Automation Program Records, DOT/SLS 152; and Employees' Compensation Records, DOT/SLS 153. DOT also proposes to delete Emergency Operating Records (Vital Records), DOT/SLS 155, since the system no longer exists.

**PURPOSE OF SYSTEM:**

DOT/SLS 151 contains statements regarding claims against the Corporation. This information is maintained in connection with Claimants Under the Federal Tort Claims Act. DOT/SLS 152 contains payroll and leave records, work measurement records, travel vouchers, and claim forms. DOT/SLS 153 contains information on employees' personal statistics and medical records. The purpose of this notice is to amend the three systems by changing the system location for DOT/SLS 151 from Massena, New York to Washington, DC, expanding descriptive information about DOT/SLS 151, and making minor changes to the title of system manager, street address, etc., in the two remaining systems of records. Minor changes are also being made to appendix I to incorporate these changes.

**AUTHORITY UNDER WHICH THE SYSTEM IS MAINTAINED:**

The authority to maintain these three systems of records is contained in 5 U.S.C. section 301, 44 U.S.C. section 3101, and 33 U.S.C. 984(a)(4).

**EFFECT ON INDIVIDUAL RIGHTS:**

Most of the information in the system is either provided voluntarily by individuals employed at the Saint Lawrence Seaway Development Corporation or by people who are involved in tort actions. The information will be used in accordance with the stated routine uses and will not unduly impact on individual privacy rights.

**RELATIONSHIP TO GOVERNMENT AGENCIES:**

The information in these systems will be provided to appropriate Federal, State, local or foreign governments in accordance with the stated routine uses and Prefatory Statement of General Routine Uses.

**SECURITY:**

All records are maintained in a secured work area limited to those persons whose duties require access. Computer processing of information requires operation numbers and individual passwords. A description of the steps taken to safeguard these records is given under the appropriate heading in each system notice.

**COMPATIBILITY OF ROUTINE USES WITH THE PURPOSES FOR WHICH THE RECORDS WERE COLLECTED:**

The routine uses are compatible with the purposes for which the information was collected.

**OMB CONTROL NUMBER:**

OMB 80–R111, Claim for Damages, Injury, or Death (Standard Form 95), applies to DOT/SLS 151.

[FR Doc. 91–10650 Filed 5–7–91; 8:45 am]
**BILLING CODE 4910-62-M**

---

## DEPARTMENT OF THE TREASURY

**Public Information Collection Requirements Submitted to OMB for Review**

April 30, 1991.

The Department of Treasury has submitted the following public information collection requirement(s) to OMB for review and clearance under the Paperwork Reduction Act of 1980, Public Law 96–511. Copies of the submission(s) may be obtained by calling the Treasury Bureau Clearance Officer listed. Comments regarding this information collection should be addressed to the OMB reviewer listed and to the Treasury Department Clearance Officer, Department of the Treasury, room 3171 Treasury Annex, 1500 Pennsylvania Avenue, NW., Washington, DC 20220.

**Internal Revenue Service**

*OMB Number:* 1545–0351.
*Form Number:* 3975.
*Type of Review:* Revision.
*Title:* Tax Practitioner Annual Mailing List Application and Order Blank.
*Description:* Form 3975 allows a practitioner a systematic way to remain on the mailing file (TPMF) and to order copies of tax forms materials.

*Respondents:* Businesses or other for-profit.
*Estimated Number of Respondents:* 415,000.
*Estimated Burden Hours Per Response:* 3 minutes.
*Frequency of Response:* Annually.
*Estimated Total Reporting Burden:* 16,325 hours.
*Clearance Officer:* Garrick Shear (202) 535–4297, Internal Revenue Service, room 5571, 1111 Constitution Avenue, NW., Washington, DC 20224.
*OMB Reviewer:* Milo Sunderhauf (202) 395–6880, Office of Management and Budget, room 3001, New Executive Office Building, Washington, DC 20503.

Lois K. Holland,
*Departmental Reports Management Officer.*
[FR Doc. 91–10642 Filed 5–7–91; 8:45 am]
**BILLING CODE 4830-01-M**

---

**[No. 15–12]**

**Delegation of Authority to the Director, Bureau of Alcohol, Tobacco and Firearms to Investigate Violations of 18 U.S.C. 1956 and 1957; Directive**

May 1, 1991.

1. *Purpose.* This directive delegates to the Director, Bureau of Alcohol, Tobacco and Firearms (ATF) authority to investigate violations of 18 U.S.C. 1956 and 1957.

2. *Delegation.* By virtue of the authority vested in the Secretary of the Treasury by 18 U.S.C. 981, 1956(e) and 1957(e) and the authority delegated to the Assistant Secretary (Enforcement) by Treasury Order 101–05, there is hereby delegated to the Director, ATF:

a. Investigatory authority over violations of 18 U.S.C. 1956 or 1957 involving 18 U.S.C. 2341–2346 (trafficking in contraband cigarettes); Section 38 of the Arms Export Control Act, 22 U.S.C. 2778 (relating to the importation of items on the U.S. Munitions Import List, except violations relating to exportation, in-transit, temporary import, or temporary export transactions); and 18 U.S.C. 1952 (relating to travelling in interstate commerce, with respect to liquor on which Federal excise tax has not been paid); or any act or activity constituting an offense listed in 18 U.S.C. 1961(1), with respect to any act or threat involving arson, which is chargeable under State law and punishable for more than one year imprisonment; and

b. Seizure and forfeiture authority and related authority under 18 U.S.C. 981 relating to violations of 18 U.S.C. 1956 or 1957 within the investigatory jurisdiction

of ATF under paragraph 2.a. above, and seizure authority under 18 U.S.C. 981 relating to any other violation of 18 U.S.C. 1956 or 1957 if the bureau with investigatory authority is not present to make the seizure. Property seized under 18 U.S.C. 981 where investigatory jurisdiction is with another bureau not present at the time of the seizure shall be turned over to that bureau.

*3. Forfeiture remission.* The Director, ATF is authorized to remit or mitigate forfeitures of property valued at not more than $500,000 seized pursuant to paragraph 2.b.

*4. Redelegation.* The authority delegated by this directive may be redelegated.

*5. Coordination.* a. If at any time during an investigation of a violation of 18 U.S.C. 1956 or 1957, the Director, ATF discovers evidence of a matter within the jurisdiction of another Treasury bureau, the Director, ATF will immediately notify that bureau of the investigation and invite that bureau to participate in the investigation. The Director, ATF shall attempt to resolve disputes over investigatory jurisdiction with other Treasury bureaus at the field level.

b. The Assistant Secretary (Enforcement) will settle disputes that cannot be resolved by the bureaus. The Assistant Secretary (Enforcement) will settle disputes over investigatory jurisdiction with the Internal Revenue Service in consultation with the Commissioner, Internal Revenue Service.

c. With respect to matters discovered within the investigatory jurisdiction of a Department of Justice bureau or the Postal Service, the Director, ATF will adhere to the provisions on notice and coordination in the "Memorandum of Understanding Among the Secretary of the Treasury, the Attorney General and the Postmaster General Regarding Money Laundering Investigations," dated August 18, 1990, or any such subsequent memorandum of understanding entered pursuant to 18 U.S.C. 1956(e) or 1957(e).

*6. Cancellation.* Treasury Directive 15–12, "Delegation of Authority to the Director, Bureau of Alcohol, Tobacco and Firearms to Investigate Violations of 18 U.S.C. 1956 and 1957," dated October 6, 1988, is superseded.

*7. Office of Primary Interest.* Office of the Assistant Secretary (Enforcement).

Peter K. Nunez,

*Assistant Secretary (Enforcement).*

[FR Doc. 91–10843 Filed 5–7–91; 8:45 am]

BILLING CODE 4810-25-M

[No. 15–29]

## Delegation of Authority to the Commissioner, United States Customs Service To Investigate Violations of 18 U.S.C. 1956 and 1957; Directive

May 1, 1991.

*1. Purpose.* This directive delegates to the Commissioner, United States Customs Service authority to investigate violations of 18 U.S.C. 1956 and 1957.

*2. Delegation.* By virtue of the authority vested in the Secretary of the Treasury by 18 U.S.C. 981, 1956(e) and 1957(e) and the authority delegated to the Assistant Secretary (Enforcement) by Treasury Order 101–05, there is hereby delegated to the Commissioner, United States Customs Service:

a. Investigatory authority over violations of 18 U.S.C. 1956 or 1957 involving 18 U.S.C. 542, 545, 549, 659, 1461–63, 1465, 2251–52, 2314, and 2321; 19 U.S.C. 1590; 21 U.S.C. 857; offenses under section 11 of the Export Administration Act of 1979 [50 U.S.C. App. Section 2410]; offenses under section 206 of the International Emergency Economic Powers Act [50 U.S.C. 1705); offenses under section 16 of the Trading With the Enemy Act [50 U.S.C. App. 16); and offenses under section 38 of the Arms Export Control Act [22 U.S.C. 2778] (relating to the exportation, intransit, temporary import, or temporary export transactions);

b. Investigatory authority over violations of 18 U.S.C. 1956(a)(2)(B)(ii), involving a reporting violation under 31 U.S.C. 5316;

c. Investigatory authority over violations of 18 U.S.C. 1956(a)(3) relating to violations within the investigatory jurisdiction of the Customs Service under paragraphs 2.a. and b.; and

d. Seizure and forfeiture authority and related authority under 18 U.S.C. 981 relating to violations of 18 U.S.C. 1956 or 1957 within the investigatory jurisdiction of the Customs Service under paragraphs 2.a., 2.b., and 2.c., and seizure authority under 18 U.S.C. 981 relating to any other violation of 18 U.S.C. 1956 or 1957 if the bureau with investigatory authority is not present to make the seizure. Property seized under 18 U.S.C. 981 where investigatory jurisdiction is with another bureau not present at the time of the seizure shall be turned over to that bureau.

*3. Forfeiture Remission.* The Commissioner, United States Customs Service is authorized to remit or mitigate forfeitures of property valued at not more than $500,000 seized pursuant to paragraph 2.d.

*4. Redelegation.* The authority delegated by this directive may be redelegated.

*5. Coordination.* a. If at any time during an investigation of a violation of 18 U.S.C. 1956 or 1957, the U.S. Customs Service discovers evidence of a matter within the jurisdiction of another Treasury bureau or office, the U.S. Customs Service will immediately notify that bureau of office with investigatory jurisdiction of the investigation and invite that bureau or office to participate in the investigation. The Commissioner, U.S. Customs Service shall attempt to resolve disputes over investigatory jurisdiction with other Treasury bureaus at the field level or in the case of the Office of Foreign Assets Control, at the headquarters level.

b. The Assistant Secretary (Enforcement) will settle disputes that cannot be resolved by the bureaus. The Assistant Secretary (Enforcement) will settle disputes over investigatory jurisdiction with the Internal Revenue Service in consultation with the Commissioner, Internal Revenue Service.

c. With respect to matters discovered within the investigatory jurisdiction of a Department of Justice bureau or the Postal Service, the U.S. Customs Service will adhere to the provisions on notice and coordination in the "Memorandum of Understanding Among the Secretary of the Treasury, the Attorney General and the Postmaster General Regarding Money Laundering Investigations," dated August 18, 1990, or any such subsequent memorandum of understanding entered pursuant to 18 U.S.C. 1956(e) or 1957(e).

*6. Cancellation.* Treasury Directive 15–29, "Delegation of Authority to the Commissioner, United States Customs Service to Investigate Violations of 18 U.S.C. 1956 and 1957," dated October 6, 1988, is superseded.

*7. Office of Primary Interest.* Office of the Assistant Secretary (Enforcement).

Peter K. Nunez,

*Assistant Secretary (Enforcement).*

[FR Doc. 91–10844 Filed 5–7–91; 8:45 am]

BILLING CODE 4810-25-M

[No. 15–42]

## Delegation of Authority to the Commissioner, Internal Revenue Service To Perform Functions Under the Money Laundering Control Act of 1986, as Amended; Directive

May 1, 1991.

*1. Purpose.* This directive delegates to the Commissioner, Internal Revenue

Service (IRS) investigatory, seizure and forfeiture authority under the Money Laundering Control Act of 1986, Public Law 99–570, subtitle H (October 27, 1986), as amended.

2. *Delegation.* By virtue of the authority vested in the Secretary of the Treasury by 18 U.S.C. 981, 1956(e), 1957(e) and the authority delegated to the Assistant Secretary (Enforcement) by the Treasury Order 101–05, there is hereby delegated to the Commissioner, IRS:

a. Investigatory authority over violations of 18 U.S.C. 1956 and 1957 where the underlying conduct is subject to investigation under title 26 or under the Bank Secrecy Act, as amended, 31 U.S.C. 5311–5326 (other than violations of 31 U.S.C. 5316);

b. Seizure and forfeiture authority over violations of 18 U.S.C. 981 relating to violations of:

(1) 31 U.S.C. 5313 and 5324; and

(2) 18 U.S.C. 1956 and 1957 which are within the investigatory jurisdiction of IRS pursuant to paragraph 2.a. above; and

c. Seizure authority relating to any other violation of 18 U.S.C. 1956 or 1957 if the bureau with investigatory authority is not present to make the seizure. Property seized under 18 U.S.C. 981 where investigatory jurisdiction is solely with another bureau not present at the time of the seizure shall be turned over to that bureau.

3. *Forfeiture Remission.* The Commissioner, IRS is authorized to remit or mitigate forfeitures of property valued at not more than $500,000 seized pursuant to paragraph 2.b.

4. *Redelegation.* The authority delegated by this directive may be redelegated.

5. *Coordination.* a. If at any time during an investigation of a violation of 18 U.S.C. 1956 or 1957, IRS discovers evidence of a matter within the jurisdiction of another Treasury bureau, to the extent authorized by law, IRS will immediately notify that bureau of the investigation and invite that bureau to participate in the investigation. The Commissioner, IRS shall attempt to resolve disputes over investigatory jurisdiction with other Treasury bureaus at the field level.

b. The Assistant Secretary (Enforcement) will settle disputes that cannot be resolved by the bureaus in consultation with the Commissioner, IRS.

c. With respect to matters discovered within the investigatory jurisdiction of a Department of Justice bureau of the

Postal Service, IRS will adhere to the provisions on notice and coordination in the "Memorandum of Understanding Among the Secretary of the Treasury, the Attorney General and the Postmaster General Regarding Money Laundering Investigations," dated August 18, 1990, or any such subsequent memorandum of understanding entered pursuant to 18 U.S.C. 1956(e) or 1957(e).

6. *Cancellation.* Treasury Directive 15–42, "Delegation of Authority to the Commissioner, Internal Revenue Service to Perform Functions Under the Money Laundering Control Act of 1986, and the Bank Secrecy Act," dated October 6, 1988, is superseded.

7. *Office of Primary Interest.* Office of the Assistant Secretary (Enforcement).

Peter K. Nunez,

*Assistant Secretary (Enforcement).*

[FR Doc. 91–10845 Filed 5–7–91; 8:45 am]

BILLING CODE 4810-25-M –

[No. 15–54]

## Delegation of Authority to the Director, United States Secret Service To Investigate Violations of 18 U.S.C. 1956 and 1957; Directive

May 1, 1991.

1. *Purpose.* This directive delegates to the Director, United States Secret Service authority to investigate violations of 18 U.S.C. 1956 and 1957.

2. *Delegation.* By virtue of the authority vested in the Secretary of the Treasury by 18 U.S.C. 981, 1956(e), 1957(e) and the authority delegated to the Assistant Secretary (Enforcement) by Treasury Order 101–05, there is hereby delegated to the Director, United States Secret Service:

a. Investigatory authority over violations of 18 U.S.C. 1956 and 1957 involving an offense under 18 U.S.C. 471–473 (counterfeiting of obligations or securities of the United States); 18 U.S.C. 500–503 (counterfeiting of blank or postal money orders, postage stamps, foreign government postage and revenue stamps, and postmarking stamps); 18 U.S.C. 657 (involving theft, embezzlement or misapplication by employees of the Federal Deposit Insurance Corporation); and 18 U.S.C. 1029 (fraud and related activity in connection with access devices); and

b. Seizure and forfeiture authority and related authority under 18 U.S.C. 981 relating to violations of section 1956 or section 1957 within the investigatory jurisdiction of Secret Service under paragraph 2.a. above, and seizure authority under 18 U.S.C. 981 relating to

any other violations of 18 U.S.C. 1956 or 1957 if the bureau with investigatory authority is not present to make the seizure. Property seized under 18 U.S.C. 981 where investigatory jurisdiction is with another bureau not present at the time of the seizure shall be turned over to that bureau.

3. *Forfeiture Remission.* The Director, United States Secret Service is authorized to remit or mitigate forfeitures of property valued at not more than $500,000 seized pursuant to paragraph 2.b. above.

4. *Redelegation.* The authority delegated by this directive may be redelegated.

5. *Coordination.* a. If at any time during an investigation of a violation of 18 U.S.C. 1956 or 1957, Secret Service discovers evidence of a matter within the jurisdiction of another Treasury bureau, Secret Service will immediately notify that bureau of the investigation and invite that bureau to participate in the investigation. Secret Service shall attempt to resolve disputes over investigatory jurisdiction with other Treasury bureaus at the field level.

b. The Assistant Secretary (Enforcement) will settle disputes that cannot be resolved by the bureaus. The Assistant Secretary (Enforcement) will settle disputes over investigatory jurisdiction with the Internal Revenue Service in consultation with the Commissioner, Internal Revenue Service.

c. With respect to matters discovered within the investigatory jurisdiction of a Department of Justice bureau or the Postal Service, Secret Service will adhere to the provisions on notice and coordination in the "Memorandum of Understanding Among the Secretary of the Treasury, the Attorney General and the Postmaster General Regarding Money Laundering Investigations," dated August 16, 1990, or any such subsequent memorandum of understanding entered pursuant to 18 U.S.C. 1956(e) or 1957(e).

6. *Cancellation.* Treasury Directive 15–54, "Delegation of Authority to the Director, United States Secret Service to Investigate Violations of 18 U.S.C. 1956 and 1957," dated October 6, 1988, is superseded.

7. *Office of Primary Interest.* Office of the Assistant Secretary (Enforcement).

Peter K. Nunez,

*Assistant Secretary (Enforcement).*

[FR Doc. 91–10846 Filed 5–7–91; 8:45 am]

BILLING CODE 4810-25-M

**WARNING**

Do not leave children unattended in the vehicle especially with access to vehicle keys. Unsupervised use of the keys can result in starting of the engine and use of vehicle systems such as the power windows and power sunroof, which could result in serious personal injury.

As explained, the probability of unsupervised children being exposed to injury from power-operated window systems during the 10 minute interval after the ignition key has been turned off and the passenger side front door is opened and before the driver side front door is opened, is non-existent and that therefore this noncompliance is inconsequential to motor vehicle safety.

VWoA requests that this [application] be granted so that an unnecessary and costly consumer recall action [can] be avoided. VWoA expects a particularly low owner response to such a recall, if it were undertaken, because the ability to operate the power windows after the front passenger side door has been opened would likely be viewed by the owner to offer a valuable convenience feature without any apparent safety disadvantage.

No comments were received on the application.

VWoA is correct that the purpose of requiring inoperative power windows is to reduce the possibility of unsupervised children operating them. In the noncompliant vehicles, the power window system remains operable only when the front passenger side door is opened, a time when the operator presumably remains behind the wheel. If the operator exits by the driver's door, the system is disabled; it is not likely that an operator would exit by means of the passenger door since that would entail passing over the cumbersome console between the two seats. Thus, the purpose of the requirement in this situation is still highly likely to be met.

In consideration of the foregoing, the applicant has met its burden of persuasion that the noncompliance herein described is inconsequential to motor vehicle safety. Accordingly, the applicant is hereby exempted from the requirements of 49 U.S.C. 30118 and 30120 to notify and remedy a noncompliance with a Federal motor vehicle safety standard.

(15 U.S.C. 1417; delegations of authority at 49 CFR 1.50 and 501.8)

Issued on: September 12, 1995.

**Barry Felrice,**

*Associate Administrator for Safety Performance Standards.*

[FR Doc. 95–23053 Filed 9–15–95; 8:45 am]

BILLING CODE 4910–59–P

## DEPARTMENT OF THE TREASURY

[Treasury Directive Number 15–12]

**Delegation of Authority to the Director, Bureau of Alcohol, Tobacco and Firearms, to Investigate Violations of 18 U.S.C. §§ 1956 and 1957**

September 11, 1995.

1. *Purpose.* This Directive delegates to the Director, Bureau of Alcohol, Tobacco and Firearms (ATF), authority to investigate violations of 18 U.S.C. §§ 1956 and 1957.

2. *Delegation.* By virtue of the authority vested in the Secretary of the Treasury by 18 U.S.C. §§ 981, 1956(e) and 1957(e) and the authority delegated to the Under Secretary (Enforcement) by Treasury Order (TO) 101–05, there is hereby delegated to the Director, ATF:

a. investigatory authority over violations of 18 U.S.C. § 1956 or 1957 involving 18 U.S.C. §§ 2341–2346 (trafficking in contraband cigarettes); § 38 of the Arms Export Control Act, 22 U.S.C. § 2778 (relating to the importation of items on the U.S. Munitions Import List, except violations relating to exportation, in transit, temporary import, or temporary export transactions); and 18 U.S.C. § 1952 (relating to travelling in interstate commerce, with respect to liquor on which Federal excise tax has not been paid); or any act or activity constituting an offense listed in 18 U.S.C. § 1961(1), with respect to any act or threat involving arson, which is chargeable under State law and punishable for more than one year imprisonment; and

b. seizure and forfeiture authority and related authority under 18 U.S.C. § 981 relating to violations of 18 U.S.C. § 1956 or 1957 within the investigatory jurisdiction of ATF under paragraph 2.a., and seizure authority under 18 U.S.C. § 981 relating to any other violation of 18 U.S.C. § 1956 or 1957 if the bureau with investigatory authority is not present to make the seizure. Property seized under 18 U.S.C. § 981 where investigatory jurisdiction is with another bureau not present at the time of the seizure shall be turned over to that bureau.

3. *Forfeiture Remission.* The Director, ATF, is authorized to remit or mitigate forfeitures of property valued at not more than $500,000 seized pursuant to paragraph 2.b.

4. *Redelegation.* The authority delegated by this Directive may be redelegated.

5. *Coordination.*

a. If at any time during an investigation of a violation of 18 U.S.C. § 1956 or 1957, the Director, ATF,

discovers evidence of a matter within the jurisdiction of another Treasury bureau, the Director, ATF, shall immediately notify that bureau of the investigation and invite that bureau to participate in the investigation. The Director, ATF, shall attempt to resolve disputes over investigatory jurisdiction with other Treasury bureaus at the field level.

b. The Under Secretary (Enforcement) shall settle disputes that cannot be resolved by the bureaus. The Under Secretary (Enforcement) shall settle disputes over investigatory jurisdiction with the Internal Revenue Service in consultation with the Commissioner, Internal Revenue Service.

c. With respect to matters discovered within the investigatory jurisdiction of a Department of Justice bureau or the Postal Service, the Director, ATF, shall adhere to the provisions on notice and coordination in the "Memorandum of Understanding Among the Secretary of the Treasury, the Attorney General and the Postmaster General Regarding Money Laundering Investigations," dated August 16, 1990; or any such subsequent memorandum of understanding entered pursuant to 18 U.S.C. § 1956(e) or 1957(e).

d. With respect to seizure and forfeiture operations and activities within its investigative jurisdiction, ATF shall comply with the policy, procedures, and directives developed and maintained by the Treasury Executive Office for Asset Forfeiture. Compliance shall include adhering to the oversight, reporting, and administrative requirements relating to seizure and forfeiture contained in such policy, procedures, and directives.

6. *Authorities.*

a. 18 U.S.C. §§ 981, 1952, 1956, 1957, 1961, and 2341–2346.

b. 31 U.S.C. §§ 5311–5326 (other than violations of 31 U.S.C. § 5316).

c. 22 U.S.C. § 2778.

d. TO 101–05, "Reporting Relationships and Supervision of Officials, Offices and Bureaus, Delegation of Certain Authority, and Order of Succession in the Department of the Treasury."

e. TO 102–14, "Delegation of Authority with Respect to the Treasury Forfeiture Fund Act of 1992," dated January 10, 1995.

7. *Cancellation.* Treasury Directive 15–12, "Delegation of Authority to the Director, Bureau of Alcohol, Tobacco and Firearms to Investigate Violations of 18 U.S.C. §§ 1956 and 1957," dated May 1, 1991, is superseded.

8. *Expiration Date.* This Directive shall expire three years from the date of

issuance unless superseded or cancelled prior to that date.

9. *Office of Primary Interest.* Office of the Under Secretary (Enforcement).

Ronald K. Noble,

*Under Secretary (Enforcement).*

[FR Doc. 95–23071 Filed 9–15–95; 8:45 am]

BILLING CODE 4810–25–P

[Treasury Directive Number 15–29]

**Delegation of Authority to the Commissioner, United States Customs Service, To Investigate Violations of 18 U.S.C. §§ 1956 and 1957**

September 11, 1995.

1. *Purpose.* This Directive delegates to the Commissioner, United States Customs Service, authority to investigate violations of 18 U.S.C. §§ 1956 and 1957.

2. *Delegation.* By virtue of the authority vested in the Secretary of the Treasury by 18 U.S.C. §§ 981, 1956(e) and 1957(e) and the authority delegated to the Under Secretary (Enforcement) by Treasury Order (TO) 101–05, there is hereby delegated to the Commissioner, United States Customs Service:

a. investigatory authority over violations of 18 U.S.C. § 1956 or 1957 involving 18 U.S.C. §§ 542, 545, 549, 659, 1461–63, 1465, 2251–52, 2314, and 2321; 19 U.S.C. § 1590; 21 U.S.C. § 863; offenses under § 11 of the Export Administration Act of 1979 (50 U.S.C. App. § 2410); offenses under § 206 of the International Emergency Economic Powers Act (50 U.S.C. § 1705); offenses under § 16 of the Trading With the Enemy Act (50 U.S.C. App. § 16); and offenses under § 38 of the Arms Export Control Act (22 U.S.C. § 2778) (relating to the exportation, intransit, temporary import, or temporary export transactions);

b. investigatory authority over violations of 18 U.S.C. § 1956(a)(2)(B)(ii), involving a reporting violation under 31 U.S.C. § 5316;

c. investigatory authority over violations of 18 U.S.C. § 1956(a)(3) relating to violations within the investigatory jurisdiction of the U.S. Customs Service under paragraphs 2.a. and b.; and

d. seizure and forfeiture authority and related authority under 18 U.S.C. § 981 relating to violations of 18 U.S.C. § 1956 or 1957 within the investigatory jurisdiction of the Customs Service under paragraphs 2.a., 2.b., and 2.c., and seizure authority under 18 U.S.C. § 981 relating to any other violation of 18 U.S.C. § 1956 or 1957 if the bureau with investigatory authority is not present to make the seizure. Property seized under 18 U.S.C. § 981 where investigatory jurisdiction is with another bureau not present at the time of the seizure shall be turned over to that bureau.

3. *Forfeiture Remission.* The Commissioner, United States Customs Service, is authorized to remit or mitigate forfeitures of property valued at not more than $500,000 seized pursuant to paragraph 2.d.

4. *Redelegation.* The authority delegated by this directive may be redelegated.

5. Coordination.

a. If at any time during an investigation of a violation of 18 U.S.C. § 1956 or 1957, the U.S. Customs Service discovers evidence of a matter within the jurisdiction of another Treasury bureau or office, the U.S. Customs Service shall immediately notify that bureau or office with investigatory jurisdiction of the investigation and invite that bureau or office to participate in the investigation. The Commissioner, U.S. Customs Service, shall attempt to resolve disputes over investigatory jurisdiction with other Treasury bureaus at the field level or in the case of the Office of Foreign Assets Control, at the headquarters level.

b. The Under Secretary (Enforcement) shall settle disputes that cannot be resolved by the bureaus. The Under Secretary (Enforcement) shall settle disputes over investigatory jurisdiction with the Internal Revenue Service in consultation with the Commissioner, Internal Revenue Service.

c. With respect to matters discovered within the investigatory jurisdiction of a Department of Justice bureau or the Postal Service, the U.S. Customs Service shall adhere to the provisions on notice and coordination in the "Memorandum of Understanding Among the Secretary of the Treasury, the Attorney General, and the Postmaster General Regarding Money Laundering Investigations," dated August 16, 1990, or any such subsequent memorandum entered pursuant to 18 U.S.C. § 1956(e) or 1957(e).

d. With respect to seizure and forfeiture operations and activities within its investigative jurisdiction, U.S. Customs Service shall comply with the policy, procedures, and directives developed and maintained by the Treasury Executive Office for Asset Forfeiture. Compliance will include adhering to the oversight, reporting, and administrative requirements relating to seizure and forfeiture contained in such policy, procedures, and directives.

6. Authorities.

a. 18 U.S.C. §§ 542, 545, 549, 659, 981, 1461–1463, 1465, 1956, 1957, 2251–52, 2314, and 2321.

b. 19 U.S.C. § 1590.

c. 21 U.S.C. § 863.

d. 22 U.S.C. § 2778.

e. 31 U.S.C. § 5316.

f. 50 U.S.C. App. § 16, 1705, and App. 2410.

g. TO 101–05, "Reporting Relationships and Supervision of Officials, Offices and Bureaus, Delegation of Certain Authority, and Order of Succession in the Department of the Treasury."

h. TO 102–14, "Delegation of Authority with Respect to the Treasury Forfeiture Fund Act of 1992," dated January 10, 1995.

7. *Cancellation.* Treasury Directive 15–29, "Delegation of Authority to the Commissioner, United States Customs Service to Investigate Violations of 18 U.S.C. §§ 1956 and 1957," dated May 1, 1991, is superseded.

8. *Expiration Date.* This Directive shall expire three years from the date of issuance unless superseded or cancelled prior to that date.

9. *Office of Primary Interest.* Office of the Under Secretary (Enforcement).

Ronald K. Noble,

*Under Secretary (Enforcement).*

[FR Doc. 95–23070 Filed 9–15–95; 8:45 am]

BILLING CODE 4810–25–P

[Treasury Directive Number 15–42]

**Delegation of Authority to the Commissioner, Internal Revenue Service, To Perform Functions Under the Money Laundering Control Act of 1986, as Amended**

September 11, 1995.

1. *Purpose.* This Directive delegates to the Commissioner, Internal Revenue Service (IRS), investigatory, seizure and forfeiture authority under the Money Laundering Control Act of 1986, Public Law 99–570, Subtitle H (October 27, 1986), as amended.

2. *Delegation.* By virtue of the authority vested in the Secretary of the Treasury by 18 U.S.C. §§ 981, 1956(e), 1957(e) and the authority delegated to the Under Secretary (Enforcement) by Treasury Order (TO) 101–05, there is hereby delegated to the Commissioner, IRS:

a. investigatory authority over violations of 18 U.S.C. §§ 1956 and 1957 where the underlying conduct is subject to investigation under Title 26 or under the Bank Secrecy Act, as amended; 31 U.S.C. §§ 5311–5328 (other than violations of 31 U.S.C. § 5316);

48200     Federal Register / Vol. 60, No. 180 / Monday, September 18, 1995 / Notices

b. seizure and forfeiture authority over violations of 18 U.S.C. § 981 relating to violations of:

(1) 31 U.S.C. §§ 5313 and 5324; and

(2) 18 U.S.C. §§ 1956 and 1957 which are within the investigatory jurisdiction of IRS pursuant to paragraph 2.a.; and

c. seizure authority relating to any other violation of 18 U.S.C. § 1956 or 1957 if the bureau with investigatory authority is not present to make the seizure. Property seized under 18 U.S.C. § 981 where investigatory jurisdiction is solely with another bureau not present at the time of the seizure shall be turned over to that bureau.

3. *Forfeiture Remission.* The Commissioner, IRS, is authorized to remit or mitigate forfeitures of property valued at not more than $500,000 seized pursuant to paragraph 2.b.

4. *Redelegation.* The authority delegated by this directive may be redelegated.

5. *Coordination.*

a. If at any time during an investigation of a violation of 18 U.S.C. § 1956 or 1957, IRS discovers evidence of a matter within the jurisdiction of another Treasury bureau, to the extent authorized by law, IRS shall immediately notify that bureau of the investigation and invite that bureau to participate in the investigation. The Commissioner, IRS, shall attempt to resolve disputes over investigatory jurisdiction with other Treasury bureaus at the field level.

b. The Under Secretary (Enforcement) shall settle disputes that cannot be resolved by the bureaus in consultation with the Commissioner, IRS.

c. With respect to matters discovered within the investigatory jurisdiction of a Department of Justice bureau or the Postal Service, IRS shall adhere to the provisions on notice and coordination in the "Memorandum of Understanding Among the Secretary of the Treasury, the Attorney General and the Postmaster General Regarding Money Laundering Investigations," dated August 16, 1990, or any such subsequent memorandum of understanding entered pursuant to 18 U.S.C. § 1956(e) or 1957(e).

d. With respect to seizure and forfeiture operations and activities within its investigative jurisdiction, IRS shall comply with the policy, procedures, and directives developed and maintained by the Treasury Executive Office for Asset Forfeiture. Compliance will include adhering to the oversight, reporting, and administrative requirements relating to seizure and forfeiture contained in such policy, procedures, and directives.

6. *Authorities.*

a. 18 U.S.C. §§ 981, 1956 and 1957.

b. 31 U.S.C. §§ 5311–5328 (other than violations of 31 U.S.C. § 5316).

c. TO 101–05, "Reporting Relationships and Supervision of Officials, Offices and Bureaus, Delegation of Certain Authority, and Order of Succession in the Department of the Treasury."

d. TO 102–14, "Delegation of Authority with Respect to the Treasury Forfeiture Fund Act of 1992," dated January 10, 1995.

7. *Cancellation.* Treasury Directive 15–42, "Delegation of Authority to the Commissioner, Internal Revenue Service to Perform Functions Under the Money Laundering Control Act of 1986, as amended," dated May 1, 1991, is superseded.

8. *Expiration Date.* This Directive shall expire three years from the date of issuance unless superseded or cancelled prior to that date.

9. *Office of Primary Interest.* Office of the Under Secretary (Enforcement).

Ronald K. Noble,
*Under Secretary (Enforcement).*

[FR Doc. 95–23069 Filed 9–15–95; 8:45 am]

BILLING CODE 4810–25–P

[Treasury Directive Number 15–54]

**Delegation of Authority to the Director, United States Secret Service, To Investigate Violations of 18 U.S.C. §§ 1956 and 1957**

September 11, 1995.

1. *Purpose.* This Directive delegates to the Director, United States Secret Service, authority to investigate violations of 18 U.S.C. §§ 1956 and 1957.

2. *Delegation.* By virtue of the authority vested in the Secretary of the Treasury by 18 U.S.C. §§ 981, 1956(e), 1957(e) and the authority delegated to the Under Secretary (Enforcement) by Treasury Order (TO) 101–05, there is hereby delegated to the Director, United States Secret Service:

a. investigatory authority over violations of 18 U.S.C. §§ 1956 and 1957 involving an offense under 18 U.S.C. §§ 471–473 (counterfeiting of obligations or securities of the United States); 18 U.S.C. §§ 500–503 (counterfeiting of blank or postal money orders, postage stamps, foreign government postage and revenue stamps, and postmarking stamps); 18 U.S.C. § 657 (involving theft, embezzlement or misapplication by employees of the Federal Deposit Insurance Corporation); and 18 U.S.C. § 1029 (fraud and related activity in connection with access devices); and

b. seizure and forfeiture authority and related authority under 18 U.S.C. § 981

relating to violations of § 1956 or 1957 within the investigatory jurisdiction of Secret Service under paragraph 2.a., an seizure authority under 18 U.S.C. § 981 relating to any other violations of 18 U.S.C. § 1956 or 1957 if the bureau with investigatory authority is not present to make the seizure. Property seized under 18 U.S.C. § 981 where investigatory jurisdiction is with another bureau not present at the time of the seizure shall be turned over to that bureau.

3. *Forfeiture Remission.* The Director, United States Secret Service, is authorized to remit or mitigate forfeitures of property valued at not more than $500,000 seized pursuant to paragraph 2.b.

4. *Redelegation.* The authority delegated by this directive may be redelegated.

5. *Coordination.*

a. If at any time during an investigation of a violation of 18 U.S.C. § 1956 or 1957, Secret Service discovers evidence of a matter within the jurisdiction of another Treasury bureau, Secret Service shall immediately notify that bureau of the investigation and invite that bureau to participate in the investigation. Secret Service shall attempt to resolve disputes over investigatory jurisdiction with other Treasury bureaus at the field level.

b. The Under Secretary (Enforcement) shall settle disputes that cannot be resolved by the bureaus. The Under Secretary (Enforcement) shall settle disputes over investigatory jurisdiction with the Internal Revenue Service in consultation with the Commissioner, Internal Revenue Service.

c. With respect to matters discovered within the investigatory jurisdiction of a Department of Justice bureau or the Postal Service, Secret Service shall adhere to the provisions on notice and coordination in the "Memorandum of Understanding Among the Secretary of the Treasury, the Attorney General and the Postmaster General Regarding Money Laundering Investigations," dated August 16, 1990, or any such subsequent memorandum of understanding entered pursuant to 18 U.S.C. § 1956(e) or 1957(e).

d. With respect to seizure and forfeiture operations and activities within its investigative jurisdiction, Secret Service shall comply with the policy, procedures, and directives developed and maintained by the Treasury Executive Office for Asset Forfeiture. Compliance will include adhering to the oversight, reporting, and administrative requirements relating to seizure and forfeiture contained in such policy, procedures, and directives.

6. *Authorities.*

**044**

a. 18 U.S.C. §§ 471–473, 500–503, 657, 981, 1029, 1956 and 1957.

b. TO 101–05, "Reporting Relationships and Supervision of Officials, Offices and Bureaus, Delegation of Certain Authority, and Order of Succession in the Department of the Treasury."

c. TO 102–14, "Delegation of Authority with Respect to the Treasury Forfeiture Fund Act of 1992," dated January 10, 1995.

7. *Cancellation.* Treasury Directive 15–54, "Delegation of Authority to the Director, United States Secret Service to Investigate Violations of 18 U.S.C. §§ 1956 and 1957," dated May 1, 1991, is superseded.

8. *Expiration Date.* This Directive shall expire three years from the date of issuance unless superseded or cancelled prior to that date.

9. *Office of Primary Interest.* Office of the Under Secretary (Enforcement).

Ronald K. Noble,

*Under Secretary (Enforcement).*

[FR Doc. 95–23068 Filed 9–15–95; 8:45 am]

BILLING CODE 4810–25–M

## UNITED STATES INFORMATION AGENCY

## Culturally Significant Objects Imported for Exhibition; Determination

Notice is hereby given of the following determination: Pursuant to the authority vested in me by the Act of October 19, 1965 (79 Stat. 985, 22 U.S.C. 2459), Executive Order 12047 of March

27, 1978 (43 FR 13359, March 29, 1978), and Delegation Order No. 85–5 of June 27, 1985 (50 FR 27393, July 2, 1985), I hereby determine that the objects to be included in the exhibit, "Johannes Vermeer" (See list [1]), imported from abroad for the temporary exhibition without profit within the United States, are of cultural significance. These objects are imported pursuant to a loan agreement with the foreign lenders. I also determine that the exhibition or display of the listed exhibit objects at the National Gallery of Art from on or about November 12, 1995, through February 11, 1996, is in the national interest. Public Notice of this determination is ordered to be published in the Federal Register.

Dated: September 12, 1995.

Les Jin,

*General Counsel.*

[FR Doc. 95–23011 Filed 9–15–95; 8:45 am]

BILLING CODE 8230–01–M

## Culturally Significant Objects Imported for Exhibition Determination

Notice is hereby given of the following determination: Pursuant to the authority vested in me by the Act of October 19, 1965 (79 Stat. 985, 22 U.S.C. 2459), Executive Order 12047 of March 27, 1978 (43 FR 13359, March 29, 1978),

[1] A copy of this list may be obtained by contacting Mr. Paul Manning, Assistant General Counsel, at 202/619–5997, and the address is Room 700, U.S. Information Agency, 301 4th Street SW., Washington, DC 20547–0001.

and Delegation Order No. 85–5 of June 27, 1985 (50 FR 27393, July 2, 1985), I hereby determine that the objects to be included in the exhibit, "Splendors of Imperial China: Treasures from the National Palace Museum, Taipei" (See list [1]), imported from abroad for the temporary exhibition without profit within the United States, are of cultural significance. These objects are imported pursuant to a loan agreement with the foreign lenders. I also determine that the temporary exhibition or display of the listed exhibit objects at The Metropolitan Museum of Art, New York, New York on or about March 12, 1996 through May 19, 1996, at The Art Institute of Chicago, Chicago, Illinois on or about June 28, 1996 through August 25, 1996, at the Asian Art Museum of San Francisco, San Francisco, California on or about October 14, 1996 through December 8, 1996, and at the National Gallery of Art, Washington, DC on or about January 27, 1997 through April 6, 1997 is in the national interest. Public Notice of this determination is ordered to be published in the Federal Register.

Dated: September 11, 1995.

Les Jin,

*General Counsel.*

[FR Doc. 95–23012 Filed 9–15–95; 8:45 am]

BILLING CODE 8230–01–M

[1] A copy of this list may be obtained by contacting Mr. Paul W. Manning of the Office of the General Counsel of USIA. The telephone number is 202 619–5997, and the address is room 700, U.S. Information Agency, 301 Fourth Street, SW., Washington, DC 20547.

Federal Register / Vol. 64, No. 25 / Monday, February 8, 1999 / Notices

effective programs to reduce the incidence of these crashes. In order to properly plan and evaluate programs directed at reducing alcohol-impaired driving, the agency needs to periodically update its knowledge and understanding of the public's attitudes and behaviors with respect to drinking and driving.

The findings from this proposed collection will assist NHTSA in addressing the problem of alcohol-impaired driving and in formulating programs and recommendations to Congress. NHTSA will use the findings to help focus current programs and activities to achieve the greatest benefit, to develop new programs to decrease the likelihood of drinking and driving behaviors, and to provide informational support to states, localities, and law enforcement agencies that will aid them in their efforts to reduce drinking and driving crashes and injuries.

**Description of the Likely Respondents (Including Estimated Number, and Proposed Frequency of Response to the Collection of Information)**

Under this proposed collection, a telephone interview averaging approximately 20 minutes in length would be administered to each of 6,000 randomly selected members of the general public age 16 and older. The respondent sample would be selected from all 50 states plus the District of Columbia. Interviews would be conducted with persons at residential phone numbers selected using random digit dialing. No more than one respondent per household would be selected, and each sample member would complete just one interview. Businesses are ineligible for the sample and would be not be interviewed.

**Estimate of the Total Annual reporting and Record Keeping Burden Resulting From the Collection of Information**

NHTSA estimates that respondents in the sample would require an average of 20 minutes to complete the telephone interview. Thus, the number of estimated reporting burden on the general public would be a total of 2000 hours for the proposed survey. The respondents would not incur any reporting or record keeping cost from the information collection.

**Rose A. McMurray,**

*Associate Administrator for Traffic Safety Programs, National Highway Traffic Safety Administration.*

[FR Doc. 99-3008 Filed 2-5-99; 8:45 am]

**BILLING CODE 4910-59-P**

## DEPARTMENT OF TRANSPORTATION

### Surface Transportation Board

**[STB Finance Docket No. 33707]**

**Albany Bridge Company, Inc., Georgia & Florida Railroad Co., Inc., and Live Oak, Perry & Georgia Railroad Company, Inc.—Corporate Family Transaction Exemption—Gulf & Ohio Railways, Inc.**

Albany Bridge Company, Inc., Georgia & Florida Railroad Co., Inc., and Live Oak, Perry & Georgia Railroad Company, Inc. (Railroad Companies), and Gulf & Ohio Railways, Inc. (G&O), have jointly filed a notice of exemption. The Railroad Companies and G&O are wholly owned by Gulf & Ohio Railways Holding Co., Inc. (Holding Company), and the Holding Company is wholly owned by H. Peter Claussen and Linda C. Claussen.[1] The Railroad Companies will be merged into G&O, with G&O as the surviving corporation.

The transaction was scheduled to be consummated on or shortly after January 21, 1999.

The proposed merger is intended to consolidate the operations of the Railroad Companies and G&O, and to eliminate administrative and operating inefficiencies, improve service, and to improve the financial viability of the surviving corporation.

This is a transaction within a corporate family of the type specifically exempted from prior review and approval under 49 CFR 1180.2(d)(3). The parties state that the transaction will not result in adverse changes in service levels, significant operational changes, or a change in the competitive balance with carriers outside the corporate family.

Under 49 U.S.C. 10502(g), the Board may not use its exemption authority to relieve a rail carrier of its statutory obligation to protect the interests of its employees. Section 11326(c), however, does not provide for labor protection for transactions under sections 11324 and 11325 that involve only Class III rail carriers. Because this transaction involves Class III rail carriers only, the Board, under the statute, may not impose labor protective conditions for this transaction.

[1] *See Albany Bridge Company, Inc., Georgia & Florida Railroad Co., Inc., Gulf & Ohio Railways, Inc., Lexington & Ohio Railroad Co., Inc., Live Oak, Perry & Georgia Railroad Company, Inc., Piedmont & Atlantic Railroad Co., Inc., Rocky Mount & Western Railroad Company, Inc.—Corporate Family Transaction Exemption—Gulf & Ohio Railways Holding Co., Inc.,* STB Finance Docket No. 33576 (STB served Apr. 10, 1998).

If the notice contains false or misleading information, the exemption is void *ab initio.* Petitions to reopen the proceeding to revoke the exemption under 49 U.S.C. 10502(d) may be filed at any time. The filing of a petition to reopen will not automatically stay the transaction.

An original and 10 copies of all pleadings, referring to STB Finance Docket No. 33707, must be filed with the Surface Transportation Board, Office of the Secretary, Case Control Unit, 1925 K Street, NW., Washington, DC 20423-0001. In addition, a copy of all pleadings must be served on Jo A. DeRoche, Weiner, Brodsky, Sidman & Kider, P.C., Suite 800, 1350 New York Avenue, NW., Washington, DC 20005-4797.

Board decisions and notices are available on our website at "WWW.STB.DOT.GOV."

Decided: January 29, 1999.

By the Board, David M. Konschnik, Director, Office of Proceedings.

**Vernon A. Williams,**

*Secretary.*

[FR Doc. 99-2666 Filed 2-5-99; 8:45 am]

**BILLING CODE 4910-00-P**

## DEPARTMENT OF THE TREASURY

**[Treasury Directive Number 15-29]**

**Delegation of Authority to the Commissioner, United States Customs Service, To Investigate Violations of 18 U.S.C. §§ 1956 and 1957**

January 21, 1999.

1. *Purpose.* This Directive delegates to the Commissioner, United States Customs Service, authority to investigate violations of 18 U.S.C. §§ 1956 and 1957.

2. *Delegation.* By virtue of the authority vested in the Secretary of the Treasury by 18 U.S.C. §§ 981, 1956(e) and 1957(e) and the authority delegated to the Under Secretary (Enforcement) by Treasury Order (TO) 101-05, there is hereby delegated to the Commissioner, United States Customs Service:

a. Investigatory authority over violations of 18 U.S.C. § 1956 or 1957 involving 18 U.S.C. §§ 542, 545, 549, 659, 1461-63, 1465, 2251-52, 2314, 2320, and 2321; 19 U.S.C. § 1590; 21 U.S.C. § 863; offenses under § 11 of the Export Administration Act of 1979 (50 U.S.C. App. § 2410); offenses under § 206 of the International Emergency Economic Powers Act (50 U.S.C. § 1705); offenses under § 16 of the Trading With the Enemy Act (50 U.S.C. App. § 16); and offenses under § 38 of the Arms Export Control Act (22 U.S.C.

§ 2778) (relating to the exportation, intrasit, temporary import, or temporary export purposes.

b. Investigatory authority over violations of 18 U.S.C. § 1956(a)(2)(B)(ii), involving a reporting violation under 31 U.S.C. § 5316;

c. Investigatory authority over violations of 18 U.S.C. § 1956(a)(3) relating to violations within the investigatory jurisdiction of the U.S. Customs Service under paragraphs 2.a. and b.; and

d. Seizure and forfeiture authority and related authority under 18 U.S.C. § 981 relating to violations of 18 U.S.C. § 1956 or 1957 within the investigatory jurisdiction of the Customs Service under paragraphs 2.a., 2.b., and 2.c., and seizure authority under 18 U.S.C. § 981 relating to any other violation 18 U.S.C. § 1956 or 1957 if the bureau with investigatory authority is not present to make the seizure. Property seized under 18 U.S.C. § 981 where investigatory jurisdiction is with another bureau not present at the time of the seizure shall be turned over that bureau.

3. *Forfeiture Remission.* The Commissioner, United States Customs Service, is authorized to remit or mitigate forfeitures of property valued at not more than $500,000 seized pursuant to paragraph 2.d.

4. *Redelegation.* The authority delegated by this directive may be redelegated.

5. *Coordination:*

a. If at any time during an investigation of a violation of 18 U.S.C. § 1956 or 1957, the U.S. Customs Service discovers evidence of a matter within the jurisdiction of another Treasury bureau or office, the U.S. Customs Service shall immediately notify that bureau or office with investigatory jurisdiction of the investigation and invite that bureau or office to participate in the investigation. The Commissioner, U.S. Customs Service, shall attempt to resolve disputes over investigatory jurisdiction with other Treasury bureaus at the field level or, in the case of the Office of Foreign Assets Control, at the headquarters level.

b. The Under Secretary (Enforcement) shall settle dispute that cannot be resolved by the bureaus. The Under Secretary (Enforcement) shall settle disputes over investigatory jurisdiction with the Internal Revenue Service in consultation with the Commissioner, Internal Revenue Service.

c. With respect to matters discovered within the investigatory jurisdiction of a Department of Justice bureau or the Postal Service, the U.S. Customs Service shall adhere to the provisions on notice

and coordination in the "Memorandum of Understanding Among the Secretary of the Treasury, the Attorney General and the Postmaster General Regarding Money Laundering Investigations," dated August 16, 1990, or any such subsequent memorandum of understanding entered pursuant to 18 U.S.C. § 1956(e) or 1957(e).

d. With respect to seizure and forfeiture operations and activities within its investigative jurisdiction, U.S. Customs Service shall comply with the policy, procedures, and directives developed and maintained by the Treasury Executive Office for Asset Forfeiture. Compliance will include adhering to the oversight, reporting, and administrative requirements relating to seizure and forfeiture contained in such policy, procedures, and directives.

6. *Ratification.* To the extent that any action heretofore taken consistent with this Directive may require ratification, it is hereby approved and ratified.

7. *Authorities:*

a. 18 U.S.C. §§ 542, 545, 659, 981, 1461–1463, 1465, 1956, 1957, 2251–52, 2314, 2320 and 2321.

b. 19 U.S.C. § 1590.

c. 21 U.S.C. § 863.

d. 22 U.S.C. § 2778.

e. 31 U.S.C. § 5316.

f. 50 U.S.C. App. § 16, 50 U.S.C. 1705, and App. 2410.

g. TO 101–05, "Reporting Relationships and Supervision of Officials, Offices and Bureaus, Delegation of Certain Authority, and Order of Succession in the Department of the Treasury," dated October 29, 1998 or successor documents.

h. TO 102–14, " Delegation of Authority with Respect to the Treasury Forfeiture Fund Act of 1992," dated January 10, 1995 or successor documents.

8. *Cancellation.* Treasury Directive 15–29, "Delegation of Authority to the Commissioner, United States Customs Service to Investigate Violations of 18 U.S.C. §§ 1956 and 1957," dated September 11, 1995, is superseded.

9. *Expiration Date.* This Directive shall expire three years from the date of issuance unless superseded or canceled prior to that date.

10. *Office of Primary Interest.* Office of the Under Secretary (Enforcement).

James E. Johnson,

*Under Secretary (Enforcement).*

[FR Doc. 99–2868 Filed 2–5–99; 8:45 am]

BILLING CODE 4810-25-M

# DEPARTMENT OF THE TREASURY

[Treasury Directive Number 15–42]

## Delegation of Authority to the Commissioner, Internal Revenue Service, To Investigate Violations of 18 U.S.C. 1956 and 1957

January 21, 1999.

1. *Purpose.* This Directive delegates to the Commissioner, Internal Revenue Service (IRS), authority to investigate violations of 18 U.S.C. 1956 and 1957.

2. *Delegation.* By virtue of the authority vested in the Secretary of the Treasury by 18 U.S.C. 981, 1956(e), 1957(e) and the authority delegated to the Under Secretary (Enforcement) by Treasury Order (TO) 101–05, there is hereby delegated to the Commissioner, IRS:

a. Investigatory authority over violations of 18 U.S.C. 1956 and 1957 where the underlying conduct is subject to investigation under Title 26 or under the Bank Secrecy Act, as amended; or 31 U.S.C. 5311–5328 (other than violations of 31 U.S.C. 5316);

b. Seizure and forfeiture authority over violations of 18 U.S.C. 981 relating to violations of:

(1) 31 U.S.C. 5313 and 5324; and

(2) 18 U.S.C. 1956 and 1957 which are within the investigatory jurisdiction of IRS pursuant to paragraph 2.a.; and

c. Seizure authority relating to any other violation of 18 U.S.C. 1956 or 1957 if the bureau with investigatory authority is not present to make the seizure. Property seized under 18 U.S.C. 981 where investigatory jurisdiction is solely with another bureau not present at the time of the seizure shall be turned over to that bureau.

3. *Forfeiture Remission.* The Commissioner, IRS, is authorized to remit or mitigate forfeitures of property valued at not more than $500,000 seized pursuant to paragraph 2.b.

4. *Redelegation.* The authority delegated by this directive may be redelegated.

5. *Coordination.*

a. If at any time during an investigation of a violation of 18 U.S.C. 1956 or 1957, IRS discovers evidence of a matter within the jurisdiction of another Treasury bureau, to the extent authorized by law, IRS shall immediately notify that bureau of the investigation and invite that bureau to participate in the investigation. The Commissioner, IRS, shall attempt to resolve disputes over investigatory jurisdiction with other Treasury bureaus at the field level.

b. The Under Secretary (Enforcement) shall settle disputes that cannot be

resolved by the bureaus in consultation with the Commissioner, IRS.

c. With respect to matters discovered within the investigatory jurisdiction of a Department of Justice bureau or the Postal Service, IRS shall adhere to the provisions on notice and coordination in the "Memorandum of Understanding Among the Secretary of the Treasury, the Attorney General and the Postmaster General Regarding Money Laundering Investigations," dated August 16, 1990, or any such subsequent memorandum of understanding entered pursuant to 18 U.S.C. 1956(e) or 1957(e).

d. With respect to seizure and forfeiture operations and activities within its investigative jurisdiction, IRS shall comply with the policy, procedures, and directives developed and maintained by the Treasury Executive Office for Asset Forfeiture. Compliance will include adhering to the oversight, reporting, and administrative requirements relating to seizure and forfeiture contained in such policy, procedures, and directives.

6. *Ratification.* To the extent that any action heretofore taken consistent with this Directive may require ratification, it is hereby approved and ratified.

7. *Authorities.*

a. 18 U.S.C. 981, 1956 and 1957.

b. 31 U.S.C. 5311–5328 (other than violations of 31 U.S.C. 5316).

c. TO 101–05, "Reporting Relationships and Supervision of Officials, Offices and Bureaus, Delegation of Certain Authority, and Order of Succession in the Department of the Treasury," dated October 29, 1998, or successor documents.

d. TO 102–14, "Delegation of Authority with Respect to the Treasury Forfeiture Fund Act of 1992," dated January 10, 1995, or successor documents.

8. *Cancellation.* Treasury Directive 15–42, "Delegation of Authority to the Commissioner, Internal Revenue Service to Perform Functions Under the Money Laundering Control Act of 1986, as amended," dated September 11, 1995, is superseded.

9. *Expiration Date.* This Directive shall expire three years from the date of issuance unless superseded or canceled prior to that date.

10. *Office of Primary Interest.* Office of the Under Secretary (Enforcement).
**James E. Johnson,**
*Under Secretary (Enforcement).*
[FR Doc. 99–2869 Filed 2–5–99; 8:45 am]
**BILLING CODE 4810–25–P**

## DEPARTMENT OF THE TREASURY

[Treasury Order Number 101–05]

**Reporting Relationships and Supervision of Officials, Offices and Bureaus, Delegation of Certain Authority, and Order of Succession in the Department of the Treasury**

January 7, 1999.

By virtue of the authority vested in the Secretary of the Treasury, including the authority vested by 31 U.S.C. 321(b), and Executive Order (E.O.) 11822, dated December 10, 1974, it is ordered that:

1. The Deputy Secretary shall report directly to the Secretary.

2. The Chief of Staff shall report directly to the Secretary and shall exercise supervision over the Director, Secretary's Scheduling Office, and the Executive Secretary.

3. The Executive Secretary shall report directly to the Chief of Staff and shall exercise supervision over the functions of the Executive Secretariat Correspondence Unit; the Office of . Public Correspondence; and, for purposes of administrative and managerial control, over the Special Assistant to the Secretary (National Security). The Special Assistant to the Secretary (National Security) shall report to the Secretary and the Deputy Secretary.

4. The following officials shall report through the Deputy Secretary to the Secretary and shall exercise supervision over those officers and organizational entities set forth on the attached organizational chart:
Under Secretary (International Affairs)
Under Secretary (Domestic Finance)
Under Secretary (Enforcement)
General Counsel
Assistant Secretary (Legislative Affairs and Public Liaison)
Assistant Secretary (Public Affairs)
Assistant Secretary (Economic Policy)
Assistant Secretary (Tax Policy)
Assistant Secretary (Management) and Chief Financial Officer
Commissioner of Internal Revenue
Comptroller of the Currency
Director, Office of Thrift Supervision

5. The Inspector General and the Treasury Inspector General for Tax Administration shall report to and be under the general supervision of the Secretary and the Deputy Secretary.

6. The Assistant Secretary (Management) serves as the Department's Chief Financial Officer pursuant to Chapter 9 of Title 31, U.S.C., and serves as the Department's Chief Operating Officer for purposes of the Presidential Memorandum, "Implementing Management Reform in

the Executive Branch," dated October 1, 1993.

7. The Deputy Assistant Secretary (Information Systems) reporting to the Assistant Secretary (Management) and Chief Financial Officer is designated as the Department's Chief Information Officer pursuant to Division E of the Clinger-Cohen Act of 1996, and E.O. 13011, dated July 16, 1996, and shall have direct access to the Secretary to the extent required by that Act and related statutes.

8. The Deputy Secretary is authorized, in that official's own capacity and that official's own title, to perform any functions the Secretary is authorized to perform and shall be responsible for referring to the Secretary any matter on which action would appropriately be taken by the Secretary. Any action heretofore taken by the Deputy Secretary in that official's own title is hereby affirmed and ratified as the action of the Secretary.

9. The Under Secretaries, the General Counsel, and the Assistant Secretaries are authorized to perform any functions the Secretary is authorized to perform. Each of these officials will ordinarily perform under this authority only functions which arise out of, relate to, or concern the activities or functions of, or the laws administered by or relating to, the bureaus, offices, or other organizational units over which the incumbent has supervision. Each of these officials shall perform under this authority in the official's own capacity and the official's own title and shall be responsible for referring to the Secretary any matter on which action would appropriately be taken by the Secretary. Any action heretofore taken by any of these officials in that official's own title is hereby affirmed and ratified as the action of the Secretary.

10. The following officials shall, in the order of succession indicated, act as Secretary of the Treasury in case of the death, resignation, absence or sickness of the Secretary and other officers succeeding the incumbent, until a successor is appointed, or until the absence or sickness shall cease:

a. Deputy Secretary;

b. The following individuals, in the order of the date on which they were first appointed to a position within the Department requiring appointment by the President by and with the advice and consent of the Senate:
• Under Secretary (International Affairs);
• Under Secretary (Domestic Finance); and
  • Under Secretary (Enforcement);
c. General Counsel; and

**6136**          Federal Register / Vol. 64, No. 25 / Monday, February 8, 1999 / Notices

d. Assistant Secretaries, appointed by the President with Senate confirmation, in the order designated by the Secretary.

11. *Cancellation.* Treasury Order 101–05, "Reporting Relationships and Supervision of Officials, Offices and Bureaus, Delegation of Certain Authority, and Order of Succession in the Department of the Treasury," dated October 29, 1998, is superseded as of this date.

12. *Office of Primary Interest.* Office of Organizational Improvement.

**Robert E. Rubin,**

*Secretary of the Treasury.*

Attachment

**BILLING CODE 4810–25–P**

Federal Register / Vol. 64, No. 25 / Monday, February 8, 1999 / Notices



## TREASURY DEPARTMENT ORDERS

(1)     T.D.O. 150-1, 17 Fed. Reg. 4590 (May 20, 1952)
Re: Assistant General Counsel for Bureau (May 8, 1952).

(2)     T.D.O. 150-2, 17 Fed. Reg. 4590 (May 20, 1952)
Re: Delegation of functions to CIR (May 15, 1952).

(3)     T.D.O. 150-3, 17 Fed. Reg. 4590 (May 20, 1952)
Re: Chicago District (May 15, 1952).

(4)     T.D.O. 150-4, 17 Fed. Reg. 5776 (June 27, 1952)
Re: New York City District (June 23, 1952).

(5)     T.D.O. 150-5, 17 Fed. Reg. 7160 (Aug. 6, 1952)
Re: National Office reorganization and title changes (July 29, 1952).

(6)     T.D.O. 150-6, 17 Fed. Reg. 8128 (Sept. 9, 1952)
Re: Baltimore District (Sept. 4, 1952).

(7)     T.D.O. 150-7, 17 Fed. Reg. 8490 (Sept. 23, 1952)
Re: Buffalo District (Sept. 17, 1952).

(8)     T.D.O. 150-8, 17 Fed. Reg. 8880 (Oct. 3, 1952)
Re: Boston District (Sept. 29, 1952).

(9)     T.D.O. 150-9, 17 Fed. Reg. 9226 (Oct. 17, 1952)
Re: St. Paul District (Oct. 8, 1952).

(10)    T.D.O. 150-10, 17 Fed. Reg. 9227 (Oct. 17, 1952)
Re: Chicago District includes Wisconsin (Oct. 9, 1952).

(11)    T.D.O. 150-11, 17 Fed. Reg. 9591 (Oct. 22, 1952)
Re: Atlanta District (Oct. 8, 1952).

(12)    T.D.O. 150-12, 17 Fed. Reg. 9592 (Oct. 22, 1952)
Re: Louisville District (Oct. 8, 1952).

(13)    T.D.O. 150-13, 17 Fed. Reg. 9827 (Oct. 31, 1952)
Re: Seattle District (Oct. 28, 1952).

(14)    T.D.O. 150-14, 17 Fed. Reg. 10390 (Nov. 13, 1952)
Re: Philadelphia District (Nov. 7, 1952).

(15)   T.D.O. 150-15, 17 Fed. Reg. 10518 (Nov. 18, 1952)
Re: St. Louis District (Nov. 14, 1952).

(16)   T.D.O. 150-16, 17 Fed. Reg. 10518 (Nov. 18, 1952)
Re: Dallas District (Nov. 14, 1952).

(17)   T.D.O. 150-17, 17 Fed. Reg. 10574 (Nov. 19, 1952)
Re: Graham as Acting CIR (Nov. 17, 1952).

(18)   T.D.O. 150-18, 17 Fed. Reg. 10603 (Nov. 20, 1952)
Re: Birmingham District (Nov. 18, 1952).

(19)   T.D.O. 150-19, 17 Fed. Reg. 10710 (Nov. 25, 1952)
Re: Denver District (Nov. 21, 1952).

(20)   T.D.O. 150-20, 17 Fed. Reg. 10747 (Nov. 26, 1952)
Re: Los Angeles District (Nov. 21, 1952).

(21)   T.D.O. 150-21, 17 Fed. Reg. 10834 (Nov. 29, 1952)
Re: Cleveland District (Nov. 21, 1952).

(22)   T.D.O. 150-22, 17 Fed. Reg. 10834 (Nov. 29, 1952)
Re: Detroit District (Nov. 21, 1952).

(23)   T.D.O. 150-23, 18 Fed. Reg. 555 (Jan. 24, 1953)
Re: Winkle as Acting CIR (Jan. 20, 1953).

(24)   T.D.O. 150-24, 18 Fed. Reg. 2152 (April 16, 1953)
Re: Reorganization of few National Offices (April 10, 1953).

(25)   T.D.O. 150-25, 18 Fed. Reg. 3238 (June 5, 1953)
Re: Section 3761 compromise authority to CIR (June 1, 1953).

(26)   T.D.O. 150-26, 18 Fed. Reg. 3499 (June 18, 1953), 1953-2 C.B. 503
Re: District Comm. changed to Regional Comm. (June 15, 1953).

(27)   T.D.O. 150-27, unpublished.

(28)   T.D.O. 150-28, 18 Fed. Reg. 4183 (July 16, 1953)
Re: Authority to certify assessment lists (July 6, 1953).

(29)   T.D.O. 150-29, unpublished.

(30)   T.D.O. 150-30, unpublished.

052

(31)   T.D.O. 150-31, unpublished.

(32)   T.D.O. 150-32, 18 Fed. Reg. 7518 (Nov. 25, 1953)
Re: Closing agreement authority to CIR (Nov. 18, 1953).

(33)   T.D.O. 150-33, 18 Fed. Reg. 7803 (Dec. 3, 1953)
Re: Authority to abate jeopardy (Nov. 27, 1953).

(34)   T.D.O. 150-34, unpublished.

(35)   T.D.O. 150-35, 19 Fed. Reg. 1776 (March 31, 1954)
Re: Authority to inspect returns (March 25, 1954).

(Rev. 1), 24 Fed. Reg. 3960, 1959-1 CB 767 (May 8, 1959)

(36)   T.D.O. 150-36, 19 Fed. Reg. 5411 (Aug. 25, 1954), 1954-2 C.B. 733
Re: General delegation re '54 Code (Aug. 17, 1954).

(37)   T.D.O. 150-37, unpublished.

(38)   T.D.O. 150-38, unpublished.

(39)   T.D.O. 150-39, 20 Fed. Reg. 4522 (June 25, 1955)
Re: Addition to L.A. District (June 22, 1955).

Rev., 48 Fed. Reg. 16160, 1983-1 CB 801 (Mar. 28, 1983)

(40)   T.D.O. 150-40, 20 Fed. Reg. 6105 (Aug. 20, 1955)
Re: Bonding of IRS employees (Aug. 16, 1955).

(41)   T.D.O. 150-41, 21 Fed. Reg. 1111 (Feb. 17, 1956), 1956-1 C.B. 1009
Re: Approval of tax regulations (Feb. 13, 1956).

(42)   T.D.O. 150-42, 21 Fed. Reg. 5852 (Aug. 4, 1956), 1956-2 C.B. 1367
Re: Canal Zone and possessions (July 27, 1956).

(43)   T.D.O. 150-43, 21 Fed. Reg. 8149 (Oct. 24, 1956), 1956-2 C.B. 1367
Re: National Office change (Oct. 5, 1956).

(44)   T.D.O. 150-44, 21 Fed. Reg. 9299 (Nov. 28, 1956), 1956-2 C.B. 1368.
Re: National Office change (Nov. 16, 1956).

(45)   T.D.O. 150-45, 22 Fed. Reg. 3022 (April 27, 1957), 1957-1 C.B. 717
Re: Regs for Federal Firearms Act (April 22, 1957);

(Rev. 1), 33 Fed. Reg. 17856, 1968-2 C.B. 965;
(Rev. 2), 35 Fed. Reg. 16660, 1970-2 C.B. 645.

(46)   T.D.O. 150-46, 23 Fed. Reg. 3676 (May 28, 1958), 1958-1 C.B. 679
Re: New National Office (May 19, 1958).

(47)   T.D.O. 150-47, 23 Fed. Reg. 7711 (Oct. 4, 1958), 1958-2 C.B. 1085
Re: Delk as Acting CIR (Sept. 27, 1958).

(48)   T.D.O. 150-48, 23 Fed. Reg. 8735 (Nov. 8, 1958), 1958-2 C.B. 1085
Re: Latham as CIR (Nov. 5, 1958).

(49)   T.D.O. 150-49, 24 Fed. Reg. 9948 (Dec. 9, 1959), 1960-1 C.B. 859
Re: Manhattan District (Nov. 25, 1959).

(50)   T.D.O. 150-50, 24 Fed. Reg. 10083 (Dec. 12, 1959), 1960-1 C.B. 859
Re: Alteration of few districts (Dec. 3, 1959).

(51)   T.D.O. 150-51, unpublished.

(52)   T.D.O. 150-52, 25 Fed. Reg. 8759 (Sept. 10, 1960), 1960-2 C.B. 917
Re: Offices in National Office (Sept. 1, 1960).

(53)   T.D.O. 150-53, 25 Fed. Reg. 12756 (Dec. 13, 1960), 1961-1 C.B. 859
Re: Reorganization of few districts (Dec. 7, 1960).

(54)   T.D.O. 150-54, 26 Fed. Reg. 626 (Jan. 20, 1961), 1961-1 C.B. 859
Re: Fox as Acting CIR (Jan. 19, 1961).

(55)   T.D.O. 150-55, 26 Fed. Reg. 800 (Jan. 26, 1961), 1961-1 C.B. 860
Re: Delegations re Guam and Samoa (Jan. 19, 1961)
Revoked, 40 Fed. Reg. 10198, 1975-1 C.B. 758.

(56)   T.D.O. 150-56, 26 Fed. Reg. 8953 (Sept. 22, 1961), 1961-2 C.B. 544
Re: National Office changes (Sept. 15, 1961).

(57)   T.D.O. 150-57, 28 Fed. Reg. 2313 (March 9, 1963), 1963-1 C.B. 425
Re: Changes in Regions (March 4, 1963).

(58)   T.D.O. 150-58, 28 Fed. Reg. 5219 (May 24, 1963), 1963-1 C.B. 427
Re: Changes in Regions (May 17, 1963).

(59)   T.D.O. 150-59, 29 Fed. Reg. 2562 (Feb. 19, 1964), 1964-1 C.B. 605
Re: Redesignation of Regions (Feb. 11, 1964).

(60)   T.D.O. 150-60, 29 Fed. Reg. 7430 (June 9, 1964), 1964-2 C.B. 900
Re: Delegations to CIR (June 3, 1964).

(61)   T.D.O. 150-61, 29 Fed. Reg. 9634 (July 16, 1964), 1964-2 C.B. 900
Re: Harding as Acting CIR (July 10, 1964).

(62)   T.D.O. 150-62, 29 Fed. Reg. 14798 (Oct. 30, 1964), 1964-2 C.B. 901
Re: delegations to CIR (Oct. 26, 1964).

(63)   T.D.O. 150-63, 29 Fed. Reg. 14861 (Oct. 31, 1964), 1964-2 C.B. 901
Re: Changes in few districts (Oct. 23, 1964).

(64)   T.D.O. 150-64, unpublished.

(65)   T.D.O. 150-65, 30 Fed. Reg. 65 (Jan. 5, 1965), 1965-2 C.B. 861
Re: Changes in Region (Jan. 4, 1965).

(66)   T.D.O. 150-66, unpublished.

(67)   T.D.O. 150-67, 33 Fed. Reg. 15449 (Oct. 17, 1968), 1968-2 C.B. 966
Re: Del. to CIR re firearms laws (Oct. 11, 1968).

(68)   T.D.O. 150-68, 34 Fed. Reg. 1214 (Jan. 24, 1969), 1969-1 C.B. 465
Re: Smith as Acting CIR (Jan. 17, 1969).

(69)   T.D.O. 150-69, 1975-2 C.B. 606
Re: IRS employees (March 14, 1969).
Revised, 1980-1 C.B. 717

(70)   T.D.O. 150-70, 34 Fed. Reg. 8170 (May 24, 1969), 1969-1 C.B. 465
Re: Interest equalization tax (March 20, 1969).

(71)   T.D.O. 150-71, 1971-2 C.B. 578
Re: Economic Opportunity Act (Jan. 8, 1971).

(72)   T.D.O. 150-72, unpublished.

(73)   T.D.O. 150-73, 36 Fed. Reg. 12177 (June 26, 1971), 1971-2 C.B. 579
Re: Swartz as Acting CIR (June 22, 1971).

(74)   T.D.O. 150-74, 36 Fed. Reg. 12996 (July 10, 1971), 1971-2 C.B. 579
Re: National Office changes (June 30, 1971).

**055**

(75)   T.D.O. 150-75, 36 Fed. Reg. 16947 (Aug. 26, 1971)

Re: Em. Preparedness Ec. Stab. Order No. 1 (Aug. 19, 1971).

(76)   T.D.O. 150-76, 36 Fed. Reg. 22188 (Nov. 20, 1971)
Re: Wage and price controls (Nov. 13, 1971).

(77)   T.D.O. 150-77, 37 Fed. Reg. 5513 (March 16, 1972)
Re: Wage and price controls (March 9, 1972).

(78)   T.D.O. 150-78, unpublished.

(79)   T.D.O. 150-79, 37 Fed. Reg. 18481 (Sept. 12, 1972)
Re: Pay Board (Sept. 5, 1972).

(80)   T.D.O. 150-80, 37 Fed. Reg. 28641 (Dec. 28, 1972)
Re: Wage and price controls (Dec. 12, 1972).

(81)   T.D.O. 150-81, 38 Fed. Reg. 12136 (May 9, 1973), 1973-1 C.B. 846
Re: Harless as Acting CIR (May 3, 1973).

(82)   T.D.O. 150-82, unpublished.

(83)   T.D.O. 150-83, 38 Fed. Reg. 23543 (Aug. 31, 1973), 1973-2 C.B. 508
Re: Competent or Taxation Authority (Aug. 21, 1973).

(84)   T.D.O. 150-84, unpublished.

(85)   T.D.O. 150-85, 41 Fed. Reg. 50523 (Nov. 16, 1976), 1976-2 C.B. 678
Re: National Office changes (Nov. 5, 1976).

(86)   T.D.O. 150-86, 42 Fed. Reg. 2151 (Jan. 10, 1977), 1977-1 C.B. 590
Re: N. Mariana SS tax (Dec. 31, 1976).

(87)   T.D.O. 150-87, 42 Fed. Reg. 40068 (Aug. 8, 1977), 1977-2 C.B. 584
Re: Tax checks of officials (July 29, 1977).
T.D.O. 150-87A, ___ Fed. Reg. ____, 1978-2 C.B. 568.

(88)   T.D.O. 150-88, 42 Fed. Reg. 61700 (Dec. 6, 1977), 1978-1 C.B. 598
Re: Immunity orders (Nov. 29, 1977).

(89)   T.D.O. 150-89, unpublished.

(90)   T.D.O. 150-90, 43 Fed. Reg. 12984 (March 28, 1978), 1978-1 C.B. 598
Re: National Office changes (Jan. 31, 1978).

(91)   T.D.O. 150-91, unpublished.

(92)   T.D.O. 150-92, 1979-2 C.B. 601
Re: Outer Continental Shelf Act (March 29, 1979).

(93)   T.D.O. 150-93, 46 Fed. Reg. 30746 (June 10, 1981), 1981-2 C.B. 732
Re: Transfer of office (June 29, 1981).

(94)   T.D.O. 150-94, 46 Fed. Reg. 45239 (Sept. 10, 1981)
Re: Houston District (Aug. 24, 1981).

(95)   T.D.O. 150-95, 47 Fed. Reg. 3464 (Jan. 25, 1982), 1982-1 C.B. 510
Re: Reorg. of National Office (Jan. 11, 1982).

(96)   T.D.O. 150-96, 47 Fed. Reg. 13267 (March 29, 1982), 1982-1 C.B. 511
Re: F.O.D. created (March 15, 1982).

(97)   T.D.O. 150-97, unpublished.

(98)   T.D.O. 150-98, 47 Fed. Reg. 44459 (Oct. 7, 1982)
Re: Del. to CIR re W.Va.P.S.C. (Sept. 14, 1982).

(99) T.D.O. 150-99, unpublished.

(100) T.D.O. 150-100, unpublished.

(101) T.D.O. 150-101, unpublished.

(102) T.D.O. 150-102, unpublished.

(103) T.D.O. 150-103, unpublished.

(104) T.D.O. 150-104, unpublished.

(105) T.D.O. 150-105, unpublished.

(106)  T.D.O. 150-106, 1985-2 C.B. 758
Re: Change from Reno to Vegas (Feb. 8, 1985).

(107)  T.D.O. 150-01, 51 Fed. Reg. 9571 (March 19, 1986), 1986-1 C.B. 686
Re: designation of districts (Feb. 27, 1986).
T.D.O. 150-01 (Rev.), 60 Fed. Reg. 52726 (Oct. 10, 1995), 1995-2 CB 460
This revision dated Sept. 28, 1995.

057

(108) T.D.O. 150-02, 51 Fed. Reg. 9573 (March 19, 1986), 1986-1 C.B. 688
Re: National Office changes (Feb. 27, 1986).
T.D.O. 150-02 (Rev.) , 51 Fed. Reg. 30022 (Aug. 21, 1986), 1986-2 C.B. 747
Re: National Office changes (July 30, 1986).
T.D.O. 150-02 (Rev.), 59 Fed. Reg. 3158 (Jan. 20, 1994), 1994-1 CB 721.
Re: National Office changes (Jan. 11, 1994).

(109) T.D.O. 150-19, 57 Fed. Reg. 23611, 1992-2 CB 591
Immunity orders delegated to CIR.

(110) Treasury Directive 15-42, 56 Fed. Reg. 21400, 1991-2 CB 902
Delegated money laundering powers to CIR.
Treasury Directive 15-42 (Rev.) 60 Fed. Reg. 48199, 1995-2 C.B. 459
Treasury Directive 15-42 (Rev.), 64 Fed.Reg. 6134 (Feb. 8, 1999)

(103) Treasury Directive 15-43, 60 Fed. Reg. 39203, 1995-2 C.B. 459
Delegation to CIR re misuse of Treasury name and symbol.

The following are the TDOs regarding creation of the BATF:

(A) T.D.O. 221, 37 Fed. Reg. 11696 (June 10, 1972), 1972-1 C.B. 777
Re: Creation of BATF (June 6, 1972).

(B) T.D.O. 221-1, 37 Fed. Reg. 13485 (July 8, 1972)
Order dated June 30, 1972.

(C) T.D.O. 221-2, 37 Fed. Reg. 20730 (Oct. 5, 1972)
Order dated Sept. 22, 1972.

(D) T.D.O. 221-3, 40 Fed. Reg. 1084 (Jan. 6, 1975), 1975-1 C.B. 759
Re: BATF (Dec. 24, 1974).

(E) T.D.O. 221-3 (Rev. 1), 41 Fed. Reg. 10079 (March 9, 1976), 1976-1 C.B. 584
Re: BATF (Feb. 21, 1976).

(D) T.D.O. 221-3 (Rev. 2), 42 Fed. Reg. 3725 (Jan. 19, 1977), 1977-1 C.B. 591
Re: BATF (Jan. 14, 1977).



# FEDERAL REGISTER

**VOLUME 17**   1934   **NUMBER 99**

*Washington, Tuesday, May 20, 1952*

## TITLE 6—AGRICULTURAL CREDIT

**Chapter IV—Production and Marketing Administration and Commodity Credit Corporation, Department of Agriculture**

Subchapter C—Loans, Purchases, and Other Operations

[1952 C. C. C. Grain Price Support Bulletin 1, Supp. 1, Winter Cover Crop Seed]

PART 601—GRAINS AND RELATED COMMODITIES

SUBPART—1952-CROP WINTER COVER CROP SEED LOAN AND PURCHASE AGREEMENT PROGRAM

A price support program has been announced for the 1952 crop of winter cover crop seeds named in § 601.1960 hereof. The 1952 C. C. C. Grain Price Support Bulletin 1, 17 F. R. 3521, issued by the Commodity Credit Corporation and containing the general requirements with respect to price support operations for grains and related commodities produced in 1952, is supplemented as follows:

Sec.
601.1951 Purpose.
601.1952 Availability of price support.
601.1953 Eligible seed.
601.1954 Warehouse receipts.
601.1955 Determination of quantity.
601.1956 Determination of quality.
601.1957 Loss or damage to seed under farm-storage loan.
601.1958 Warehouse and other charges.
601.1959 Maturity of loans.
601.1960 Schedule of basic specifications and rates.
601.1961 County rates.
601.1962 Delivery of seed to CCC.
601.1963 Settlement.

AUTHORITY: §§ 601.1951 to 601.1963 issued under sec. 4, Stat. 1070, as amended; 15 U. S. C. Sup. 714b. Interpret or apply sec. 5, 62 Stat. 1072, secs. 301, 401, 63 Stat. 1051; 15. U. S. C. Sup. 714, 7 U. S. C. Sup. 1447, 1421.

§ 601.1951 *Purpose.* This subpart states additional specific requirements which, together with those contained in the 1952 C. C. C. Grain Price Support Bulletin 1, 17 F. R. 3521, apply to loans and purchase agreements under the 1952-Crop Winter Cover Crop Seed Price Support Program.

§ 601.1952 *Availability of price support—*(a) *Method of support.* Price support will be available through farm-storage and warehouse-storage loans and purchase agreements for all seeds listed in § 601.1960.

(b) *Area.* Farm-storage and warehouse-storage loans and purchase agreements will be available to producers wherever any of the seeds listed in § 601.1960 are grown in the continental United States, except that farm-storage loans will not be available in areas where the PMA State committee determines that such seeds cannot be safely stored on the farm.

(c) *Where to apply.* Application for price support should be made at the office of the PMA county committee which keeps the farm-program records for the farm.

(d) *When to apply.* Loans and purchase agreements will be available to producers from the time of harvest through December 31, 1952, and the applicable documents must be signed by the producer and delivered to the county committee not later than such date.

(e) *Eligible producer.* (1) An eligible producer shall be an individual, partnership, association, corporation, or other legal entity producing seed listed in § 601.1960 in 1952 as landowner, landlord, tenant or sharecropper.

(2) Cooperative marketing associations of producers shall be deemed to be eligible producers for loans and purchase agreements: *Provided,* That (i) the producer members are bound by contract to market through the association; (ii) the major part of the seed marketed by the association is produced by members who are eligible producers; (iii) the members share proportionately in the proceeds from marketings according to the quantity and quality of seed each delivers to the association; (iv) the seed purchased from nonmembers is segregated at all times to assure that the seed placed under loan or delivered under a purchase agreement is seed grown by producer members; and (v) the association has the legal right to pledge or mortgage the seed as security for a loan or to sell the seed under a purchase agreement.

§ 601.1953 *Eligible seed.* At the time the seed is placed under loan or delivered

(Continued on p. 4555)

## CONTENTS

**Agriculture Department** Page
*See* Commodity Credit Corporation; Production and Marketing Administration.

**Atomic Energy Commission**
Colorado; withdrawing lands and minerals for use of the Commission (*see* Land Management, Bureau of).

**Civil Aeronautics Administration**
Rules and regulations:
Air carrier operating certificate; ceiling and visibility minimums_____ 4557
Danger areas; alterations_____ 4558

**Civil Aeronautics Board**
*See also* Civil Aeronautics Administration.
Notices:
Northwest Airlines, Inc.; final mail rate, trans-Pacific operations; hearing_____ 4599
Proposed rule making:
Conversion of speed and distance provisions of the Civil Air Regulations to knots and nautical miles_____ 4583

**Civil Service Commission**
Rules and regulations:
Appointment through the competitive service; delayed filing of applications_____ 4557

**Commerce Department**
*See* Civil Aeronautics Administration; Federal Maritime Board; National Production Authority.

**Commodity Credit Corporation**
Rules and regulations:
Winter cover crop seed; 1952-crop loan and purchase agreement program_____ 4553

**Defense Mobilization, Office of**
Rules and regulations:
Creating a Procurement Policy Board; changing the name of the Procurement Policy Board to Defense Procurement Policy Committee (DMO 13)____ 4561
Creating a committee on production policy (DMO 16)___ 4561

**Economic Stabilization Agency**
*See* Price Stabilization, Office of; Rent Stabilization, Office of.
4553

Secretary of the Treasury under date of May 8, 1952:

Pursuant to Reorganization Plan No. 1 of 1952, Reorganization Plan No. 26 of 1950, and section 3930 of the Internal Revenue Code, the Assistant General Counsel whose office was established by Reorganization Plan No. 1 of 1952 shall serve as chief counsel for the Bureau of Internal Revenue, and all the authority, duties, and functions pertaining to the Bureau of Internal Revenue set forth in Order Delegating Authority, dated September 21, 1937, as amended, are delegated to that Assistant General Counsel, effective upon the entrance on duty of the first incumbent of the position.

THOMAS J. LYNCH,
*General Counsel.*

Approved:

JOHN W. SNYDER,
*Secretary of the Treasury.*

[F. R. Doc. 52–5610; Filed, May 19, 1952; 8:57 a. m.]

---

[Treasury Department Order No. 150–1]

ASSISTANT GENERAL COUNSEL FOR BUREAU OF INTERNAL REVENUE

ABOLITION OF OFFICE

The following order was issued by the Secretary of the Treasury under date of May 8, 1952:

Pursuant to the provisions of section 1 of Reorganization Plan No. 1 of 1952, the office of Assistant General Counsel for the Bureau of Internal Revenue, provided for in section 3931 of the Internal Revenue Code, is abolished, effective upon the entrance on duty of the Assistant General Counsel appointed pursuant to section 2 (b) of Reorganization Plan No. 1 of 1952.

JOHN W. SNYDER,
*Secretary of the Treasury.*

[F. R. Doc. 52–5611; Filed, May 19, 1952; 8:57 a. m.]

---

[Treasury Department Order No. 150–2]

COMMISSIONER OF INTERNAL REVENUE

DELEGATION OF GENERAL AUTHORITY OVER FUNCTIONS IN BUREAU OF INTERNAL REVENUE

By virtue of the authority vested in me by Reorganization Plan No. 26 of 1950, there are hereby transferred to the Commissioner of Internal Revenue, to the extent not heretofore transferred to him, the functions of all officers, employees, and agencies of the Bureau of Internal Revenue, except the functions of the Assistant General Counsel serving as chief counsel for the Bureau of Internal Revenue.

The functions herein transferred may be delegated by the Commissioner to subordinates in the Bureau of Internal Revenue in such manner as he shall from time to time direct.

This order shall become effective as of May 15, 1952.

Dated: May 15, 1952.

[SEAL]       JOHN W. SNYDER,
*Secretary of the Treasury.*

[F. R. Doc. 52–5569; Filed, May 19, 1952; 8:55 a. m.]

---

[Treasury Department Order No. 150–3]

BUREAU OF INTERNAL REVENUE; REORGANIZATION

ABOLITION OF OFFICES OF COLLECTORS AND DEPUTY COLLECTORS OF ILLINOIS COLLECTION DISTRICTS; ESTABLISHMENT OF OFFICES OF DISTRICT COMMISSIONER AND DIRECTORS OF INTERNAL REVENUE

By virtue of the authority vested in me as Secretary of the Treasury by Reorganization Plan No. 26 of 1950 and Reorganization Plan No. 1 of 1952:

1. *Abolition of existing offices.* The abolition of the offices of Collector of Internal Revenue and Deputy Collector for the First and Eighth Collection Districts of Illinois shall become effective as of 12 o'clock midnight, May 19, 1952.

2. *Establishment of District Commissioner.* Effective as of 12:01 a. m., May 20, 1952, there is hereby established within the State of Illinois, and for such State, an office of District Commissioner of Internal Revenue.

3. *Name and composition of District.* The District hereby created shall be known as the Chicago District and shall be comprised of the entire State of Illinois.

4. *Location of headquarters.* The headquarters office shall be located in the City of Chicago, Illinois.

5. *Establishment of offices of Director of Internal Revenue.* Effective as of 12:01 a. m., May 20, 1952, there are hereby created the following offices within the Chicago District:

(a) Director of Internal Revenue for the First Collection District of Illinois (as presently constituted). Such office shall have the operating title of Director of Internal Revenue, Chicago.

(b) Director of Internal Revenue for the Eighth Collection District of Illinois (as presently constituted). Such office shall have the operating title of Director of Internal Revenue, Springfield.

Dated: May 15, 1952.

[SEAL]       JOHN W. SNYDER,
*Secretary of the Treasury.*

[F. R. Doc. 52–5570; Filed, May 19, 1952; 8:55 a. m.]

---

# VETERANS' ADMINISTRATION

STATEMENT OF ORGANIZATION

The Veterans' Administration Statement of Organization (15 F. R. 7851, 16 F. R. 2450, and 16 F. R. 5029) is further amended as follows:

1. In section 1, paragraph (b) (2) is amended to read as follows:

SECTION 1. *General.* • • •

(b) *General description of organization.* • • •

(2) The Veterans' Administration is organizationally divided as follows:

Central office, district offices, regional offices, hospitals, centers, domiciliaries, VA offices, supply depots, forms depots, records service center, and publications depot.

2. In section 2, paragraphs (f), (h), (l), (l), and (m) are amended to read as follows:

SEC. 2. *Central office.* • • •

(f) *Office of the assistant administrator for contact and administrative services*—(1) *Mission.* Formulates policies, plans, and procedures for the contact and administrative services of the Veterans' Administration; exercises direct supervision over activites under the immediate jurisdiction of the central office; and maintains staff supervision over counterpart activities located in field stations.

(2) *Major functions.* The office of the assistant administrator for contact and administrative services performs the following major functions:

(i) Administers the security information program within the Veterans' Administration and in this connection formulates policies, standards, and procedures for the transmission, handling, and safeguarding of official information in consonance with Executive Order 10290, dated September 24, 1951; maintains continuing staff supervision and appraisal of contact and administrative services activities at all operating locations.

(ii) Conducts a program concerned with furnishing advice and assistance to veterans, their beneficiaries and dependents at the central office and formulates policies, standards, and procedures for such activity at field stations.

(iii) Formulates policies, standards, and procedures for: (a) Receipt, disposition, and dispatch of mailable matter, (b) provision of messenger or courier service, (c) indexing and identification of applications for benefits and related material, (d) initial development of benefit claims including acquisition and consolidation of service or other evidentiary data from defense establishments or other sources, (e) custody, maintenance, and movement of veterans' records and centralized general administrative files, (f) segregation and physical disposition of records, (g) procurement of common carrier or other transportation for persons, (h) installation and use of machine records and accounting equipment, (i) procurement and utilization of electrical communicating equipment, and (j) provision of information reception service; maintains liaison with other agencies on records operations and procedures including the procurement and transfer of records to and from those agencies.

(iv) Formulates policies, standards, and procedures for the procurement or production, stockage, and distribution of printed and duplicated material, and the production, control, and distribution of graphic arts, exhibits, and visual aids; furnishes technical assistance in the operation of therapeutic printing plants; provides printing or duplicating and distribution services.

(v) Administers the records management program involving formulation of policies, standards, and procedures for the creation, classification, maintenance,



# FEDERAL REGISTER

**VOLUME 17**     **1934**     **NUMBER 126**

## Washington, Friday, June 27, 1952

---

## TITLE 3—THE PRESIDENT

### EXECUTIVE ORDER 10366

AMENDING THE SELECTIVE SERVICE REGULATIONS

By virtue of the authority vested in me by title I of the Universal Military Training and Service Act (62 Stat. 604), as amended, I hereby prescribe the following amendment of the Selective Service Regulations prescribed by Executive Order No. 10292 [1] of September 25, 1951, and constituting a portion of Chapter XVI of Title 32 of the Code of Federal Regulations:

Section 1622.23 of Part 1622, *Classification Rules and Principles*, is amended to read as follows:

§ 1622.23 *Necessary employment defined.* (a) Except as otherwise provided in paragraph (b) of this section, a registrant's employment in industry or other occupation, service in office, or activity in research, or medical, scientific, or other endeavors, shall be considered to be necessary to the maintenance of the national health, safety, or interest only when all of the following conditions exist:

(1) The registrant is, or but for a seasonal or temporary interruption would be, engaged in such activity.

(2) The registrant cannot be replaced because of a shortage of persons with his qualifications or skill in such activity.

(3) The removal of the registrant would cause a material loss of effectiveness in such activity.

(b) A registrant's activity as an apprentice in an apprentice training program may be considered to be necessary to the maintenance of the national health, safety, or interest when all of the following conditions exist:

(1) The apprentice training program meets the standards and requirements prescribed by the Director of Selective Service based upon the recommendations of the Secretary of Labor.

(2) The program has been accepted by the Director of Selective Service for deferment purposes.

[1] 16 F. R. 9843.

(3) The registrant has satisfactorily completed in the program a minimum amount of training prescribed by the Director of Selective Service.

(4) The registrant is satisfactorily pursuing his training in the program and meeting the requirements, and standards of performance prescribed by the Director of Selective Service.

(c) The President may, from time to time (1) designate special categories of occupation, employment, or activity essential to the national health, safety, or interest; and (2) prescribe regulations governing the deferment of individual registrants engaged in such occupations, employments, or activities.

HARRY S. TRUMAN

THE WHITE HOUSE,
*June 26, 1952.*

[F. R. Doc. 52-7165; Filed, June 26, 1952; 1:48 p. m.]

---

## TITLE 7—AGRICULTURE

### Chapter IV—Federal Crop Insurance Corporation, Department of Agriculture

[Appendix 1]

PART 416—CORN CROP INSURANCE

SUBPART—REGULATIONS FOR THE 1950 AND SUCCEEDING CROP YEARS

Pursuant to authority contained in paragraph (a) of § 416.1 of the above-identified regulations, as amended (14 F. R. 5290, 6674; 15 F. R. 4161, 6739, 9032; 16 F. R. 7695, 9301; 17 F. R. 2109), the following counties have been designated for insurance for the 1952 crop year.

| Illinois: | Illinois—Con. |
|---|---|
| Adams. | Montgomery. |
| Bureau. | Rock Island. |
| Carroll. | Sangamon. |
| Hancock. | Stark. |
| Iroquois. | Tazewell. |
| Kane. | Warren. |
| Livingston. | Whiteside. |
| McDonough. | Will. |
| Mercer. | Woodford. |

(Continued on p. 5751)

---

## CONTENTS

### THE PRESIDENT

**Executive Order**    **Page**
Amending the Selective Service Regulations _____ 5749

### EXECUTIVE AGENCIES

**Agriculture Department**
*See* Federal Crop Insurance Corporation; Production and Marketing Administration.

**Alien Property, Office of**
Notices:
Joost, Martin _____ 5783
Ludewig, Anna Katharina Friederike _____ 5784

**Army Department**
Rules and regulations:
National cemeteries; miscellaneous amendments _____ 5761
Reserve Officers' Training Corps; transportation _____ 5761

**Civil Aeronautics Administration**
Notices:
Airport District Offices; consolidation:
Delaware, Maryland, New Jersey, Pennsylvania, and Virginia _____ 5777
Kansas and Missouri _____ 5777

**Civil Aeronautics Board**
Notices:
Service to Melbourne, Fla.; postponement of oral argument __ 5777
Rules and regulations:
Alaskan air carriers, classification and exemption; cancellation of inactive letters of registration of Alaskan pilot-owners _____ 5759

**Commerce Department**
*See* Civil Aeronautics Administration.

**Customs Bureau**
Rules and regulations:
Drawback; time allowed for filing and completion of claims __ 5759
Liability for duties, entry of imported merchandise; liquidation of import entries on the basis of customs assay _____ 5759

5749

1. In addition to the authority delegated to the District Commissioner for he New York City District by Commisioner's Reorganization Order No. NYC-' the District Commissioner for the New York City District is hereby vested with general supervision over the operations of the following offices with respect o areas outside of such District.

(a) The New York District Intelligence Division (comprised of Puerto Rico, the State of New York, and the Fifth Collection District of New Jersey);

(b) The Alcohol and Tobacco Tax Supervisory District No. 2 (comprised of Puerto Rico and the State of New York); and

(c) The New York District of the Appellate Staff (comprised of the State of New York), subject, however, to the provisions of Commissioner's Reorganization Order No. 2 (relating to the functions of the Appellate Division).

2. In addition to the authority delegated to the Director of Internal Revenue, Upper Manhattan, by Commissioner's Reorganization Order No. NYC-1, such Director is hereby vested with general supervision over the operations of the Internal Revenue Agent in Charge, Upper New York Revenue Agents District with respect to functions pertaining to areas outside of the Third Collection District of New York.

3. Pending the issuance of further instructions, officers, agencies and employees of the offices listed in paragraph 1 shall continue to perform the functions they were authorized to perform immediately prior to the effective date of this order in accordance with authorized regulations and procedures in effect at such time.

4. This order shall be effective as of 12:01 a. m., July 1, 1952.

Dated June 23, 1952.

[SEAL]             JOHN B. DUNLAP,
                     Commissioner.

[F. R. Doc. 52-7059; Filed, June 26, 1952; 8:58 a. m.]

---

## Office of the Secretary

[Treasury Department Order No. 150-4]

BUREAU OF INTERNAL REVENUE; REORGANIZATION

ABOLITION OF OFFICES OF COLLECTORS AND DEPUTY COLLECTORS OF FIRST, SECOND AND THIRD NEW YORK COLLECTION DISTRICTS; ESTABLISHMENT OF OFFICES OF DISTRICT COMMISSIONER AND DIRECTORS OF INTERNAL REVENUE

By virtue of the authority vested in me as Secretary of the Treasury by Reorganization Plan No. 26 of 1950 and Reorganization Plan No. 1 of 1952:

1. *Abolition of existing offices.* The abolition of the offices of Collector of Internal Revenue and Deputy Collector for the First, Second and Third Collection Districts of New York shall become effective as of 12 o'clock midnight, June 30, 1952.

¹ For Commissioner's Reorganization Order No. NYC-1. See F. R. Doc. 52-7058, *supra.*

---

2. *Establishment of District Commissioner.* Effective as of 12:01 a. m., July 1, 1952, there is hereby established within the City of New York an office of District Commissioner of Internal Revenue.

3. *Name and composition of District.* The District hereby created shall be known as the New York City District and shall be comprised of the following territory: The Counties of Kings, Nassau, New York, Queens, Richmond, and Suffolk, and Randalls Island, Wards Island and Blackwells Island (which territory presently comprises the First, Second and Third Collection Districts of New York.)

4. *Location of headquarters.* The headquarters office shall be located in the City of New York, New York.

5. *Establishment of offices of Director of Internal Revenue.* Effective as of 12:01 a. m., July 1, 1952, there are hereby created the following offices within the New York City District:

(a) Director of Internal Revenue for the First Collection District of New York (as presently constituted). Such office shall have the operating title of Director of Internal Revenue, Brooklyn.

(b) Director of Internal Revenue for the Second Collection District of New York (as presently constituted). Such office shall have the operating title of Director of Internal Revenue, Lower Manhattan.

(c) Director of Internal Revenue for the Third Collection District of New York (as presently constituted). Such office shall have the operating title of Director of Internal Revenue, Upper Manhattan.

Dated: June 23, 1952.

[SEAL]             JOHN W. SNYDER,
                 *Secretary of the Treasury.*

[F. R. Doc. 52-7057; Filed, June 26, 1952; 8:57 a. m.]

---

# DEPARTMENT OF THE INTERIOR

## Bureau of Land Management

### NEVADA

CLASSIFICATION ORDER

JUNE 13, 1952.

1. Pursuant to the authority delegated to me by the Director, Bureau of Land Management, by Order No. 427 dated August 16, 1950, I hereby classify under the Small Tract Act of June 1, 1938 (52 Stat. 609), as amended July 14, 1945 (59 Stat. 467, 43 U. S. C. 682a), as hereinafter indicated, the following described land in the Nevada land district, embracing approximately 200 acres.

NEVADA SMALL TRACT CLASSIFICATION NO. 88

For lease and sale for homesites only:
T. 17 N., R. 20 E., M. D. M.
  Sec. 18. W½SE¼, NE¼SW¼, SE¼SW¼ and N½ of Lot 2 of the SW¼ (or NW¼ SW¼).

Leases for tracts in the NW¼SW¼ will not be issued until a supplemental plat has been prepared, dividing the irregular acreage and assigning tract numbers.

---

The land is situated in Washoe County, Nevada, about 15 miles south of Reno, Nevada. It can be reached over Highway 395. All community services are available in Reno, Nevada, and also at Carson City, Nevada, which is 15 miles south of the land. The area is one that is used extensively for recreational purposes during the summer seasons.

2. As to applications regularly filed prior to 9:00 a. m., June 9, 1952, and are for the type of site for which the land is classified, this order shall become effective upon the date it is signed.

3. This order shall not otherwise become effective to change the status of such lands until 10:00 a. m. on the 35th day after the date of this order. At that time the said lands shall, subject to valid existing rights and the provisions of existing withdrawals, become subject to application, petition, location, and selection as follows:

(a) *Ninety-one day period for preference-right filings.* For a period of 91 days, commencing at the hour and on the day specified above, the public lands affected by this order shall be subject only to application under the Small Tract Act of June 1, 1938; 52 Stat. 609 (43 U. S. C. 682a), as amended, by qualified veterans of World War II, subject to the requirements of applicable law. All applications filed under this paragraph either at or before 10:00 a. m. on the 35th day after the date of this order shall be treated as though filed simultaneously at that time. All applications filed under this paragraph after 10:00 a. m. on the said 35th day shall be considered in the order of filing.

(b) *Date for non-preference-right filings.* Commencing at 10:00 a. m. on the 126th day after the date of this order, any lands remaining unappropriated shall become subject to such application, petition, location, selection, or other appropriation by the public generally as may be authorized by the public-land laws. All such applications filed either at or before 10:00 a. m. on the 126th day after the date of this order, shall be treated as though filed simultaneously at the hour specified on such 126th day. All applications filed thereafter shall be considered in the order of filing.

4. A veteran shall accompany his application with a complete photostatic, or other copy (both sides), of his certificate of honorable discharge, or of an official document of his branch of the service which shows clearly his honorable discharge as defined in § 181.36 of Title 43 of the Code of Federal Regulations, or constitutes evidence of other facts upon which the claim for preference is based and which shows clearly the period of service. Other persons claiming credit for service of veterans must furnish like proof in support of their claims. Persons asserting preference rights, through settlement or otherwise, and those having equitable claims, shall accompany their application by duly corroborated statements in support thereof, setting forth in detail all facts relevant to their claims.

5. All of the lands will be leased in tracts of approximately 5 acres, each



# FEDERAL REGISTER

**VOLUME 17** · 1934 · **NUMBER 153**

### Washington, Wednesday, August 6, 1952

---

## TITLE 7—AGRICULTURE

Chapter I—Production and Marketing Administration (Standards, Inspections, Marketing Practices), Department of Agriculture

Subchapter A—Commodity Standards and Standard Container Regulations

PART 44—UNITED STATES STANDARDS FOR GRADES OF EDIBLE SUGARCANE MOLASSES

In F. R. Doc. 52–7571, appearing in the issue for Thursday, July 10, 1952 (17 F.R. 6181), in the second column on page 6181, line fourteen of paragraph (b) of § 44.3, and line 5 in the third column on page 6183, paragraph (a) of § 44.4 are corrected to have the total sulfites read as follows: "not more than 250 parts".

Issued this 31st day of July 1952.

[SEAL]     ROY W. LENNARTSON,
    *Assistant Administrator, Production and Marketing Administration.*

[F. R. Doc. 52–8566; Filed, Aug. 5, 1952; 8:48 a. m.]

---

## TITLE 9—ANIMALS AND ANIMAL PRODUCTS

Chapter I—Bureau of Animal Industry, Department of Agriculture

Subchapter A—Meat Inspection Regulations

PART 9—ANTE-MORTEM INSPECTION

PART 11—DISPOSAL OF DISEASED CARCASSES AND PARTS

MISCELLANEOUS AMENDMENTS

On July 3, 1952, there was published in the FEDERAL REGISTER (17 F. R. 5995) a notice of proposed amendments of the regulations governing the meat inspection of the United States Department of Agriculture (9 CFR, Chapter 1, Subchapter A, as amended). After due consideration of all relevant matters presented and pursuant to the authority conferred upon me by the Meat Inspection Act, as amended (21 U. S. C. 71–91), the aforesaid regulations are hereby amended as follows:

1. Section 9.6 is amended to read as follows:

§ 9.6 *Animals showing symptoms of anaplasmosis, leptospirosis, listerellosis, parturient paresis, rabies, railroad sick-*

ness, *or tetanus.* (a) All animals showing on ante-mortem inspection symptoms of anaplasmosis, leptospirosis, listerellosis, parturient paresis, rabies, railroad sickness, or tetanus shall be marked "U. S. condemned" and disposed of in accordance with § 9.16, except that cattle showing symptoms of anaplasmosis, leptospirosis, listerellosis, parturient paresis, or railroad sickness may be set apart and held for treatment under division or other responsible official supervision. If, at the expiration of the treatment period, animals upon examination are found to be free from disease, they may be released for any purpose in accordance with § 9.16, except that when released for slaughter at the official establishment, animals which have been previously affected with listerellosis shall be marked "U. S. suspect."

(b) Animals which have reacted to a test for leptospirosis, but which show no symptoms of the disease, shall be marked "U. S. suspect."

2. Section 9.16 is amended to read as follows:

§ 9.16 *Disposition of condemned animals.* Except as otherwise provided in this part, animals marked "U. S. condemned" shall be killed by the official establishment, if not already dead. Such animals shall not be taken into an establishment to be slaughtered or dressed; nor shall they be conveyed into any department of the establishment used for edible products; but they shall be disposed of and tanked in the manner provided for condemned carcasses in Part 14 of this subchapter. The "U. S. condemned" tag shall not be removed from, but shall remain on, the carcass until it goes into the tank at which time, the tag may be removed by a division employee only. The number of such tag shall be reported to the inspector in charge by the inspector who affixed it, and also by the inspector who supervised the tanking of the carcass. Any animal condemned on account of hog cholera, swine erysipelas, vesicular exanthema, vesicular stomatitis, railroad sickness, parturient paresis, anasarca, anaplasmosis, leptospirosis, listerellosis, or inflammatory condition including pneumonia, enteritis, and peritonitis, may be set apart and held for treatment under division or other responsible official supervision. The "U. S.

(Continued on p. 7137)

---

## CONTENTS

| | Page |
|---|---|
| **Agriculture Department** | |
| *See* Animal Industry Bureau; Production and Marketing Administration. | |
| **Alien Property, Office of** | |
| Notices: | |
| Vesting orders, etc.: | |
| Carmona, Jesus N | 7173 |
| Fisher, Minna | 7173 |
| Halbach, Anna Nargareth Kohl | 7174 |
| Kuhmann, Margarete | 7173 |
| Nationals of The Netherlands | 7174 |
| **Animal Industry Bureau** | |
| Rules and regulations: | |
| Ante-mortem inspection; disposal of diseased carcasses and parts; miscellaneous amendments | 7135 |
| Labeling | 7137 |
| **Army Department** | |
| Rules and regulations: | |
| Safeguarding security information | 7140 |
| **Census Bureau** | |
| Rules and regulations: | |
| Foreign trade statistics; reports of vessel entrances and clearances | 7138 |
| **Civil Aeronautics Board** | |
| Rules and regulations: | |
| Operations; pursuant to exemption authority | 7137 |
| **Commerce Department** | |
| *See* Census Bureau; International Trade, Office of. | |
| **Customs Bureau** | |
| Rules and regulations: | |
| Liability for duties, entry of imported merchandise; packing, stamping and marking, trademarks, trade-names and copyrights; additional information on customs invoices | 7139 |
| **Defense Department** | |
| *See also* Army Department. | |
| Notices: | |
| Chairman of Joint Chiefs of Staff; delegation of authority with respect to the Whittier Defensive Sea Area | 7160 |

7160

NOTICES

## 8. *Review Division.*

8. *Review Division.* Reviews all inspection reports for the following purposes: Ascertains whether or not the inspection manuals have been followed and whether inspections have been thorough; advises the Assistant Commissioner (Inspection) of those situations requiring immediate attention and insures that inspection reports are uniform and clear; takes corrective action on any reports containing serious errors. Reviews promotions and appointments of key personnel for the purpose of providing operating officials with all pertinent information; cooperates closely with other Divisional activities of the Inspection Service.

9. *Administrative Division.* Is responsible for the performance of the administrative functions of the Inspection Service, covering preparation, control and maintenance of budget allotment; considers and passes on requests from Chief Inspectors for the allowance of funds for travel and miscellaneous operating expenses and maintains allowance records for controlling such expenses; acts on requests for office furniture, equipment and non-expendable items of supply; considers space request accommodations; executes the Bureau personnel program as it pertains to the Inspection Service; initially interviews position applicants; advises offices of Chief Inspectors on a wide variety of subject-matter coverage; prepares instructions issued by the Inspection Service pertaining to administrative matters; prepares periodic and special non-recurring reports pertaining to the activities of the Inspection Service, and represents the Assistant Commissioner (Inspection) at the Washington and field level on all matters of an administrative nature.

[F. R. Doc. 52-8577; Filed, Aug. 5, 1952; 8:49 a. m.]

---

## Fiscal Service, Bureau of Accounts

[Dept. Circ. 570, Rev. Apr. 20, 1943, 1952, 77th Supp.]

### WESTERN FIRE INSURANCE CO.

SURETY COMPANIES ACCEPTABLE ON FEDERAL BONDS

JULY 31, 1952.

A Certificate of Authority has been issued by the Secretary of the Treasury to the following company under the act of Congress approved July 30, 1947, 6 U. S. C. sections 6–13, as an acceptable surety on Federal bonds. An underwriting limitation of $332,000.00 has been established for the company. Further details as to the extent and localities with respect to which the company is acceptable as surety on Federal bonds will appear in the next issue of Treasury Department Form 356, copies of which, when issued, may be obtained from the Treasury Department, Bureau of Accounts, Section of Surety Bonds, Washington 25, D. C.

NAME OF COMPANY, LOCATION OF PRINCIPAL EXECUTIVE OFFICE AND STATE IN WHICH INCORPORATED

KANSAS

The Western Fire Insurance Company, Fort Scott.

[SEAL]          JOHN W. SNYDER,
                *Secretary of the Treasury.*

[F. R. Doc. 52-8592; Filed, Aug. 5, 1952; 8:50 a. m.]

---

## Office of the Secretary

[Treasury Department Order No. 150–5]

BUREAU OF INTERNAL REVENUE; REORGANIZATION

ABOLITION OF CERTAIN OFFICES IN WASHINGTON HEADQUARTERS AND DETERMINATION OF TITLES OF NEW OFFICES

By virtue of the authority vested in me as Secretary of the Treasury by Reorganization Plan No. 26 of 1950 and Reorganization Plan No. 1 of 1952:

1. *Abolition of certain existing offices.* The abolition of the offices of Assistant Commissioner, Special Deputy Commissioner and Deputy Commissioner for the Bureau of Internal Revenue shall become effective at 12:00 p. m., midnight, August 10, 1952.

2. *Establishment of new offices.* It is hereby determined, pursuant to section 2 of Reorganization Plan No. 1 of 1952, that there shall be in the Washington Headquarters office of the Bureau of Internal Revenue, effective August 11, 1952, offices having titles as follows:

Assistant to the Commissioner.
Administrative Assistant to the Commissioner.
Head, Alcohol and Tobacco Tax Division.
Head, Appellate Division.
Head, Audit Division.
Head, Collection Division.
Head, Field Management and Planning Division.
Head, Intelligence Division.
Head, Technical Rulings Division.
Head, Technical Planning Division.
Head, Special Technical Services Division.
Executive Assistant, Office of Assistant Commissioner (Inspection).
Executive Assistant, Office of Assistant Commissioner (Inspection).

3. The offices of "Assistant Commissioner of Internal Revenue", for operational purposes, are hereby designated as Assistant Commissioner (Operations), Assistant Commissioner (Technical), and Assistant Commissioner (Inspection), respectively.

Dated: July 29, 1952.

[SEAL]          JOHN W. SNYDER,
                *Secretary of the Treasury.*

[F. R. Doc. 52-8576; Filed, Aug. 5, 1952; 8:49 a. m.]

---

# DEPARTMENT OF DEFENSE

## Office of the Secretary

CHAIRMAN OF THE JOINT CHIEFS OF STAFF

DELEGATION OF AUTHORITY WITH RESPECT TO WHITTIER DEFENSIVE SEA AREA

By virtue of the authority vested in me by Executive Order 10361, June 11, 1952, 17 F. R. 5357, and pursuant to section 202 (f) of the National Security Act of 1947, as amended, 5 USC 171a, the following designation and delegation of authority is effective this date.

1. The Chairman of the Joint Chiefs of Staff shall exercise the functions, duties and powers (including the power of designation) conferred upon me by Paragraphs 1, 2, 3 and 4 of said Executive Order 10361.

2. The Chairman of the Joint Chiefs of Staff, as he deems necessary, may designate any officer or employee, military or civilian, of the Department of Defense to exercise in whole or in part the authority conferred upon said Chairman of the Joint Chiefs of Staff under Paragraph 1, hereof.

3. The Chairman of the Joint Chiefs of Staff shall have published in the FEDERAL REGISTER any designation made under Paragraph 2, hereof.

                ROBERT A. LOVETT,
                *Secretary of Defense.*

JULY 30, 1952.

[F. R. Doc. 52-8536; Filed, Aug. 5, 1952; 8:45 a. m.]

---

### MUNITIONS BOARD

ORGANIZATION AND FUNCTIONS

I. *Authority and purpose.* This directive is issued pursuant to the authority vested in the Secretary of Defense by the National Security Act of 1947, as amended, in order more fully to define the authority and duties of the Munitions Board (hereinafter called the "Board"), established by section 213 of said act, and to define the relationships of the Board with the military departments and other agencies of the Department of Defense, and more fully to define the authority and duties of the Chairman of the Board.

II. *Directive rescinded.* The directive of November 3, 1949, entitled "Munitions Board Charter," as amended by the directive dated September 13, 1950, is hereby rescinded. All other directives of the Secretary of Defense addressed to or relating to the Board or its Chairman shall remain in effect until specifically modified or rescinded by the Secretary of Defense.

III. *Membership.* The Board shall be composed of a civilian Chairman, appointed by the President, who shall be the head thereof, and an Under or assistant Secretary from each of the military departments to be designated by the Secretary of each department. The Secretary of each of the military departments shall also designate an alternate who shall be an Under Secretary or an Assistant Secretary of the department, and who, in the absence of his principal, shall act in his stead with powers of his principal. The Chairman, with the approval of the Secretary of Defense, may designate a Vice Chairman, who shall, in the absence or disability of the Chairman, act for and exercise the powers of the Chairman. In the absence of the duly appointed Chairman and Vice Chairman, the Secretary of Defense will designate a Board member to act as Chairman.

IV. *Authority—A. Authority of the Chairman.* 1. The Chairman of the Board shall be the head thereof and shall, subject to the authority of the Secretary of Defense, have the power of decision upon all matters falling within the jurisdiction of the Board. He shall be the principal advisor and assistant to

064



# FEDERAL REGISTER

VOLUME 17      1934      NUMBER 176

*Washington, Tuesday, September 9, 1952*

## TITLE 6—AGRICULTURAL CREDIT

### Chapter III—Farmers Home Administration, Department of Agriculture

#### Subchapter B—Farm Ownership Loans

#### PART 311—BASIC REGULATIONS

#### SUBPART B—LOAN LIMITATIONS

##### AVERAGE VALUE OF FARMS AND INVESTMENT LIMITS; CERTAIN STATES

For the purposes of title I of the Bank-head-Jones Farm Tenant Act, as amended, average values of efficient family-type farm-management units and investment limits for the counties identified below are determined to be as herein set forth. The average values and investment limits heretofore established for said counties, which appear in the tabulations of average values and investment limits under § 311.30, Chapter III, Title 6 of the Code of Federal Regulations, are hereby superseded by the average values and investment limits set forth below for said counties.

###### ARIZONA

| County | Average value | Investment limit |
|---|---|---|
| Cochise | $25,000 | $12,000 |
| Yuma | 35,000 | 12,000 |

###### FLORIDA

| County | Average value | Investment limit |
|---|---|---|
| Alachua | $15,000 | $12,000 |
| Citrus | 12,000 | 12,000 |
| Hernando | 12,000 | 12,000 |
| Pasco | 12,000 | 12,000 |

###### MAINE

| County | Average value | Investment limit |
|---|---|---|
| Androscoggin | $12,000 | $12,000 |
| Oxford | 15,000 | 12,000 |
| Piscataquis | 12,000 | 12,000 |
| Somerset | 12,000 | 12,000 |

###### MINNESOTA

| County | Average value | Investment limit |
|---|---|---|
| Meeker | $24,000 | $12,000 |

###### NEW HAMPSHIRE

| County | Average value | Investment limit |
|---|---|---|
| Carroll | $12,000 | $12,000 |

###### NEW MEXICO

| County | Average value | Investment limit |
|---|---|---|
| Chaves | $30,000 | $12,000 |
| Colfax | 25,000 | 12,000 |
| De Baca | 25,000 | 12,000 |
| Eddy | 30,000 | 12,000 |
| Guadalupe | 25,000 | 12,000 |
| Lea | 25,000 | 12,000 |
| Lincoln | 25,000 | 12,000 |
| Mora | 25,000 | 12,000 |
| San Miguel | 25,000 | 12,000 |
| Valencia | 25,000 | 12,000 |

###### WYOMING

| County | Average value | Investment limit |
|---|---|---|
| Campbell | $25,000 | $12,000 |

(Sec. 41 (1), 60 Stat. 1066; 7 U. S. C. 1015 (1). Interprets or applies secs. 3 (a), 44 (b), 60 Stat. 1074, 1069; 7 U. S. C. 1003 (a), 1018 (b))

Issued this 4th day of September 1952.

[SEAL]     CHARLES F. BRANNAN,
*Secretary of Agriculture.*

[F. R. Doc. 52-9812; Filed, Sept. 8, 1952; 8:48 a. m.]

## TITLE 7—AGRICULTURE

### Chapter IX—Production and Marketing Administration (Marketing Agreements and Orders), Department of Agriculture

#### PART 940—PEACHES GROWN IN THE COUNTY OF MESA IN COLORADO

##### DETERMINATION RELATIVE TO EXPENSES AND FIXING OF RATE OF ASSESSMENT FOR 1952-53 FISCAL YEAR

Notice was published in the August 14, 1952, daily issue of FEDERAL REGISTER (17 F. R. 7398) that consideration was being given to proposals regarding the expenses and the fixing of the rate of assessment for the 1952-53 fiscal year under the marketing agreement, as amended, and Order No. 40, as amended (7 CFR Part 940) regulating the handling of peaches grown in the County of Mesa in Colorado, effective under the applicable provisions of the Agricultural Marketing Agreement Act of 1937, as amended.

(Continued on p. 8115)

## CONTENTS

| | Page |
|---|---|
| **Agriculture Department** | |
| *See* Farmers Home Administration; Production and Marketing Administration. | |
| **Alien Property, Office of** | |
| Notices: | |
| Vesting orders, etc.: | |
| Universitaet Breslau | 8138 |
| Woseczek, Karl | 8142 |
| **Civil Aeronautics Administration** | |
| Rules and regulations: | |
| Standard instrument approach procedures; alterations | 8116 |
| Testimony by employees and production of records in legal proceedings | 8116 |
| **Civil Aeronautics Board** | |
| Notices: | |
| U. S. Airlines, Inc.; enforcement proceedings; postponement of hearing | 8130 |
| **Commerce Department** | |
| *See also* Civil Aeronautics Administration; National Production Authority. | |
| Rules and regulations: | |
| Disposal of foreign excess property; excess property fabricated from critical materials; revocation | 8120 |
| **Customs Bureau** | |
| Proposed rule making: | |
| "Clean content" of imported wool and hair | 8124 |
| **Economic Stabilization Agency** | |
| *See* Price Stabilization, Office of. | |
| **Farmers Home Administration** | |
| Rules and regulations: | |
| Average values of farms and investment limits; loan limitations in certain States | 8113 |
| **Federal Communications Commission** | |
| Notices: | |
| Chief of Field Engineering and Monitoring Bureau; delegation of authority with respect to handling applications for commercial radio operator licenses | 8132 |
| | 8113 |